# In the United States Court of Appeals for the Sixth Circuit

---

BUCKEYE INSTITUTE,
*Plaintiff-Appellee,*

v.

INTERNAL REVENUE SERVICE; WILLIAM LONG,
in his official capacity as Commissioner of Internal Revenue;
U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT,
in his official capacity as Secretary of the Treasury,
*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus
Case No. 2:22-cv-04297 (The Hon. Michael H. Watson)

---

## BRIEF FOR AMICUS CURIAE TAX LAW CENTER AT NYU LAW IN SUPPORT OF DEFENDANTS-APPELLANTS

---

BRANDON DEBOT
THE TAX LAW CENTER AT NYU LAW
110 West 3rd Street #204
New York, NY 10012
(212) 998-6002
*brandon.debot@nyu.edu*

JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*jon@guptawessler.com*

June 27, 2025                    *Counsel for Amicus Curiae*

**DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST**

Under Sixth Circuit Rule 26.1, amicus curiae makes the following disclosures:

1.    Are any parties a subsidiary or affiliate of a publicly owned corporation?

    **No.**

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

    **No.**

Dated: June 27, 2025

# TABLE OF CONTENTS

Table of authorities ................................................................................. iii

Introduction and statement of interest ........................................................ 1

Argument ............................................................................................ 5

    A.    Information reporting is critical to the federal
           government's revenue-collection efforts ................................................ 5

    B.    Congress enacted the substantial-contributor reporting
           requirement to help strengthen and enforce the rules
           governing tax-exempt organizations .................................................... 9

    C.    The substantial-contributor reporting requirement
           directly advances the government's interest in revenue
           collection .................................................................................... 12

Conclusion .......................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Americans for Prosperity Foundation v. Bonta,*
    594 U.S. 595 (2021)................................................................................1

*Byers v. IRS,*
    963 F.3d 548 (6th Cir. 2020) ..........................................................12

*Moore v. United States,*
    602 U.S. 572 (2024) .........................................................................10

*Regan v. Taxation with Representation of Washington,*
    461 U.S. 540 (1983)............................................................................2

*United States v. Bisceglia,*
    420 U.S. 141, (1975) ......................................................................3, 5

**Statutes and rules**

26 C.F.R. § 1.6033-2 .............................................................................10

26 U.S.C. § 170 .....................................................................................14

26 U.S.C. § 2055 ...................................................................................14

26 U.S.C. § 2522 ...................................................................................14

26 U.S.C. § 4941..............................................................................4, 16

26 U.S.C. § 4942 ...................................................................................4

26 U.S.C. § 4943................................................................................4, 16

26 U.S.C. § 4946 ...................................................................................16

26 U.S.C. § 4958 ...................................................................................16

26 U.S.C. § 4967 ...................................................................................16

26 U.S.C. § 501......................................................................................15

26 U.S.C. § 507 ................................................................. 4, 10, 16

26 U.S.C. § 509 ............................................................................ 10

26 U.S.C. § 6033 ................................................................... 3, 10, 12

26 U.S.C. § 6104 ........................................................................... 10

Pub. L. No. 91-172, § 101,
    83 Stat. 487 (1969) ..................................................................... 9

**Other authorities**

Cheryl Chasin, Debra Kawecki, & David Jones,
    *Form 990 in IRS EO CPE text 2002* ......................................... 9

Josephine Cureton,
    *On Tax Day, Reject DOGE-Led Cuts to the IRS Workforce & Budget,*
    Center On Budget & Policy Priorities (Apr. 10, 2025) .......................... 8

James J. Fishman,
    *The Private Foundation Rules at Fifty: How Did We Get Them & Do They Meet*
    *Current Needs?*, 17 Pitt. Tax Rev. 247 (2020) ......................... 11, 18

Philip Hackney,
    *The 1969 Tax Reform Act & Charities: Fifty Years Later,*
    17 Pitt. Tax Rev. 235 (2020) ........................................... 10, 11

Philip Hackney,
    *Dark Money Darker? IRS Shutters Collection of Donor Data,*
    25 Fla. Tax Rev. 140 (2021) ............................................ 16, 18

H.R. Rep. No. 91-413 (1969) ............................................... 4, 12

IRS,
    *2011 Annual Report & 2012 Work Plan* ................................... 17

IRS,
    *EO Operational Requirements: Private Foundations & Public Charities* .......... 11

IRS,
    *Internal Revenue Service Data Book 2024* (May 2025) ..................... 5, 14

IRS,
    *IRS: The tax gap* (updated Apr. 14, 2025) ........................................................ 7, 8

IRS,
    *SOI tax stats - Annual extract of tax-exempt organization financial data*
    (updated May 7, 2025) ...................................................................... 14

IRS,
    *Tax Gap Projections for Tax Year 2022* (Oct. 2024) ...................................... 5

IRS, Tax Exempt and Government Entities Division,
    *Fiscal Year 2020: Program Letter* ............................................................ 17

Joint Commission on Internal Revenue Taxation,
    *General Explanation of the Tax Reform Act of 1969*, JCS-16-70 (1970) ......................... 11

Joint Committee on Taxation,
    *General Explanation of Tax Legislation Enacted in the 108th Congress*,
    JCS-5-05 (2005) ............................................................................ 13

Leandra Lederman & Joseph C. Dugan,
    *Information Matters in Tax Enforcement*,
    2020 B.Y.U. L. Rev. 145 (2020) .................................................... 6, 8, 13

Letter from Charles P. Rettig to Senator Elizabeth Warren (Aug. 27, 2021) ......... 6, 12

Adam Looney,
    *Abuse of tax deductions for charitable donations of conservation lands are on the rise*,
    Brookings Institution (Jun. 1, 2017) ...................................................... 14

Douglas M. Mancino,
    *Charities and Tax Shelters: Old Wine in New Bottles?*, American Bar
    Association Tax Times (2004) ............................................................ 14

Edward A. Morse,
    *Whistleblowers and Tax Enforcement: Using Inside Information to Close the "Tax
    Gap,"* 24 Akron Tax J. 1 (2009) ........................................................... 7

National Taxpayer Advocate,
    *Objectives Report to Congress: Fiscal Year 2026* (Jun. 25, 2025) ......................... 8

Natasha Sarin,
  *The Case for a Robust Attack on the Tax Gap,*
  U.S. Dep't of Treasury (Sept. 7, 2021) ................................................... 7

Jay A. Soled,
  *Homage to Information Returns*, 27 Va. Tax Rev. 371 (2007) ..................................... 6

S. Rep. No. 65-103 (1917) ........................................................ 6

U.S. Department of Treasury,
  *Tax Expenditures* (Nov. 27, 2024) ........................................................ 14

U.S. Gov. Accountability Office,
  IRS Should Take Steps to Ensure Continued Improvement in
  Estimates
  (May 2024) ................................................................... 7, 8

## INTRODUCTION AND STATEMENT OF INTEREST

The Tax Law Center at NYU Law School is a nonpartisan, nonprofit center dedicated to improving the integrity of the federal tax system. Its staff includes tax-law experts with experience in tax policymaking, administration, and litigation. The Center aims to protect and preserve tax revenues, advance equity through the tax system, and improve tax administration. It submits this brief to offer its perspective on the implications of this case for the federal tax system.[1]

This case challenges the constitutionality of a federal statute that has existed for more than 50 years—the requirement that charitable organizations identify their major donors in their federal tax filings if they wish to receive the benefits of tax-exempt status under section 501(c)(3) of the Internal Revenue Code. The impetus for this late-breaking First Amendment challenge appears to be the U.S. Supreme Court's decision in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), which struck down a California regulation requiring charities to disclose their major donors to register for business in the state. But the Court in *Bonta* went out of its way to note that the federal law challenged here is different in two key respects: It concerns the "conferral of tax-exempt status," whereas California's regulation had the potential

---

[1] This brief does not purport to represent the views, if any, of New York University School of Law. No counsel for a party authored this brief in whole or in part, and no person made a monetary contribution intended to fund the preparation or submission of this brief. All parties consent to the filing of this amicus brief.

to "prevent charities from operating in the State altogether." *Id.* at 618. And it implicates Congress's "revenue collection efforts," whereas California's regulation was aimed at reducing charitable fraud. *Id.*

These differences matter to the constitutional analysis. Although the Supreme Court subjected the disclosure requirement in *Bonta* to "exacting scrutiny" under the First Amendment, *id.* at 608, the Court has long held that a condition on the conferral of tax subsidies—including tax-exempt status and tax deductibility—is reviewed more deferentially, *see id.* at 618 (citing *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983)). The government ably explains why this case involves just such a condition—which is all that is needed to come within *Regan*—and *Bonta* does not alter this conclusion. *See* Appellants' Br. 21–53. For this reason alone, the substantial-contributor reporting requirement should not be subjected to exacting scrutiny, but should be upheld if it "bear[s] a rational relation to a legitimate governmental purpose." *Regan*, 461 U.S. at 547. The district court erred in concluding otherwise.

That issue, however, is not the focus of this brief. This brief instead focuses on the other key distinction noted in *Bonta*: that this case involves "revenue collection efforts." 594 U.S. at 618. Most major donors to 501(c)(3) organizations receive a large subsidy from the federal government in the form of a charitable deduction—the equivalent of up to 40.8 cents for every dollar donated by high-income individuals.

Congress has chosen to provide this subsidy, which costs over $60 billion a year, to encourage genuine contributions to charities. At the same time, Congress knows that providing this subsidy creates the potential for illegitimate deductions, costing the government money. For example, taxpayers could report deductions that exceed the amounts of their actual donations. Or they could claim deductions for transfers that were in fact purchases or loans, rather than donations. Or they could claim deductions for donations to ineligible organizations. The list goes on. Protecting revenue collection by reducing such abuse is thus an important goal of Congress.

The statute at issue here directly advances that goal by promoting voluntary tax compliance, deterring tax evasion, and aiding tax enforcement. By requiring tax-exempt 501(c)(3) organizations to identify to the IRS "all substantial contributors," 26 U.S.C. § 6033(b)(5), the statute ensures that these organizations and their major donors know that the IRS possesses this information. This knowledge provides a strong incentive for them to obey the law, reducing the likelihood of improperly claimed deductions. In this way, the statute addresses "the reality that some persons attempt to outwit the system, and [that] tax evaders are not readily identifiable," by encouraging voluntary tax compliance. *United States v. Bisceglia*, 420 U.S. 141, 145 (1975). Voluntary compliance, in turn, is fundamental to the design of our tax system, which seeks to maximize revenue collection while recognizing the reality that resource constraints limit the number of enforcement actions that the IRS may take.

Encouraging voluntary compliance through information reporting is especially important given the sharp reduction in IRS enforcement resources and the magnitude of the "tax gap" (the difference between the total taxes owed and the total collected). Yet the statute also aids enforcement by enabling the IRS to cross-check large claimed charitable deductions, thereby protecting the federal tax base.

In addition, the statute strengthens the rules for 501(c)(3) tax-exempt status in ways that further protect the tax base and the integrity of the tax system. When Congress enacted the substantial-contributor reporting requirement in 1969, it did so as part of a larger overhaul imposing new restrictions on tax-exempt charitable organizations. Many of these restrictions police the relationship between certain 501(c)(3) organizations and their substantial contributors, with Congress authorizing the imposition of taxes (and even the loss of tax-exempt status) if the restrictions are transgressed. *See, e.g.*, 26 U.S.C. §§ 507, 4941–4943. These restrictions build on other longstanding requirements for 501(c)(3) organizations, including that their earnings may not benefit any private shareholder, such as a substantial contributor. Requiring 501(c)(3) organizations to tell the IRS the identities of their substantial contributors, then, promotes compliance and "facilitate[s] meaningful enforcement of the limitations imposed by [Congress]." H.R. Rep. No. 91-413, at 1681 (1969).

Taken together or apart, these reasons confirm what the Supreme Court itself indicated in *Bonta*: that the government's interest in tax collection supports the constitutionality of this statute—whatever the level of scrutiny that is applied.

## ARGUMENT

### A. Information reporting is critical to the federal government's revenue-collection efforts.

Our "tax structure is based on a system of self-reporting." *Bisceglia*, 420 U.S. at 145. "There is legal compulsion, to be sure, but basically the Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all information relevant to tax liability" and to pay the amounts owed. *Id.*

That is by design. Under the system for revenue collection that Congress created, the IRS does not audit every tax return filed by every individual or entity. To the contrary, Congress gives the IRS the resources to audit only a small fraction of the returns filed each year. This means that the overwhelming majority of tax revenue that funds the federal government is collected through voluntary compliance—far outstripping the amount of revenue raised through IRS enforcement actions. *See* IRS, *Internal Rev. Serv. Data Book 2024*, at 3, 61 (May 2025), https://perma.cc/6BHH-58JR; *see also* IRS, *Tax Gap Projections for Tax Year 2022*, at 11 (Oct. 2024), https://perma.cc/T2JK-SWR8.

To make this system of self-reporting work, Congress has long recognized that information-reporting requirements are essential. In 1917, when Congress expanded

information reporting, the Senate Finance Committee explained why this was so important: because requiring "information at the source is a foundation upon which the administrative structure must be built if the income-tax law is to be rendered most effective." S. Rep. No. 65-103, at 20 (1917). A century's worth of experience has confirmed that insight. Congress has added dozens of information-reporting requirements to the tax code since 1917, *see* 26 U.S.C. §§ 6031–6060, and they are now "a linchpin of effective tax administration," Leandra Lederman & Joseph C. Dugan, *Information Matters in Tax Enforcement*, 2020 B.Y.U. L. Rev. 145, 151 (2020).

One reason why information reporting has become such a pillar of federal tax collection is because it promotes voluntary compliance. As the government points out in its brief (at 37), it is now "widely accepted as a matter of tax policy that a reporting requirement discourages misbehaving taxpayers." Former IRS Commissioner Charles Rettig observed that IRS "research shows that compliance is as low as 45 percent when income is subject to little or no information reporting or tax withholding," but "[w]hen there is substantial information reporting, compliance rises above 95 percent." Letter from Charles P. Rettig to Sen. Elizabeth Warren, at 23 (Aug. 27, 2021), https://perma.cc/P48Z-MNSV; *see also* Jay A. Soled, *Homage to Information Returns*, 27 Va. Tax Rev. 371, 371–73 (2007) (describing research finding that, when the IRS does not have information necessary to police misconduct, "taxpayer compliance plummets"). A lack of information reporting is a significant driver of the

tax gap, which totals about $600 billion or more annually—some 2 to 3 percent of GDP. *See* IRS, *IRS: The tax gap* (updated Apr. 14, 2025), https://perma.cc/7YK6-WT59; Natasha Sarin, *The Case for a Robust Attack on the Tax Gap*, U.S. Dep't of Treasury (Sept. 7, 2021), https://perma.cc/RA6G-6X9W; U.S. Gov. Accountability Off., *IRS Should Take Steps to Ensure Continued Improvement in Estimates* (May 2024), https://perma.cc/Y9MZ-UMN2.

Information reporting is also critical to the government's ability to detect and address tax evasion and abuse. It gives the IRS information that it can use to predict noncompliance, and it helps the IRS direct its limited audit resources and "enhance prospects for accurately targeting those likely to be noncompliant or particular noncompliant practices." Edward A. Morse, *Whistleblowers and Tax Enforcement: Using Inside Information to Close the "Tax Gap*," 24 Akron Tax J. 1, 3 (2009). And information reporting can improve the results of audits themselves, by providing information that can be used to verify or dispute the positions taken on returns and properly determine tax liability.

Information reporting by third parties—that is, a party besides the tax filer and government—is particularly effective. It addresses the asymmetry between what the tax filer knows about the facts relevant to tax liability and what the government knows, and it "fosters taxpayer compliance because the taxpayer no longer acts unobserved." Lederman & Dugan, *Information Matters in Tax Enforcement*, 2020 B.Y.U.

L. Rev. at 148–49. "The key to [its] effectiveness in increasing up-front 'voluntary' compliance is that it does not operate only after the fact, in the enforcement context," but also "decreases the perceived opportunity to evade tax." *Id.* at 162–63.

Information reporting is especially important to revenue collection when the IRS's resources are highly constrained, as they currently are. Congress recently cut over $40 billion of funding that had been provided to the IRS to increase its enforcement capacity, and IRS staffing will likely fall by at least 25 percent this year. Josephine Cureton, *On Tax Day, Reject DOGE-Led Cuts to the IRS Workforce & Budget*, Ctr. On Budget & Pol'y Priorities (Apr. 10, 2025), https://perma.cc/Y7WR-E9T9; National Taxpayer Advocate, *Objectives Report to Congress: Fiscal Year 2026* (Jun. 25, 2025), https://perma.cc/MC55-JQF5. The voluntary compliance rate has been relatively stable—between 82 and 85 percent in recent decades—even as the IRS's enforcement resources have varied. U.S. Gov. Accountability Off., *IRS Should Take Steps to Ensure Continued Improvement in Estimates*, at 10. But if information reporting requirements were to be weakened, it could reduce voluntary compliance by making it easier for unscrupulous filers to get away with failing to report income and improperly claiming deductions. That could cost the public dearly. Even a one-percentage point decline in voluntary compliance would cost the government over $45 billion a year. IRS, *IRS: The tax gap*.

Scaling back information reporting that Congress currently requires would also decrease the effectiveness of the IRS's more limited audit capacity. Limiting the information collected up front would make it more difficult for the IRS to choose to audit filers with the highest risks of noncompliance. And it would be harder for auditors to identify and investigate potential tax issues, thus reducing the quality of the fewer audits that are undertaken.

### B. Congress enacted the substantial-contributor reporting requirement to help strengthen and enforce the rules governing tax-exempt organizations.

This case involves one of the many information-reporting requirements that Congress has added to the tax system over the past century. For more than 50 years, Congress has required tax-exempt charitable organizations to identify their major donors as part of the "Form 990" that they file with the IRS each year. The requirement itself is older still: The IRS required the information as part of the very first Form 990 in 1941, which was then a "simple two page form" filed by some tax-exempt organizations. Cheryl Chasin, Debra Kawecki, & David Jones, *Form 990 in IRS EO CPE text 2002*, at 227, https://perma.cc/TKT2-LUKR. Three decades later, in 1969, Congress codified this requirement as part of a larger effort to reform the rules for tax-exempt charitable organizations. *See* Pub. L. No. 91-172, § 101(d)(1), (2), 83 Stat. 487, 493 (1969) (codified at 26 U.S.C. § 6033(b)(5)). "Such a long settled and established practice can carry great weight in resolving constitutional questions"—

especially where, as here, it "reflects and reinforces" the Supreme Court's precedents. *Moore v. United States*, 602 U.S. 572, 592 (2024) (cleaned up). Under current law, the term "substantial contributor" applies only to those who make large donations and are positioned to hold influence over the organization—namely, those whose donations (1) made up at least two percent of the total donations to the organization during the year, and (2) were at least $5,000 for the year. *See* 26 U.S.C. § 507(d)(2); 26 C.F.R. § 1.6033-2(a)(2)(iii)(A).

Congress imposed the substantial-contributor reporting requirement alongside a host of other reporting requirements, *see* Appellants' Br. 7–8, and did so for the express "purpose of carrying out the internal revenue laws," 26 U.S.C. § 6033(a). By the late 1960s, it had become increasingly clear that tax-exempt charities—and private foundations especially—were being used as vehicles for tax evasion and abuse, and that legislative action was necessary.[2] *See generally* Philip Hackney, *The 1969 Tax Reform Act & Charities: Fifty Years Later*, 17 Pitt. Tax Rev. 235 (2020). It had also become increasingly clear that this problem was compounded by

---

[2] All 501(c)(3) organizations are either public charities or private foundations. Public charities generally engage directly in charitable activities and receive support from a large number of donors. Unlike public charities, private foundations generally receive their support from a relatively small number of donors, 26 U.S.C. § 509(a), and largely engage in grantmaking to public charities. The substantial-contributor reporting requirement applies to both public charities and private foundations, although private foundations file different paperwork with the IRS and are subject to additional disclosure rules. *See id.* § 6104.

a lack of accurate, pertinent information made available to the government. *See, e.g.*, James J. Fishman, *The Private Foundation Rules at Fifty: How Did We Get Them & Do They Meet Current Needs?*, 17 Pitt. Tax Rev. 247, 279 (2020) ("One aspect about the oversight deficiencies of private foundations that all agreed upon was the lack of accurate information available to the government."). Congress sought to address these problems in two distinct yet complementary ways.

*First*, "Congress constricted the influence of the wealthy on private foundations and hindered the abuse of dollars put into charitable solution through income tax rules." Hackney, *The 1969 Tax Reform Act & Charities*, 17 Pitt. Tax Rev. at 235. It subjected these organizations to "various operating restrictions and to excise taxes for failure to comply with those restrictions." IRS, *EO Operational Requirements: Private Foundations & Public Charities*, https://perma.cc/K8BA-Z8WL.

*Second*, Congress bolstered the effectiveness of the new restrictions (and of other restrictions placed on tax-exempt charitable organizations) by broadening and strengthening information-reporting requirements. "The primary purpose of these requirements," as Congress's nonpartisan Joint Committee on Taxation put it, "was to provide the Internal Revenue Service with the information needed to enforce the tax laws." Joint Comm. on Internal Revenue Tax'n, *General Explanation of the Tax Reform Act of 1969*, JCS-16-70, at 52 (1970).

Congress had the same purpose in mind when it came to the substantial-contributor reporting requirement in particular. That provision was specifically "intended to facilitate meaningful enforcement of the limitations imposed by [the 1969 Act]." H.R. Rep. No. 91-413, at 1681. And Congress expressly determined that it served the "purpose of carrying out the internal revenue laws," 26 U.S.C. § 6033(a)—that is, promoting tax compliance and collecting taxes.

## C. The substantial-contributor reporting requirement directly advances the government's interest in revenue collection.

As discussed, "[o]ur self-reporting system of taxation relies on honesty at the front end and investigation at the back end." *Byers v. IRS*, 963 F.3d 548, 552 (6th Cir. 2020). The substantial-contributor reporting requirement serves both these purposes.

On the front end: The requirement serves the government's tax-collection interest by promoting voluntary compliance. It is well-established that there is a strong relationship between tax compliance and information-reporting requirements, as explained in Part A. *See also* Letter from Rettig to Sen. Warren, at 22 (Former IRS Commissioner: "[W]henever we implement new information reporting requirements, we see behavioral changes among taxpayers that result in higher voluntary compliance."). There is no reason to believe that the same wouldn't be true here.

Knowledge that the IRS possesses substantial-contributor information encourages the proper claiming of charitable deductions and compliance with the

requirements of tax-exempt status. For the charitable deduction, reporting substantial-contributor information deters taxpayers from trying to claim a large tax benefit for which they do not in fact qualify. That is because the filer would know that the IRS will receive information from the charitable organization on major contributions, making it far easier for the IRS to verify whether a charitable deduction is properly claimed. And for 501(c)(3) organizations, the reporting requirement discourages them from violating the conditions that Congress has imposed on their tax-preferred status through improper transactions with their donors. That is because these organizations know that the IRS will have visibility into their major donors, which could shed light on potential violations of the conditions of tax-exempt status. To be sure, donors and 501(c)(3) organizations could work together to facilitate noncompliance, but it is common knowledge in tax administration that "collusion is riskier than cheating alone, and thus less likely." Lederman & Dugan, *Information Matters in Tax Enforcement*, 2020 B.Y.U. L. Rev. at 149.

Promoting voluntary compliance is, if anything, particularly important in this context. Charitable deductions have long been recognized as an area prone to abuse, and where such abuse can be difficult to identify.[3] And these deductions add up to

---

[3] *See, e.g.*, Joint Committee on Taxation, *General Explanation of Tax Legislation Enacted in the 108th Congress*, JCS-5-05, at 462 (2005) (noting existence of "valuation abuses" for certain charitable deductions); Douglas M. Mancino, *Charities and Tax Shelters: Old Wine in New Bottles?*, Am. Bar Ass'n Tax Times (2004),

huge sums of money—reducing federal revenues by $60 billion in 2024 for individual tax returns alone. U.S. Dep't of Treasury, *Tax Expenditures*, at 32 (Nov. 27, 2024), https://perma.cc/AC26-P3QF. Charitable contributions are also deductible for corporate, estate, and gift tax purposes. 26 U.S.C. §§ 170, 2055, 2522. Even a small erosion in compliance would therefore translate to a big revenue loss. Likewise, there were over 1.5 million 501(c)(3) tax-exempt organizations as of 2024, with the IRS processing over 190,000 Forms 990 with a Schedule B for substantial-contributor information that year. IRS, *Data Book 2024*, 23, 30 (May 2025), https://perma.cc/57HZ-SJKD; *see also* IRS, *SOI tax stats - Annual extract of tax-exempt organization financial data* (updated May 7, 2025), https://perma.cc/GJV8-GKEZ (total from spreadsheets for exempt organization returns filed in calendar year 2023). Here, too, even a small reduction in voluntary compliance with the rules for tax-exempt entities could have a significant effect on tax-collection efforts. Especially given the magnitude of the tax gap and the IRS's resource constraints, promoting such voluntary compliance serves as a key plank of revenue collection. As a result, the substantial-contributor reporting requirement contributes significantly to the government's revenue-collection efforts even in cases where there is no audit.

---

https://perma.cc/K59D-RCGR (detailing why 501(c)(3) organizations "enjoy several tax benefits that make them particularly well suited to be targets for abuse by aggressive promoters of tax shelters"); Adam Looney, *Abuse of tax deductions for charitable donations of conservation lands are on the rise*, Brookings Institution (Jun. 1, 2017), https://perma.cc/AE9A-ZF8D.

On the back end: The substantial-contributor reporting requirement allows the IRS to better enforce limitations on 501(c)(3) tax-exempt status and prohibitions on self-dealing. And as already discussed, several other provisions impose excise taxes on organizations that run afoul of these limitations. Determining whether the limitations have been transgressed, and thus whether taxes are owed, can require knowing the identities of the organization's substantial contributors.

For starters, the reporting requirement helps the IRS determine whether an entity has violated the prohibition on self-dealing and private gain that is a fundamental requirement of tax-exempt status. Unlike a for-profit entity, a 501(c)(3) organization may not have any "part of [its] net earnings … inure[] to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(3). For example, if an organization treats its contributors as shareholders (in other words, if it allows its earnings to inure to them), the organization is not entitled to an exemption from the 21% corporate tax, and the IRS must tax the organization on its activities. Substantial contributors are among those most at risk of receiving an improper benefit from the organization that could disqualify it from tax-exempt status. The reporting requirement thus promotes revenue collection by enabling the IRS to identify and address entity misclassification. *See* Dist. Ct. Dkt. Nos. 43-6 at 4; 43-8 at 1–3; 43-9 at 1–5 (IRS employees describing how names and addresses provided as a result of the

substantial-contributor requirement are regularly used to assess whether entities are misclassified for tax purposes and may therefore owe additional taxes).

Additionally, Congress has imposed excise taxes on (1) excess benefit transactions between certain tax-exempt organizations and their substantial contributors, 26 U.S.C. § 4958; (2) excess business holdings between substantial contributors and private foundations, *id.* §§ 4943, 4946; (3) self-dealing transactions between substantial contributors and private foundations, *id.* § 4941; and (4) distributions from donor-advised funds to donors and related persons, *id.* § 4967. Congress has further provided for the loss of tax-exempt status and an accompanying excise tax for private foundations if the tax breaks received by substantial contributors and others are too large. *Id.* § 507. The substantial-contributor reporting requirement directly advances the enforcement of each of these provisions. *See* Dist. Ct. Dkt. Nos. 43-1 at 5–6; 43-6 at 1–6; 43-9 at 1–5 (IRS employees explaining that contributor names and addresses help verify compliance and guide excise-tax audits).

There is no ready alternative that would allow the IRS to easily obtain information about the identities of substantial donors, and therefore police these boundaries effectively. "Like officers and directors, substantial donors are classic suspects of those who might seek improper private benefits through their control of a nonprofit. But substantial donors, unlike officers and directors, are not public facing." Philip Hackney, *Dark Money Darker? IRS Shutters Collection of Donor Data*, 25 Fla.

Tax Rev. 140, 140–41 (2021) (discussing changes to reporting requirements for noncharitable 501(c) organizations). And "[w]ithout substantial donor information, an IRS auditor has no reason to begin to question certain transactions and operations of the nonprofit that accrue to the benefit of a substantial donor that could potentially lead to modification of a claimed tax result." *Id.*

The requirement to disclose substantial contributors also helps focus audit selection. As one IRS compliance director has explained, "names and addresses reported on Schedule B help classifiers identify or rule out issues for examination and decide whether a referral warrants an examination." Dist. Ct. Dkt. No. 43-9 at 5; *see also* Dist. Ct. Dkt. No. 43-6 at 3 (IRS revenue agent confirming names and addresses "are part of the process through which my manager and I decided whether to proceed with an examination and if so, which issues to focus on"). Further, the IRS's Tax Exempt and Government Entities Division has explained that it uses Form 990 information "to develop risk models to assess the likelihood of noncompliance by organizations, allowing more effective use of examination resources." IRS, *2011 Annual Report & 2012 Work Plan*, at 8, https://perma.cc/D2XF-DZTW. Specifically, the IRS uses data analytics to make decisions about which tax-exempt organizations to audit "based on quantitative criteria, which allows [the IRS] to allocate resources that focus on issues that have the greatest impact." IRS, Tax Exempt and Government Entities Division, *Fiscal Year 2020: Program Letter*, at 5,

https://perma.cc/DEZ6-HYYB. Among these issues, according to the IRS's tax-exempt compliance program, are "private benefit/inurement." *Id.* Put in pithier terms: The substantial-contributor reporting requirement serves "as a roadmap for audits." Hackney, *Dark Money Darker?*, 25 Fla. Tax Rev. at 140.

Nor is that all. When filers claim large charitable deductions to significantly reduce their tax burdens, substantial-contributor information is used to cross-check the accuracy of those claimed deductions. *See* Dist. Ct. Dkt. No. 43-8 at 2 (IRS tax-exempt specialist stating that it is "common" to receive requests "to confirm that a contribution from a particular donor was reported" as part of the investigation and examination process). If the IRS were stripped of its ability to obtain that information, it would be even more difficult for it to police those large charitable deductions on the back end, including for donations to private foundations—an area of particular congressional concern at the time the reporting requirement was enacted in 1969. *See generally* Fishman, *The Private Foundation Rules at Fifty*.

In short, the substantial-contributor reporting requirement is a reasonable means to an important end. A finding that the requirement is unconstitutional would directly undermine the federal tax base and would threaten the integrity of the tax system. The requirement is crucial to the federal government's revenue-collection efforts. It should be evaluated under a deferential standard of review, but regardless of the level of scrutiny, it should be upheld in its entirety.

**CONCLUSION**

This Court should reverse the district court's order.

Respectfully submitted,

*/s/ Jonathan E. Taylor*
JONATHAN E. TAYLOR
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*jon@guptawessler.com*

BRANDON DEBOT
THE TAX LAW CENTER AT NYU LAW
110 West 3rd Street #204
New York, NY 10012
(212) 998-6002
*brandon.debot@nyu.edu*

June 27, 2025                    *Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32(g)(1) because this brief contains 4,335 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

June 27, 2025

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Sixth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor