No. 25-3170

# In the United States Court of Appeals for the Sixth Circuit

THE BUCKEYE INSTITUTE,

*Plaintiff-Appellee*

v.

INTERNAL REVENUE SERVICE, *et al.*,

*Defendants-Appellants*

On appeal from the United States
District Court for the Southern District of Ohio
Hon. Michael H. Watson, District Judge
(Dist. Ct. No. 2:22-cv-4297)

## APPELLEE'S BRIEF

Robert Alt
David C. Tryon
Jay R. Carson
Alex M. Certo
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, OH 43125

Alan Gura
Brett R. Nolan
Charles M. Miller
THE INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., Suite 801
Washington, DC 20036
(202) 301-3300
bnolan@ifs.org

*Counsel for The Buckeye Institute*

DISCLOSURE STATEMENT

Counsel for The Buckeye Institute, Brett R. Nolan, certifies that The Buckeye Institute is not a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation has a substantial interest in the outcome of this litigation.


/s/ Brett R. Nolan

Disclosure Statement.................................................................. i

Table of Contents .................................................................... ii

Table of Authorities ................................................................ iv

Statement Regarding Oral Argument ................................... ix

Statement of Jurisdiction ........................................................ 1

Statement of Issues................................................................. 2

Introduction ............................................................................. 3

Statement of the Case.............................................................. 5

   I.   Legal background ......................................................... 5

     A.   Tax-exempt status under § 501(c)(3) ....................... 5

     B.   The donor-disclosure law for "substantial contributors" ........... 7

   II.   Factual background.................................................... 11

   III.  Procedural background ............................................ 15

Summary of Argument ...........................................................19

Standard of Review.................................................................22

Argument .................................................................................23

   I.   The disclosure law must satisfy exacting scrutiny. ......................23

     A.   Exacting scrutiny applies to the government's demand that tax-exempt organizations disclose their donors.........................24

     B.   Funding conditions receive lower scrutiny only when they limit how federal funds are used. .............................................29

     C.   The disclosure law must overcome heightened scrutiny because it does not regulate how federal funds are used. .........37

     D.   The government's proposed tax-benefit exception to the Constitution transforms the tax code into the supreme law of the land. .................................................................................46

1. There is no general rule that conditions directly related to voluntary tax benefits receive lower scrutiny. ..........................46

2. The government's expansive theory carves a gaping hole in the Constitution. ..............................................................49

II. The government's evidence-free claim that the disclosure rule passes exacting scrutiny is frivolous. ...........................................55

A. The government cannot rely on its own unsubstantiated assertions to satisfy exacting scrutiny. .......................................55

B. The little evidence the government does have would entitle The Buckeye Institute—not the government—to judgment as a matter of law. ....................................................................58

III. Even under *Regan*'s reasonableness standard, The Buckeye Institute is entitled to prove the allegations in its complaint. ....61

Conclusion.............................................................................63

Certificate of Compliance........................................................64

Certificate of Service...............................................................65

Addendum ..............................................................................66

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ...................................................... passim

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
591 U.S. 430 (2020) ................................................ 43, 44, 45

*Alexander v. MSPB*,
165 F.3d 474 (6th Cir. 1999) .......................................... 62

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ...................................................... passim

*Annex Books, Inc. v. City of Indianapolis*,
581 F.3d 460 (7th Cir. 2009) .......................................... 56

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011) ...................................................... 6

*Baird v. State Bar of Ariz.*,
401 U.S. 1 (1971) ......................................................... 26

*Bates v. City of Little Rock*,
361 U.S. 516 (1960) .................................................. 25, 26

*Buckley v. Am. Const. Law Found., Inc.*,
525 U.S. 182 (1999) ..................................................... 26

*Buckley v. Valeo*,
424 U.S. 1 (1976) ..................................................... 3, 25

*Cammarano v. United States*,
358 U.S. 498 (1959) ..................................................... 41

*Carman v. Yellen*,
112 F.4th 386 (6th Cir. 2024) ......................................... 18

*Carpenter v. United States*,
585 U.S. 296 (2018) ..................................................... 53

*CIC Servs., LLC v. IRS*,
593 U.S. 209 (2021) ..................................................... 54

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ....................................................45, 46

*Comm'r v. Glenshaw Glass Co.,*
    348 U.S. 426 (1955) ........................................................5, 52

*Doe v. Reed,*
    561 U.S. 186 (2010) ..........................................25, 26, 54

*Elkins v. Summit Cnty.,*
    615 F.3d 671 (6th Cir. 2010) ..............................................22

*FCC v. League of Women Voters of California,*
    468 U.S. 364 (1984) ....................................................33, 41

*FEC v. Ted Cruz for Senate,*
    596 U.S. 289 (2022) ........................................................57

*G. M. Leasing Corp. v. United States,*
    429 U.S. 338 (1977) ........................................................54

*Gibson v. Fla. Legis. Investigation Comm.,*
    372 U.S. 539 (1963) ......................................................3, 26

*Grove City College v. Bell,*
    465 U.S. 555 (1984) ....................................................41, 42

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) ..............................................18

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 553 (2001) ........................................................31

*Lewis Publishing Co. v. Morgan,*
    229 U.S. 288 (1913) ........................................................42

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ........................................................25

*McMullen v. Meijer,*
    355 F.3d 485 (6th Cir. 2004) ..............................................23

*Mobile Republican Assembly v. United States,*
    353 F.3d 1357 (11th Cir. 2003) ..........................................48

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 460 (1958) ....................................................24, 26

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) .............................................................60

*Perry v. Sindermann*,
   408 U.S. 593 (1972) ................................................... passim

*Planned Parenthood of Greater Ohio v. Hodges*,
   917 F.3d 908 (6th Cir. 2019) (en banc).............................52

*Regan v. Taxation with Representation*,
   461 U.S. 540 (1983) ................................................... passim

*Rust v. Sullivan*,
   500 U.S. 173 (1991) .............................................18, 30, 32

*Shelton v. Tucker*,
   364 U.S. 479 (1960) ................................................... passim

*Speiser v. Randall*,
   357 U.S. 513 (1958) .....................................................31, 32

*Students for Fair Admissions, Inc. v. President &
   Fellows of Harv. Coll.*,
   600 U.S. 181 (2023) .......................................................45

*United States v. American Library Ass'n*,
   539 U.S. 194 (2003) .......................................................62

*Vance v. United States*,
   90 F.3d 1145 (6th Cir. 1996) .......................................57, 61

*Walz v. Tax Comm'r of N.Y.*,
   397 U.S. 664 (1970) ....................................................... 6


**Statutes & Regulations**

22 U.S.C. § 7631(e)................................................................34

22 U.S.C. § 7631(f) ...............................................................34

26 C.F.R. § 1.501(c)(3)-1....................................................... 7

26 C.F.R. § 1.501(c)(3)-1(b)(1)(i)(b) ..................................... 7

26 C.F.R. § 1.501(c)(3)-1(b)(1)(iii) ....................................... 7

26 C.F.R. § 1.501(c)(3)-1(c)(1)..........................................7, 38

vi

26 C.F.R. § 1.501(c)(3)-1(c)(2)....................................38

26 C.F.R. § 1.6033-2(a)(2)(ii)(f) ................................ 8

26 C.F.R. § 1.6033-2(a)(2)(ii)(f) (2019) ....................... 9

26 C.F.R. § 1.6033-2(a)(2)(iii)(A) .............................. 8

26 U.S.C. § 1.............................................5, 52

26 U.S.C. § 11............................................5, 52

26 U.S.C. § 152(c)(1)(B)......................................53

26 U.S.C. § 170(a)(1) .......................................... 5

26 U.S.C. § 170(c)(2) .......................................... 5

26 U.S.C. § 170(c)(6) .......................................... 9

26 U.S.C. § 24................................................53

26 U.S.C. § 280A(c)...........................................52

26 U.S.C. § 501(a) ............................................. 5

26 U.S.C. § 501(c)(19) ......................................... 9

26 U.S.C. § 501(c)(3) ...............................5, 6, 7, 38

26 U.S.C. § 501(c)(4)..........................................42

26 U.S.C. § 507(d)(2)(A) ....................................... 8

26 U.S.C. § 6033(a)(1) ......................................... 7

26 U.S.C. § 6033(a)(3)(A) ...................................... 9

26 U.S.C. § 6033(a)(3)(A)(i) ................................... 8

26 U.S.C. § 6033(b) ..........................................7, 9

26 U.S.C. § 6033(b)(5) .......................................2, 8

26 U.S.C. § 6033(j)(1)(B) ...................................... 8

26 U.S.C. § 61(a) ...........................................5, 52

28 U.S.C. § 1292(b) ........................................... 1

28 U.S.C. § 1331............................................... 1

52 U.S.C. § 30118(b)(2).......................................46

vii

**Other Authorities**

Bernie Becker, *IRS: Contractor leaked more than 400k returns*,
  Politico (Feb. 25, 2025),
  https://bit.ly/3JrDBeV ...............................................................13

Gregory Korte, *Cincinnati IRS agents first raised Tea Party issues*,
  USA Today (June 11, 2013),
  https://perma.cc/DNK9-NVR6.................................................14

Guidance Under Section 6033 Regarding the Reporting
  Requirements of Exempt Organizations,
  85 Fed. Reg. 31959 (May 28, 2020) ...............................9, 10

Ira Stoll, *I'm a Crime Victim—ProPublica Has My Tax Returns*,
  Wall Street Journal (May 28, 2024),
  https://bit.ly/49DXoSU ...........................................................13

IRS Form 990 (2024), https://perma.cc/E855-TYSP ............................. 8

IRS Pub. 587 (2024) ...................................................................52

J. Eisinger, *et al.*, *The Secret IRS Files: Trove of Never-Before-Seen
  Records Reveal How the Wealthiest Avoid Income Tax*,
  ProPublica (June 8, 2021),
  https://bit.ly/4o5WodV............................................................12

Schedule B (Form 990), Schedule of Contributors (Dec. 2024),
  https://perma.cc/SZ5M-5EE5 ................................................. 8

**Rules**

Fed. R. Civ. P. 56(d) .................................................................61

STATEMENT REGARDING ORAL ARGUMENT

The Buckeye Institute requests oral argument. This case raises an exceptionally important question of first impression about the scope of constitutional review for conditions that the federal government imposes on tax-exempt entities.

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because The Buckeye Institute asserted a claim arising under federal law. Complaint, R.1, PageID#10–11; *see also* Amend. Complaint, R.68, PageID#886–88. The district court denied the government's motion to dismiss and the parties' cross-motions for summary judgment on November 9, 2023, Op. & Order, R.60, PageID#843–55, and it amended that order to include a certificate of appealability under 28 U.S.C. § 1292(b) on February 26, 2024, Op. & Order, R.73, PageID#930–31. This Court granted permission to appeal on March 14, 2025. *See In re: IRS*, No. 24-0301 (6th Cir. Mar. 14, 2025). The Court has jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(b).

STATEMENT OF ISSUES

1. Whether exacting scrutiny governs a First Amendment challenge to 26 U.S.C. § 6033(b)(5)'s requirement that nonprofit organizations disclose their "substantial contributors."

2. Whether the Court can enter judgment against the plaintiff-appellee, determining that § 6033(b)(5) does not violate the First Amendment, without affording the plaintiff-appellee an opportunity for discovery or factual development.

Federal law requires certain tax-exempt organizations to identify their major donors and disclose them to the government each year using a "Schedule B" form. Just a few years ago, the Supreme Court facially invalidated a California regulation that required the same organizations to disclose those same donors using that same form. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 602, 615–19 (2021). It did so by applying exacting scrutiny—the standard of review applicable whenever the government compels organizations to disclose their members and contributors. *Id.* at 607–08. "Such scrutiny," the Supreme Court explained, "is appropriate given the 'deterrent effect on the exercise of First Amendment rights' that arises as an 'inevitable result of the government's conduct in requiring disclosure.'" *Id.* at 607 (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976)).

This deterrent effect exists whenever the government demands information about an organization's members and donors, whether it does so while regulating election-related speech, *Buckley*, 424 U.S. at 64–66, as part of a legislative investigation, *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 546 (1963), or as a condition of

obtaining a government benefit, *Shelton v. Tucker*, 364 U.S. 479, 485–87 (1960). No matter the context, compelled disclosure of group affiliation creates a "real and pervasive" chilling effect across the ideological spectrum. *Bonta*, 594 U.S. at 617. And exacting scrutiny ensures that such demands reflect the seriousness of that burden.

Under exacting scrutiny, the federal government can no more compel tax-exempt organizations to disclose donor information than could California. Yet this Court need not—and should not—resolve that question today. Given the district court's determination that factual disputes preclude summary judgment, The Buckeye Institute is entitled to develop a record through discovery. At a minimum, the government cannot meet its heightened burden on the record below.

The Court should affirm the district court's decision that exacting scrutiny applies to The Buckeye Institute's First Amendment challenge and return the case to the trial court for further proceedings.

STATEMENT OF THE CASE

I.   LEGAL BACKGROUND

A.   Tax-exempt status under § 501(c)(3)

The federal income tax presumptively captures every dollar gained

by individuals and organizations unless "specifically exempted."

*Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 430 (1955); 26 U.S.C. §§ 1,

11; 61(a). But against this sweeping default rule, Congress has carved

out a web of exemptions and deductions. These exceptions translate into

valuable benefits—relieving taxpayers from bearing the weight of "the

full measure of [Congress's] taxing power." *Glenshaw Glass Co.*, 348

U.S. at 429 (quotation omitted).

One such exception resides in 26 U.S.C. § 501(c)(3). This provision

allows certain nonprofit organizations to apply for tax-exempt status if

they are "organized and operated exclusively" for religious, charitable,

educational, or other similar "purposes." *Id.* Tax-exempt status under

§ 501(c)(3) means the organization does not pay federal income taxes.

*See* 26 U.S.C. § 501(a). It also means that donors to the organization

can deduct contributions from their own income tax liability. 26 U.S.C.

§ 170(a)(1), (c)(2). This combination makes 501(c)(3) status doubly

beneficial to nonprofit organizations. Both the tax-exempt savings and the tax-deductible contributions have a similar effect as "cash grants" to the organization. *Regan v. Taxation with Representation*, 461 U.S. 540, 544 (1983).[1]

Congress has limited 501(c)(3) status to organizations that engage in specific activities. To qualify, an organization must "operate[] exclusively" for certain purposes—religious, charitable, scientific, educational, and other similar purposes. *See* 26 U.S.C. § 501(c)(3). The organization must also agree not to engage in certain prohibited activities—even if doing so would further one of the otherwise qualifying purposes. A 501(c)(3) organization, for example, cannot devote a "substantial part of [its] activities" to lobbying. *Id.* Nor can it participate in political campaigns. *Id.* And the statute also forbids a 501(c)(3) organization from using its net income for the benefit of "any

---

[1] That the Supreme Court has treated tax exemptions and deductions "like cash subsidies" in this context does not mean "they are in all respects identical." *Regan*, 461 U.S. at 544 n.5 (citing *Walz v. Tax Comm'r of N.Y.*, 397 U.S. 664, 674–76 (1970)). Indeed, taking the point too far would mean that tax exemptions "convert[] libraries, art galleries, [and] hospitals into arms of the state," *Walz*, 397 U.S. at 675, wrongly treating income "as if it were government property even if it has not come into the tax collector's hands," *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

private shareholder or individual." *Id.* These restrictions limit how tax-exempt organizations use their tax-free funds.

The IRS's regulatory rules emphasize this activity-focused qualification. *See generally* 26 C.F.R. § 1.501(c)(3)-1. Organizations must "engage[] primarily in activities which accomplish" the "exempt purposes specified" in the statute. *Id.* § 1.501(c)(3)-1(c)(1). In fact, the IRS does not even allow 501(c)(3) organizations to adopt bylaws that authorize them "to engage [more than an insubstantial amount] in activities" outside the scope of "one or more exempt purposes." *Id.* § 1.501(c)(3)-1(b)(1)(i)(b). An organization, for example, organized "for charitable purposes" will not qualify if its bylaws also "empower[]" it "to engage in a manufacturing business." *Id.* § 1.501(c)(3)-1(b)(1)(iii). This restriction ensures that tax-free income under § 501(c)(3) only goes to organizations that devote the bulk of their activities to the specific purposes Congress identified.

B.      The donor-disclosure law for "substantial contributors"

1. The government requires a subset of 501(c)(3) organizations to report their income and activities each year. 26 U.S.C. § 6033(a)(1), (b). The primary vehicle for doing so is Form 990, which requires

information about an organization's income, expenses, and activities, among other things. *See* IRS Form 990 (2024), https://perma.cc/E855-TYSP. Not all 501(c)(3) organizations file a Form 990, *see, e.g.*, 26 U.S.C. § 6033(a)(3)(A)(i), but for those that must, failing to do so means losing tax-exempt status, *id.* § 6033(j)(1)(B).

Part of the annual report requires 501(c)(3) organizations to disclose the names and addresses of their major donors. 26 U.S.C. § 6033(b)(5). The statute refers to these donors as "substantial contributors," which means they give an organization more than $5,000 during the tax year if that amount is more than 2 percent of the organization's annual contributions. 26 C.F.R. § 1.6033-2(a)(2)(ii)(f), (iii)(A) (public charities); *see also* 26 U.S.C. § 507(d)(2)(A) (private foundations). These donors must be listed on the organization's Schedule B—an attachment to Form 990. *See* Schedule B (Form 990), Schedule of Contributors (Dec. 2024), https://perma.cc/SZ5M-5EE5.

Just as not every 501(c)(3) organization must file a Form 990, not every organization must disclose its substantial contributors. Churches and other religious organizations, for example, while subject to the same restrictions on how they use their tax-free income, do not file

annual returns or the accompanying Schedule B. 26 U.S.C.
§ 6033(a)(3)(A).

2. Federal law does not presently require other kinds of tax-exempt
organizations to disclose their substantial contributors, but that has not
always been the case. By statute, the rule applies only to 501(c)(3)s. 26
U.S.C. § 6033(b). For almost 50 years, however, the IRS imposed the
same disclosure requirement on other 501(c) organizations by
regulation, such as social-welfare organizations, § 501(c)(4), social clubs,
§ 501(c)(7), and fraternal organizations, §§ 501(c)(8) & (10). *See* 26
C.F.R. § 1.6033-2(a)(2)(ii)(f) (2019). Some of those organizations—like
veteran organizations exempt under § 501(c)(19)—also enjoy the extra
benefit of tax-deductible contributions. 26 U.S.C. § 170(c)(6). But the
IRS's disclosure requirement for these non-501(c)(3) organizations
ended in May 2020. *See* Guidance Under Section 6033 Regarding the
Reporting Requirements of Exempt Organizations, 85 Fed. Reg. 31959,
31966 (May 28, 2020). The current regulation tracks the statute,
requiring only 501(c)(3) organizations to disclose their major donors. *See*
26 C.F.R. § 1.6033-2(a)(2)(ii)(F).

The IRS rescinded its broader regulation after determining that it "does not need personally identifiable information of donors to be reported on Schedule B of [Form 990] in order to carry out its responsibilities." Revenue Proc. 2018-38, R.36-4, PageID#203. Rather, the IRS explained, it "can obtain sufficient information from other elements of the Form 990." 85 Fed. Reg. at 31963. Annually collecting donor information from every 501(c) organization did not help the agency "evaluat[e] possible private benefit or inurement or other potential issues." *Id.* And rather than making the agency's job easier, the disclosure requirement "needlessly consume[d] both private and government resources." Treasury Dept. Ltr., R.36-6, PageID#213. On top of those issues, removing the disclosure requirement reduced the risk of "inadvertent [public] disclosure," thus protecting donors and organizations against "possible reprisals (such as harassment, threats of violence, or economic retribution)." *Id.* at 31963–64.

Because the donor-disclosure requirement for 501(c)(3)s is set by statute, however, the IRS's regulatory rescission did not alter the disclosure obligations for those organizations.

II.    FACTUAL BACKGROUND

The Buckeye Institute is an Ohio-based, nonprofit organization
exempt from taxation under § 501(c)(3). Alt Decl. ¶2, R.36-1,
PageID#185. The Buckeye Institute's mission is to promote limited
government and individual freedom. *Id.* ¶3. It accomplishes as much
through public-policy research, economic studies, and strategic
advocacy—often acting as a government watchdog in defense of
constitutional rights. *Id.*

Like other nonprofit organizations, The Buckeye Institute relies on
financial support from individuals, corporations, and foundations that
share its commitment to advancing liberty, prosperity, and limited
government. *Id.* ¶5 at PageID#186. But The Buckeye Institute's
advocacy is often controversial. Harassment Decl. ¶4, R.49-1,
PageID#720. It criticizes the government, *see* Alt Decl. ¶10, R.36-1,
PageID#186–87, and weighs in on topics that many people feel strongly
about, Harassment Decl. ¶¶4–16, R.49-1, PageID#720–22. This reality
makes privacy critical for The Buckeye Institute and its supporters. Alt
Decl., R.36-1 ¶7, PageID#186. Many donors (and potential donors) fear
"retribution from Buckeye's opponents," and they're reluctant to

financially support The Buckeye Institute if doing so means the IRS has easy access to their personal information through forms like the Schedule B. *Id.* ¶¶8, 11 at PageID#186–87; Donor Decl. ¶5, R.49-2, PageID#733.

The IRS, after all, does not have a sterling record of protecting taxpayer data. Just a few years ago, the IRS announced that it mistakenly posted private information from 990-T forms affecting more than one hundred thousand taxpayers. Treasury Disclosure Ltr., R. 36-11, PageID#261, also available at https://perma.cc/J7EY-XYBY. In 2019, the IRS confirmed that it knew of at least 14 unauthorized disclosures of Form 990 information since 2010, *see* Talking Points Email, R.36-9, PageID#245, and less than two years after that, the media organization ProPublica published private income and tax payment information of several high-profile taxpayers on its website—where it remains publicly available today, *see* J. Eisinger, *et al.*, *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal How the Wealthiest Avoid Income Tax*, ProPublica (June 8, 2021), https://bit.ly/4o5WodV (last visited Nov. 19, 2025).

Yet these are just examples that reached the public. In 2014, the Treasury Inspector General reported that taxpayer data remained "vulnerable to inappropriate *and undetected* use, modification, or disclosure." Treas. Report on IRS Technology, R.36-12, PageID#278 (emphasis added). That might explain how some public disclosures have turned out to be even worse than originally thought. The IRS, for example, initially reported the leak to ProPublica in 2021 affected about 70,000 taxpayers—only to revise the number to more than 400,000 a year later. *See* Bernie Becker, *IRS: Contractor leaked more than 400k returns*, Politico (Feb. 25, 2025), https://bit.ly/3JrDBeV (last visited Nov. 11, 2025). And even when the responsible party is caught, prosecuted, and sent to prison, victims who have had their confidential information leaked "have no assurance that their personal information will not be the subject of a news article tomorrow, next week, next month, or even next year." Ira Stoll, *I'm a Crime Victim—ProPublica Has My Tax Returns*, Wall Street Journal (May 28, 2024), https://bit.ly/49DXoSU (last visited Nov. 19, 2025).

This looming threat of exposure and loss of privacy creates a "real and pervasive" deterrent effect that inhibits The Buckeye Institute's

relationship with its supporters. *See Bonta*, 594 U.S. at 617. But it's not only public leaks and private harassment that cause this problem. Donors also worry about government retaliation. Alt Decl. ¶8, R.36-1, PageID#186. And for The Buckeye Institute's supporters, there's good reason for concern.

Several years ago The Buckeye Institute successfully led an effort to oppose Ohio's Medicaid expansion under the Affordable Care Act. *Id.* ¶10 at PageID#186–87. Soon after the Ohio legislature followed The Buckeye Institute's counsel and rejected the expansion, the IRS's Cincinnati office initiated a full field audit of The Buckeye Institute. *Id.* This happened around the same time that news began spreading about the IRS's Cincinnati office engaging in a "systematic" and "unprecedented" effort to deny tax-exempt status to organizations affiliated with the conservative Tea Party movement. Gregory Korte, *Cincinnati IRS agents first raised Tea Party issues*, USA Today (June 11, 2013), https://perma.cc/DNK9-NVR6. Public reports stated that the IRS targeted "groups whose 'issues include government spending, government debt and taxes,' and groups 'critical of how the country is being run'"—all issues on which The Buckeye Institute regularly

engages. *Id.* So it is no surprise that some of The Buckeye Institute's otherwise generous supporters reduced or eliminated their giving, citing "the then-unfolding story" about the IRS targeting conservative nonprofits and "express[ing] concern" about appearing on The Buckeye Institute's Schedule B. Alt Decl. ¶11, R.36-1, PageID#187.

## III.   PROCEDURAL BACKGROUND

1. In 2021, the Supreme Court decided *Americans for Prosperity Foundation v. Bonta.* It held that exacting scrutiny applied to a California regulation that required charitable organizations to provide copies of their federal Schedule B to the state Attorney General's office. 594 U.S. at 607–08. The Supreme Court then held the law facially unconstitutional because it "create[d] an unnecessary risk of chilling in violation of the First Amendment, indiscriminately sweeping up the information of *every* major donor with reason to remain anonymous." *Id.* at 616–17 (internal quotation and citation removed). The decision did not foreclose the possibility that the government could satisfy exacting scrutiny in particular circumstances. But it rejected the state's claim that it needed to collect donor information from every nonprofit, every year. *Id.* at 613, 617.

Following *Bonta*'s lead, The Buckeye Institute brought this suit, alleging that the federal law compelling it to disclose the same donor information to the IRS likewise violates the First Amendment. Compl., R.1, PageID#10–11. The Buckeye Institute alleged that the law fails exacting scrutiny because the IRS does not need to indiscriminately collect donor information each year, and so the chilling effect on free association outweighs any purported interest the government may have.

Both sides filed dispositive motions before discovery began. The government moved to dismiss the complaint for two reasons. First, it argued that The Buckeye Institute lacks standing. Mot. Dismiss, R.21, PageID#62–68. And second, it argued that the law does not violate the First Amendment because—unlike California's regulation in *Bonta*—it's a condition on government spending that need only be rationally related to the government's interest. *Id.* at PageID#68–83. The government also moved for summary judgment, repeating its arguments from the motion to dismiss and arguing in the alternative that the law survives exacting scrutiny as well. Gov't MSJ, R.43, PageID#480–96.

At the same time, The Buckeye Institute moved for summary judgment. MSJ, R.36, PageID#165. Relying on the evidence discussed above (and more), The Buckeye Institute argued that the IRS has conceded that indiscriminately collecting donor information on Schedule Bs every year is unnecessary, that it imposes costs on both the government and the tax-exempt organizations, and that it chills associational freedom through the risk of improper use and disclosure. *Id.* at PageID#175–84. The Buckeye Institute also argued that the conditional spending cases do not apply here because the disclosure law "does not limit 'the activities Congress wants to subsidize'" or otherwise restrict how 501(c)(3) organizations "use" federal funds. Resp. to MTD, R.35, PageID#156–57.

2. The district court denied all three motions. Op. & Order, R.60, PageID#843. In doing so, the court held that exacting scrutiny applies— rejecting the government's theory that Congress has more discretion here because the law applies only if an organization voluntarily applies for tax-exempt status. *Id.* at PageID#852–53. The court explained that, unlike other spending limits that receive deferential review, the law here "is not an example of the Government 'simply insisting that public

funds be spent for the purposes for which they were authorized.'" *Id.* at 853 (quoting *Rust v. Sullivan*, 500 U.S. 173, 196 (1991)).

Applying exacting scrutiny, however, required resolving factual disputes, such as whether the disclosure law really is "an important part of the IRS's enforcement and compliance procedures." *Id.* at PageID#854. So the district court denied The Buckeye Institute's summary-judgment motion as well and set the case on track for trial. *Id.*[2]

3. The government asked the district court to certify its decision about the proper level of scrutiny for interlocutory appeal under 28 U.S.C. § 1292(b). Motion, R.71, PageID#908. The district court granted the motion, Op. & Order, R.73, PageID#930–31, and this Court then

---

[2] The district court also rejected the government's standing argument, which it raised only in its motion to dismiss. Op. & Order, R.60, PageID#847–50. The government does not press standing here, but because this Court must assure itself of its own jurisdiction, The Buckeye Institute provides two additional pieces of information. First, after the district court's decision, this Court decided *Carman v. Yellen*, 112 F.4th 386 (6th Cir. 2024), which held that the object of a disclosure law has standing because disclosure itself "is injurious." *Id.* at 407. Second, and also after the district court's decision, The Buckeye Institute amended its complaint with allegations that provide even more grounds for standing than the original complaint. *See* Amend. Compl., R.68 ¶38, PageID#886–87; *Kentucky v. Yellen*, 54 F.4th 325, 342–43 (6th Cir. 2022). Standing thus poses no obstacle to this appeal.

granted the petition for appeal, explaining that the question presented here about the level of scrutiny makes it "one of those exceptional cases" with "broad[]" and "readily apparent" consequences, *In re: IRS*, No. 24-301, Dkt. 11 (Mar. 14, 2025).

SUMMARY OF ARGUMENT

I. Exacting scrutiny applies whenever the government demands information about an organization's members and donors. This is the proper standard of review because it ensures that the government's demand reflects the serious burden that compelled disclosure imposes on the exercise of First Amendment rights. And so for more than half a century, the Supreme Court has applied exacting scrutiny in all sorts of circumstances, including discovery orders, legislative investigations, election regulations, and even demands made as a condition of obtaining government benefits.

The government's argument that the disclosure requirement here is different because it only applies as a condition of a voluntary tax benefit fundamentally misunderstands the Supreme Court's unconstitutional-conditions precedent. While it's true that the government receives a more deferential review when a law implicating constitutional rights is

19

a condition of accepting government benefits, that rule applies only when the condition restricts how federal funds are used. A law prohibiting federal funds from being spent on lobbying, for example, does not infringe on the First Amendment, even though the Constitution protects the right to lobby. But if a law provided federal funds for lobbying, the government could not restrict funds to only those applicants who agree not to attend church. The former condition simply specifies the activity that the government wants to fund. The latter does something more—and that something violates the First Amendment.

The disclosure law here falls into this second category. The government grants tax-exempt status under § 501(c)(3) to nonprofit organizations that engage in certain activities—religious, educational, charitable, and so on. The law requires those organizations to restrict their primary activities to further those purposes. And it restricts them from engaging in prohibited activities—like lobbying or participating in political campaigns. These restrictions limit how 501(c)(3) organizations use their tax-free income.

The disclosure law, however, does not regulate how organizations use tax-free income. Whether The Buckeye Institute discloses its donors on

a Schedule B has no bearing on what kind of speech or activity The Buckeye Institute engages in. Thus, the condition restricts tax-exempt status not based on what an organization will do with its subsidized funding, but based on whether the organization waives its right to be free from compelled disclosures. That kind of condition must face the same First Amendment scrutiny as a direct regulation.

II. The government's alternative argument that the Court should apply exacting scrutiny and rule for the government as a matter of law is not just wrong—it's frivolous. Exacting scrutiny requires the government to substantiate its claims about why the law is necessary—why it is narrowly tailored—with record evidence. Not only does that evidence not exist here, but the parties have not even engaged in discovery. So The Buckeye Institute has had no opportunity to investigate the government's claims about why it needs this law to enforce the tax code.

Nor can the government avoid this problem by having the Court defer to Congress's judgment about whether the disclosure law is narrowly tailored. The entire point of exacting scrutiny is to require the government to prove its claims. Deferring to Congress—without

discovery—would turn this well-established standard on its head and prevent the judiciary from performing its duty under Article III.

III. Even if the Court holds that *Regan*'s reasonableness standard applies, it should decline the government's request for judgment as a matter of law. The Buckeye Institute alleges that the disclosure law serves no legitimate purpose, and that the government lacks the technological capability to even use Schedule B information in the way it claims. Reasonableness review under *Regan* may be deferential, but it is not rational basis. The Buckeye Institute is entitled to prove its allegations through discovery, and the government's request for judgment as a matter of law is premature.

STANDARD OF REVIEW

This interlocutory appeal arises from the district court's denial of a motion to dismiss and cross-motions for summary judgment, s*ee* Op. & Order R.60, PageID#843, but the government only challenges the summary-judgment issues, *see* Gov't Br. at 21. The Court reviews "the district court's denial of summary judgment de novo," *Elkins v. Summit Cnty.*, 615 F.3d 671, 674 (6th Cir. 2010), and reviews the lower court's decision about whether "there exists a genuine issue of material fact"

for abuse of discretion, *McMullen v. Meijer*, 355 F.3d 485, 489 (6th Cir. 2004).

ARGUMENT

The district court correctly held that exacting scrutiny applies to the disclosure law and that the government has not met its burden on the preliminary record below. The Court should affirm.

I.    THE DISCLOSURE LAW MUST SATISFY EXACTING SCRUTINY.

The Buckeye Institute challenges a federal law requiring it to disclose the identity of its major donors. Four years ago, the Supreme Court held that "compelled disclosure requirements are reviewed under exacting scrutiny." *Bonta*, 594 U.S. at 608. This standard ensures that "the strength of the governmental interest" outweighs the "inevitable" chilling effect from disclosure. *Id.* at 607. No one can reasonably dispute that the same chilling effect exists here. The disclosure law, after all, covers the same information at issue in *Bonta*—the donor names and addresses listed on a Schedule B. *See id.* at 602. Exacting scrutiny protects associational freedom in these circumstances not by making this information unattainable, but by requiring the government to show

"its need for *universal* [disclosure] in light of any less intrusive alternatives." *Id.* at 613 (emphasis added).

Despite the "real and pervasive" deterrent effect of disclosure, *id.* at 617, the government urges the Court to apply a lower level of scrutiny reserved for laws that "impose limits on the use of [federal] funds," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("*AOSI I*"). There is just one problem: The disclosure law does not "impose limits on the use of [federal] funds." *Id.* So even if disclosing donor information is "relevant to the objectives of the program," it must satisfy the ordinary First Amendment test—exacting scrutiny. *Id.*

A.   Exacting scrutiny applies to the government's demand that tax-exempt organizations disclose their donors.

The First Amendment requires the government to satisfy exacting scrutiny whenever it demands that organizations disclose their donors. *Bonta*, 594 U.S. at 607–08. This well-established rule protects against the "inevitable" chilling effect that compelled disclosure creates. *Id.* at 607. It applies here just as it does to other disclosure regimes.

1. The Supreme Court has long recognized a right to privacy implicit in the First Amendment. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 460, 462 (1958). This right protects not just anonymous speech, but

also anonymous association. *Bonta*, 594 U.S. at 606–07. The government can mandate that an organization reveal its "members and contributors" only after proving a "compelling" interest in doing so. *Bates v. City of Little Rock*, 361 U.S. 516, 519, 524 (1960). Even then, the government must satisfy narrow tailoring by "demonstrat[ing] its need for [the information] in light of any less intrusive alternatives." *Bonta*, 596 U.S. at 613.

The Supreme Court calls this standard "exacting scrutiny," and it ensures that any compelled disclosure "reflect[s] the seriousness of the actual burden on" speech and association. *Id.* at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). A government's demand for donor information creates an "inevitable" chilling effect on people exercising their First Amendment rights. *Id.* at 607 (quoting *Buckley*, 424 U.S. at 65). The reasons for that are plenty: "anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). The threat from disclosure (even when "there [is] no disclosure to the general public") creates a "real and pervasive" deterrent effect on

exercising First Amendment freedoms. *Bonta*, 594 U.S. 616–17 (quoting *Shelton*, 364 U.S. at 486).

Exacting scrutiny applies to government-compelled disclosures no matter the context. The Supreme Court articulated the principle in *NAACP v. Alabama*—vacating a contempt order over the NAACP's refusal to turn over its member list to the state Attorney General. 357 U.S. at 451, 467. Since then, the Supreme Court has applied the standard for disclosure demands made to further a legislative investigation, *Gibson*, 372 U.S. at 543–46, to enforce a municipal tax code, *Bates*, 361 U.S. at 526, to regulate circulators for a ballot initiative, *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 202–04 (1999), and to prevent electoral fraud, *Reed*, 561 U.S. at 196. Just four years ago, the Supreme Court applied exacting scrutiny to California's requirement that "tax-exempt charities" turn over the same donor information at issue here. *See Bonta*, 596 U.S. at 602, 607–08. Regardless of the context, exacting scrutiny ensures that "compelled disclosure regimes" do not unnecessarily "discourage citizens from exercising rights protected by the Constitution." *Id.* at 610 (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality op.)).

2. Exacting scrutiny has also long applied to disclosure rules that operate "as a condition of" receiving a government benefit. *Shelton*, 364 U.S. at 480. In *Shelton*, the Supreme Court invalidated a state law that compelled public-school teachers to disclose "every organization to which [they] belonged or regularly contributed within the preceding five years." *Id.* The Court had "no doubt" that the state had the right "to investigate the competence and fitness of [its teachers]." *Id.* at 485. And there was "no question" that a teacher's associations were "relevan[t]" to that investigation. *Id.* Yet that did not relieve the state of its exacting burden. *Id.* at 487–88. The government still had to prove that the disclosure law did not "broadly stifle fundamental personal liberties when the end [could] be more narrowly achieved." *Id.* at 488.

*Shelton* was an "early" iteration of the Supreme Court's "compelled disclosure cases." *Bonta*, 594 U.S. at 608. And it was also an early example of the "general principle" that the government cannot "deny a benefit to a person because of his constitutionally protected speech or associations." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (citing *Shelton*, 408 U.S. at 485–86). As the Supreme Court later explained, the plaintiffs in *Shelton* had "no 'right' to [the] valuable governmental

benefit" they sought. *Id.* But the compelled-disclosure law still faced exacting scrutiny because conditioning a government benefit on the applicant's willingness to reveal his private associations burdens the "exercise of First and Fourteenth Amendment rights." *Id.* at 598 (citing *Shelton*, 364 U.S. at 485–86).

3. Exacting scrutiny applies here for the same reason it applied in *Bonta* and *Shelton*. In fact, the information the IRS requires is the same information at issue in *Bonta. See* 594 U.S. at 602. There, California required charitable organizations to disclose unredacted copies of their federal Schedule B, which identifies their substantial contributors. *Id.* The Supreme Court held that doing so created a "real and pervasive" deterrent effect on free association. *Id.* at 617. That "deterrent effect" is why exacting scrutiny is the "appropriate" level of review in the first place. *Id.* at 607.

So too here. The government requires The Buckeye Institute and other 501(c)(3) organizations to disclose their substantial donors to the IRS. This creates an "inevitable" chilling effect on free association—just as it did in *Bonta. Id.* While the government's interest in revenue collection may differ from California's interest in protecting against

28

charitable fraud (and thus "*may* raise issues" not presented in *Bonta*, *id.* at 618 (emphasis added),[3] exacting scrutiny is how courts evaluate that interest and deal with those issues in light of the burden on associational freedom.

    B.    Funding conditions receive lower scrutiny only when they limit how federal funds are used.

The government resists exacting scrutiny because—in its view—Congress's spending power grants more discretion for imposing disclosure rules as a condition to receiving tax-exempt status. That argument not only ignores the Supreme Court's decisions in *Perry* and *Shelton*—it misunderstands Congress's authority to limit how federal funds are used.

When Congress spends money, it can "define the limits of the government spending program" to ensure that federal funds "are used in the manner Congress intends." *AOSI I*, 570 U.S. at 213–14. That

---

[3] The government relies on this quote from *Bonta* noting that federal law here "may raise issues" the California regulation did not. *See, e.g.*, Gov't Br. at 32. Yet this quote is not part of the Supreme Court's discussion about which level of scrutiny applies. Rather, the quote sits within the discussion about how to *apply* exacting scrutiny. *Compare* 594 U.S. at 606–08, *with id.* at 611–18. Even still, the most one could say about this passage from *Bonta* is the Supreme Court chose not to address the issue. That says nothing about how it should be resolved.

means the government can impose conditions on funds "that specify the activities Congress wants to subsidize." *Id.* at 214. And the typical recourse for a party objecting to such limits "is to decline the funds." *Id.*

Not all conditions, however, restrict how federal funds are "used." *Id.* at 213–14. Some go beyond "specify[ing] the activities Congress wants to subsidize," *id.*, and instead "place[] a condition on the *recipient* of the subsidy," *Rust*, 500 U.S. at 197. When that happens, the condition must satisfy the usual First Amendment inquiry. *See AOSO I*, 570 U.S. at 213–14, 220–21. That's because, while Congress can ensure that federal money is used for particular purposes, it cannot condition government benefits—even gratuitous benefits that a recipient has "no 'right to'"— on "a basis that infringes his constitutionally protected interests." *Perry*, 408 U.S. at 597. This guardrail on Congressional authority is "especially" true when conditions impact one's "freedom of speech." *Id.*

The line between permissible and impermissible conditions has sometimes been difficult to apply because the government can almost always "manipulate[]" how it defines the scope of a funding program to "subsume the challenged condition." *AOSI I*, 570 U.S. at 215 (quoting

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 553, 547 (2001)). But precedent easily resolves the issue here.

1. *Regan* illustrates the distinction well. In *Regan*, the Supreme Court upheld the federal law limiting the amount of lobbying that 501(c)(3) organizations can engage in. 461 U.S. at 544. Tax-exempt status, the Court explained, "has much the same effect as a cash grant to the organization." *Id.* at 544. And so the restriction on lobbying simply reflected Congress's choice "not to subsidize lobbying as extensively as it chose to subsidize other activities that nonprofit organizations undertake." *Id.* at 544. That kind of choice does not raise First Amendment concerns because the Constitution does not require the government "to subsidize lobbying" or any other activity. *Id.* at 546.

To reach this conclusion, the Supreme Court distinguished the lobbying restriction in *Regan* from a different tax exemption that the Supreme Court invalidated in *Speiser v. Randall*, 357 U.S. 513 (1958). In *Speiser*, the Court rejected a "rule requiring anyone who sought to take advantage of a property tax exemption to sign a declaration stating that he did not advocate the forcible overthrow of the Government of the United States." *Regan*, 461 U.S. at 545 (citing *Speiser*, 357 U.S. at

518). Unlike a restriction on lobbying, compelling recipients to speak a certain message does not control what "activity" federal funds are being spent on. *Id.* at 544. Rather, it restricts federal funds to only those recipients who are willing to give up their right to be free from compelled speech. So while both conditions attached to a tax exemption, only one limited how federal funds are "used." *AOSI I*, 570 U.S. at 213.

Twice over the next decade, the Supreme Court confirmed that funding conditions bypass the usual First Amendment standards only when they restrict how recipients use federal money. In *Rust*, the Court upheld a regulation that required recipients of Title X funds to establish a "physically and financially separate" program for administering Title X services. 500 U.S. at 180. The issue in *Rust* involved abortion funding. Under Title X, the government "provides federal funding for family-planning services." *Id.* at 178. But the statute prohibits funds from being used "in programs where abortion is a method of family planning." *Id.* So the regulation required recipients who provided abortion services with private funds to "physically and financially" separate their Title X services. *Id.* at 180. The Supreme Court upheld

this regulation because it simply ensured "that federal funds will be used only to further the purposes of a grant." *Id.* at 198.

By contrast, the Supreme Court rejected a funding condition that "barred" broadcast stations receiving federal subsidies from "all editorializing." *FCC v. League of Women Voters of California*, 468 U.S. 364, 400 (1984). Unlike *Regan* and *Rust*, the law in *League of Women Voters* did not allow a broadcast station "to segregate its *activities* according to the source of funding" (and thus use private funds for "editorial activity"). *Id.* (emphasis added). A station "that receive[d] only 1% of its overall income from [federal] grants [was] barred absolutely from all editorializing." *Id.* Thus, the condition did not simply restrict how federal funds were used—it also limited activities funded by private sources of income. That took the condition outside of Congress's spending authority.

2. The Supreme Court synthesized *Regan*, *Rust*, *League of Women Voters*, and other cases in *AOSI I* when it struck down a condition for funding used "to combat the spread of HIV/AIDS around the world." 570 U.S. at 208, 221. In *AOSI I*, Congress had appropriated "billions of dollars to fund efforts by nongovernmental organizations to assist in the

fight." *Id.* at 208. But to receive funding, organizations had to abide by two conditions. The first restricted funds from being "used to promote or advocate the legalization or practice of prostitution or sex trafficking." *Id.* (quoting 22 U.S.C. § 7631(e)). And the second prevented organizations from receiving funds unless they had "a policy explicitly opposing prostitution and sex trafficking." *Id.* (quoting 22 U.S.C. § 7631(f)). The challenge in *AOSI I* concerned only the second condition—the requirement that organizations explicitly oppose prostitution.

The government's argument in *AOSI I* mirrored its argument here. It claimed that because organizations could simply decline the funds, the condition need only be noncoercive and reasonably related to the statute's purpose. *Id.* at 214; *see also* Pet'r Br. at 16–19, *AOSI I*, 570 U.S. 205 (No. 12-10), https://perma.cc/KX2G-4N4U. But the Supreme Court rejected that argument. *AOSI I*, 570 U.S. at 214. Instead, it explained that the "relevant distinction" is between "conditions that define the limits of the government's spending program—those that *specify the activities Congress wants to subsidize*—and conditions that seek to leverage funding to regulate speech outside the contours of the

program." *Id.* at 214–15 (emphasis added). Whether the condition was related to the program was beside the point if it went beyond "specify[ing] the activities Congress wants to subsidize." *Id.*

That distinction proved fatal. Requiring organizations to adopt a policy against prostitution went beyond defining the limits of how funds are used. *Id.* at 218–19. This became apparent when considering the two statutory conditions together. The first condition prohibited federal funds from "being used to promote or advocate the legalization or practice of prostitution or sex trafficking." *Id.* at 217–18 (internal quotation marks omitted). This provision "ensure[d] that federal funds [would] not be used for the prohibited purposes." *Id.* at 218. The second condition did "something more"—it compelled recipients "to adopt a particular belief as a condition of funding" even when they used the funds for the very purpose that Congress required. *Id.* Thus, the condition was not about how the funds were used, but about the recipients themselves.

While *AOSI I* clarified the Supreme Court's past decisions, it did not break new ground. As discussed above, *Shelton* also involved a voluntarily obtained government benefit to which no one was entitled.

*See Perry*, 408 U.S. at 597. And it also involved a condition that related directly to the government's interest—a point on which both the majority and dissent agreed. *Compare Shelton*, 364 U.S. at 485, *with id.* at 498 (Harlan, J., dissenting) (agreeing "that information about a teacher's associations may be useful to school authorities" in evaluating potential candidates). But the majority in *Shelton* applied exacting scrutiny—not the reasonableness review urged by the dissent and seen in cases like *Regan* and *Rust*.

That makes sense—and it fits comfortably with how the Supreme Court has explained the rule over the past half century. A teacher's job, after all, stays the same no matter what that teacher's associations may be. So while the disclosure law might have been useful for the government to vet its teachers, it did not define or limit how the state's funds would be "used." *AOSI I*, 570 U.S. at 213. Rather, it penalized recipients who were unwilling to waive their right to be free from compelled disclosure, just as the law in *Speiser* penalized recipients who were unwilling to waive their right to be free from compelled speech. That's why the Supreme Court has grouped cases like *Speiser* and *Shelton* together, *see Perry*, 408 U.S. at 597, and why it has

distinguished them from cases like *Regan* that do not "fit[] the *Speiser-Perry* model," *see Regan*, 461 U.S. at 545.

The bottom line is simple enough. Conditions that restrict how federal funds are "used" need only be reasonably related to the federal program's purpose. *AOSI I*, 570 U.S. at 213–14. Conditions that go beyond "specify[ing] the activities Congress wants to subsidize" must pass the ordinary First Amendment test. *Id.*

C. The disclosure law must overcome heightened scrutiny because it does not regulate how federal funds are used.

The lower scrutiny applied in cases like *Regan* and *Rust* does not apply here because the disclosure rule does not restrict how 501(c)(3) organizations use federal funds. Rather, the law requires recipients to give up their right to be free from compelled disclosure just as the law in *AOSI I* required recipients to give up their right to be free from compelled speech.

1. Start with the basic point: the disclosure law does not limit how federal funds are "used." *See AOSI I*, 570 U.S. at 213. Nor does it "specify the activities Congress wants to subsidize." *Id.* at 214. A 501(c)(3) organization will engage in the same speech and the same activities regardless of whether it discloses its substantial contributors

37

on a Schedule B. That alone resolves this issue. The reasonableness standard from *Regan* applies only to conditions that "impose limits on the use of [federal] funds," *id.* at 213—which the disclosure law does not do.

This is even more apparent in view of the larger regulatory context. Like the statute in *AOSI I*, the law here imposes multiple conditions on the recipients. And like the statute in *AOSI I*, those other conditions restrict how federal funds are used. Organizations can obtain tax-exempt status, for example, only if they operate "exclusively" for certain "purposes." *See* 26 U.S.C. § 501(c)(3). To meet that condition, organizations must "engage[] primarily *in activities* which accomplish one or more" of those exempt purposes. 26 C.F.R. § 1.501(c)(3)-1(c)(1) (emphasis added). Organizations must also limit activities like lobbying, refrain from activities like participating in political campaigns, and ensure that their tax-free funding does not inure "to the benefit of private shareholders or individuals." 26 U.S.C. § 501(c)(3); 26 C.F.R. § 1.501(c)(3)-1(c)(2). These conditions all "ensure[] that federal funds will not be used for . . . prohibited purposes." *AOSI I*, 570 U.S. at 218.

"The [disclosure law] therefore must be doing something more—and it is." *Id.* The law has no effect on how organizations spend their tax-free income. Rather, it is (as the IRS concedes) intended as an enforcement tool, to make administering the tax code more convenient and efficient. Even assuming the law serves that purpose, it would only mean that the regulation is "relevant to the objectives of the program." *Id.* at 214. But that is not enough under *AOSI I. Id.* The condition must "specify the activities Congress wants to subsidize"—which the disclosure law does not do. *Id.*

To see why, consider how the law affects an organization like The Buckeye Institute. The Buckeye Institute is an educational organization that "promote[s] limited and effective government and individual freedom." Alt Decl. ¶3, R.36-1, PageID#185. Its public-policy work falls squarely within the "activities Congress wants to subsidize" under § 501(c)(3). *AOSI I*, 570 U.S. at 214. So when The Buckeye Institute speaks using tax-exempt income, its funds are "used in the manner Congress intends." *Id.* at 213.

What changes about The Buckeye Institute's activities if it does not disclose its substantial contributors to the IRS every year? Nothing. The

Buckeye Institute's speech remains the same. The Buckeye Institute's activities remain the same. Everything that The Buckeye Institute does with its tax-free income remains the same because—just like in *AOSI I*—other statutory and regulatory restrictions "ensure[] that federal funds will not be used for . . . prohibited purposes." *AOSI I*, 570 U.S. at 218. The disclosure law does "something more" than restrict how federal funds are "used." *Id.* at 213, 218. And that something is limiting The Buckeye Institute's associational freedom as the price of tax-exempt status.

The government attempts to distinguish *AOSI I* by arguing that "Congress has simply chosen not to subsidize a tax-exempt organization under § 501(c)(3) and give its contributors deductions without generally requiring the organizations to report its substantial contributors." Gov't Br. 51. But that's no distinction at all. One can recast *AOSI I*'s facts in the same way, explaining that "Congress [had] simply chosen not to subsidize [organizations fighting AIDS/HIV] without generally requiring the organizations to [adopt an anti-prostitution policy]." If the government is right here, the Supreme Court was wrong in *AOSI I*.

The same confusion over what it means to limit how funds are "used" arises when the government discusses *League of Women Voters*. There, the government explains that the Supreme Court invalidated the law in *League of Women Voters* because the funding recipients were "not able to segregate [their] activities according to the source of [their] funding." Govt. Br. at 47 (quoting *League of Women Voters*, 468 U.S. at 400). That is true. But the government never takes the next, necessary step to explain how it applies here. Which "activities" should a 501(c)(3) organization "segregate?" In *Regan*, it was lobbying and non-lobbying. In *Rust*, it was abortion and other family-planning services. In *League of Women Voters*, it was broadcasting editorial content and non-editorial content. No similar dichotomy exists here because the disclosure law does not limit how 501(c)(3) organizations use tax-exempt funds.

None of the government's favored cases lead to a different conclusion. In *Cammarano v. United States*, 358 U.S. 498 (1959), the Supreme Court applied the same principle as it did *Regan*—that prohibiting deductions for lobbying is a restriction on the activities that federal funds pay for. *Id.* at 513. In *Grove City College v. Bell*, 465 U.S. 555 (1984), the Court likewise upheld conditions that ensured federal

funding is only used to pay for non-discriminatory education programs. *Id.* at 575. These cases fit easily within the use-recipient paradigm.[4]

2. Still, the government says, The Buckeye Institute can solve its problem by forming a separate affiliated entity, seeking tax-exempt status for that affiliate under § 501(c)(4), and directing privacy-conscious donors to the affiliate. But as the district court recognized, that does not solve the problem at all. *See* Op. & Order, R.60, PageID#854 n.6. The Buckeye Institute must either waive its right to associational privacy to receive tax-deductible contributions, or it must waive its eligibility for tax-deductible contributions to retain its right to associational privacy. Setting up a separate 501(c)(4) does not change anything.

Nor does *Regan* say otherwise. True, the Supreme Court discussed in *Regan* how the plaintiff could establish a 501(c)(4) if it wanted to lobby. But that only mattered because, unlike here, the condition in *Regan* restricted what the plaintiff could use its tax-free income for. *Regan*,

---

[4] The government also seeks support in *Lewis Publishing Co. v. Morgan*, 229 U.S. 288 (1913). Gov't Br. at 44. But *Lewis Publishing* was decided half a century before the Supreme Court began using tiers of scrutiny—much less considering the different standards of review that might apply to conditional government benefits.

461 U.S. at 544. So the option to lobby with an affiliate did not cure any First Amendment problem—it didn't need to because the First Amendment does not require Congress "to subsidize lobbying" in the first place. *Id.* at 546. Rather, the option to lobby with an affiliate simply demonstrated how the law did not penalize lobbying—it simply declined to fund it. But as discussed above, the disclosure law here is not a restriction on how organizations use tax-free income, and so there is no need to consider whether the law penalizes recipients for engaging in a constitutionally protected activity beyond declining to subsidize it.

Even still, the Supreme Court foreclosed the government's argument on this point just a few years ago in the sequel to *AOSI I*. After *AOSI I*, a group of plaintiffs returned to the Supreme Court, challenging the same policy as applied to foreign affiliates of American organizations. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430 (2020) ("*AOSI II*"). But foreign organizations operating abroad do not have First Amendment rights. *Id.* at 433–34. So the plaintiffs argued that the American organizations' First Amendment rights extended to their foreign affiliates because of the risk that the affiliates' speech could be wrongly attributed to their American counterparts. *Id.* at 436–

43

37. The Supreme Court disagreed. It rejected the challenge based on the "long settled" principle that "separately incorporated organizations are separate legal units with distinct legal rights and obligations." *Id.* at 435. To the extent that *Regan* suggested otherwise, the Court made clear that *Regan*'s discussion of affiliates did no more than "explain[] that a speech restriction on a corporate entity did not prevent a separate affiliate from speaking, a point that is not disputed in this case." *Id.* at 437.

So too here. If the disclosure law burdens The Buckeye Institute's First Amendment rights, it does not matter that a separate affiliated organization could exercise its own right to associate privately without restriction. *Regan*'s conclusion that "a speech restriction on a corporate entity [does] not prevent a separate affiliate from speaking" has no bearing on this case. *Id.*

Remarkably, the government mentions *AOSI II* only once in its brief—and when it does, it cites the dissent for its argument that The Buckeye Institute could just set up an affiliate. *See* Gov't Br. at 31 (citing *AOSI II*, 591 U.S. at 445 (Breyer, J., dissenting)). But "[a] dissenting opinion is generally not the best source of legal advice on

how to comply with the majority opinion." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 230 (2023). The Supreme Court's actual holding that "separately incorporated organizations are separate legal units with distinct legal rights" forecloses the government's affiliate argument. *AOSI II*, 591 U.S. at 435. And even if *Regan* held otherwise, *AOSI II* confined the decision to its unique facts.

To be sure, *AOSI II* did little more than follow well-established First Amendment principles. Ten years earlier, in *Citizens United v. FEC*, 558 U.S. 310 (2010), the Supreme Court considered a challenge to the federal ban on corporate political expenditures. The federal government defended the law (in part) by arguing that the law was not "a *complete* ban" on political expenditures because corporations could set up a PAC to speak on their behalf. *See* Supp. Br. at 15, *Citizens United v. FEC*, 558 U.S. 310 (2010) (No. 08-205) (quotation marks omitted) (emphasis added), https://perma.cc/Q6FC-6FZL. The Supreme Court disagreed. The law "does not allow corporations to speak" because "[a] PAC is a separate association from the corporation." *Citizens United*, 558 U.S. at 337. And that's true even though the sole purpose of a PAC is to engage

in political speech on behalf of its corporate affiliate. *Id.* at 321; 52

U.S.C. § 30118(b)(2). For the same reason, the fact that a 501(c)(4) can

retain its associational privacy by giving up eligibility for tax-deductible

contributions in no way cures the unconstitutional burden imposed on

an affiliated 501(c)(3) counterpart.[5]

D. The government's proposed tax-benefit exception to the Constitution transforms the tax code into the supreme law of the land.

1. *There is no general rule that conditions directly related to voluntary tax benefits receive lower scrutiny.*

Much of the government's position depends on an expansive claim

that "restrictions tied to federal tax subsidies do not 'infringe' First

Amendment rights." Gov't Br. at 25 (quoting *Regan*, 461 U.S. at 549–

50). Effectively, the government expands the bottom-line conclusion

from *Regan*—that the lobbying restriction does not violate the First

Amendment—to apply to any rule that attaches to a tax benefit. But

---

[5] If the Court determines that *Regan* requires applying a more deferential standard than that announced in *Bonta*, The Buckeye Institute respectfully preserves the argument that *Regan* was wrongly decided and should be reconsidered. Individuals do not give up their right to associational privacy by operating a tax-exempt entity under federal law, and the First Amendment does not permit Congress to exercise its power to tax to coerce such a bargain. In any event, The Buckley Institute would prevail even under *Regan*. *See infra* Section III.

*Regan* did not create a new rule for voluntary tax exemptions. And there's no authority for claiming that the context of a tax deduction changes the analysis.

In fact, the opposite is true. As discussed above, the Supreme Court has explained that *Speiser* (a case about tax exemptions) and *Shelton* (a case about a government teaching job) fit within the same class of unconstitutional-conditions cases. *Perry*, 408 U.S. at 597. In both contexts, neither claimant had a "right" to the government benefit. *Id.* And so in both cases, the Supreme Court applied the "general principle" that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Id.*

No decision since *Regan* even suggests that the Supreme Court views the case as having carved out a special rule for "restrictions tied to federal tax subsidies." Govt. Br. at 25. The Supreme Court has repeatedly relied on *Regan* in cases having nothing to do with federal taxes to explain when conditions on government benefits implicate the First Amendment. To argue (as the government does) that all conditions "tied to federal tax subsidies" necessarily do not infringe on First

Amendment rights ignores *AOSI I* and makes "much of the reasoning of *Regan* . . . beside the point." 570 U.S. at 220.

The government's reliance on *Mobile Republican Assembly v. United States*, 353 F.3d 1357 (11th Cir. 2003), is likewise misplaced. To start, and contrary to the government's argument (at 25–26), the Eleventh Circuit did not address which level of scrutiny applies to reporting requirements like the one here. In fact, it couldn't have—because the Eleventh Circuit held that the plaintiff's challenge was prohibited by the Anti-Injunction Act. *Id.* at 1359. The court's discussion about whether the law was a "penalty" or "part of the tax framework" had nothing to do with the limits of Congress's spending power. The court answered the statutory question of whether the plaintiff's challenge was "barred" by the Anti-Injunction Act because "it sought to enjoin the collection of a tax." *Id.* at 1360.

To the extent that the Eleventh Circuit addressed (in dicta) the merits of the plaintiff's claim, its analysis is inconsistent with *AOSI I*. The court grounded that discussion—like the government does here—on the tax subsidy being "voluntary," and so any organization that does not want to comply with a reporting requirement can "simply decline to

register." *Id.* at 1361. But that was true in *AOSI I*. The condition there "enacted no barrier to the exercise of [the plaintiffs'] constitutional rights" because they could simply decline the federal grant. *Id.* And the condition was certainly "part of the [statutory] framework" Congress enacted to fight HIV/AIDS. *Id.*at 1362. But because the condition did not regulate how the federal funds were "used," the First Amendment still applied. *AOSI I*, 570 U.S. at 213. The Eleventh Circuit's decision in *Mobile Republican Assembly* never even discusses the relevant legal question.[6]

### 2. The government's expansive theory carves a gaping hole in the Constitution.

The government's tax-benefits-are-unique argument is not just wrong—it raises an alarming problem. It would free the IRS from ordinary constitutional constraints so long as its laws and regulations

---

[6] The government makes a similar argument in distinguishing this case from *Bonta*, arguing that The Buckeye Institute can avoid the disclosure law by declining tax-exempt status or establishing an affiliate. Gov't Br. at 42. The plaintiff in *Bonta*, however, had the same choice, as California's regulation required only that nonprofit organizations disclose their federal Schedule B. *Bonta*, 594 U.S. at 602. If the *Bonta* plaintiffs declined federal tax-exempt status under § 501(c)(3), they would not have had to disclose their donors.

marginally (or even just theoretically) help the agency enforce the tax code. Nothing in *Regan* supports such sweeping authority.

Consider a variation on this case to see how the problem manifests. The government contends that the disclosure law here passes rational-basis review because of "its deterrent effect." Gov't Br. at 37. Disclosure itself, the government says, encourages voluntary compliance because donors are less likely to claim improper deductions when they know the 501(c)(3) organization is reporting their information to the IRS. *Id.* at 37–38. And that's enough to satisfy the Constitution—or so the government argues.

But suppose that rather than requiring 501(c)(3) organizations to disclose their substantial contributors to the IRS, the government instead required disclosing all contributors to the public. That would presumably encourage voluntary compliance as well. And why stop there? If disclosure encourages compliance, why not mandate that taxpayers claiming deductions or exemptions of any kind publish their own tax returns too?

The government pushed back on hypotheticals like these below because they "confuse[] reporting to the IRS with disclosure to the

public." Gov't Reply, R.37, PageID#453. But that's the point. Public disclosure increases the burden on exercising one's associational rights. And capturing all donors instead of just major donors does the same thing. Yet the government's position here is that those distinctions do not matter—courts must uphold a law requiring public disclosure of any taxpayer's associational information "as long as there is a 'rational basis' for the requirement." Gov't Br. at 32. And any burden on associational freedom is irrelevant because a taxpayer can always "decline the subsidy." *Id.* at 30.

The whole point of exacting scrutiny is to account for these variations. It ensures that the strength of the government's interest "reflect[s] the seriousness of the actual burden on First Amendment rights." *See Bonta*, 594 U.S. at 607. Applying rational-basis review to any condition on a federal tax benefit—regardless of whether that condition "specif[ies] the activities Congress wants to subsidize," *AOSI I*, 570 U.S. at 214—makes those otherwise serious issues immaterial.

The government shrugs in response. Tax-exempt status "is wholly voluntary," the government says, and so taxpayers can avoid burdensome conditions by declining whatever deductions or exemptions

the IRS offers. Gov't Br. at 24. But that was also true for the plaintiffs in *AOSI I*, who did not have to accept government funding to fight HIV/AIDS. Still, it's worth pausing to consider the expansive scope of the government's position.

Congress has exercised "the full measure of its taxing power" to presumptively tax every dollar of income gained by individuals and organizations alike. *See Glenshaw Glass Co.*, 348 U.S. at 429 (quotation omitted); 26 U.S.C. §§ 1, 11, 61(a). It then carves out exceptions to that general rule and offers them as a "benefit." Treating every voluntary tax benefit as beyond the ordinary constitutional rules thus maximizes the government's ability to "leverage its spending authority to limit, if not eliminate, the exercise of this or that constitutional right." *See Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019) (en banc).

Consider two examples. The tax code offers deductions for home office expenses. 26 U.S.C. § 280A(c). Whether one qualifies for a particular deduction can turn on "[t]he amount of time spent at each place where you conduct business." IRS Pub. 587 at 3 (2024). Enforcing that rule might be easier if the government required taxpayers claiming

those deductions to submit to location tracking. Does the Fourth Amendment apply to that condition? *See Carpenter v. United States*, 585 U.S. 296, 320–21 (2018). The government would answer no.

Or what about the child tax credit? 26 U.S.C. § 24. Imagine a law giving the IRS authority to conduct warrantless searches of any home, at any time, belonging to a family claiming a credit because it enables the agency to verify whether a child in fact lives there. *See* 26 U.S.C. §§ 24, 152(c)(1)(B). Does the Fourth Amendment apply to such searches? Again, the government would say no. Those opposed to giving up their Fourth Amendment rights for a child tax credit can simply "decline the subsidy." Gov't Br. at 30.

None of this is to say that the tax code's far-reaching nature means the Court should adopt a special rule in the other direction. Decisions like *Regan* and *AOSI I* resolve these hypotheticals with ease. Unless a condition is limited to restricting how tax-free income is "used," the ordinary constitutional rules apply. *AOSI I*, 570 U.S. at 213. That's what *AOSI I* requires. And it leaves no room for the government's claim that "restrictions tied to federal tax subsidies do not 'infringe' First Amendment rights." Gov't Br. at 25.

One last point about taxes. No one should worry that applying ordinary constitutional principles to some conditions will impede the IRS's ability to enforce the tax code. The Supreme Court has long recognized the government's interest in "collect[ing] a consistent stream of revenue." *CIC Servs., LLC v. IRS*, 593 U.S. 209, 212 (2021) (quotation omitted). Yet even when considering laws that are "essential" to our tax system—the "life-blood of government"—the Supreme Court requires the government to satisfy basic constitutional standards. *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 350, 354–55 (1977) (quotation omitted). If the IRS can enforce "essential" laws without bypassing the Constitution, *id.* at 350, it can do the same here.

To this end, The Buckeye Institute does not contend that the IRS can never obtain donor information. And for this appeal, the Court need not decide whether collecting the same information on a Schedule B narrowly furthers the government's interest. All The Buckeye Institute contends is that the government must satisfy exacting scrutiny if it wants to do so. It is a high bar to be sure—but it's not insurmountable. *See, e.g.*, *Reed*, 561 U.S. at 202. If the government needs donor

information on the Schedule B as much as it claims, it should have no trouble proving that claim on remand.

## II. THE GOVERNMENT'S EVIDENCE-FREE CLAIM THAT THE DISCLOSURE RULE PASSES EXACTING SCRUTINY IS FRIVOLOUS.

The government alternatively claims that the disclosure rule passes exacting scrutiny "as a matter of law" because Congress decided "long ago" that narrower alternatives were insufficient. Gov't Br. 53–54. But the plaintiffs have not yet engaged in any discovery to test the veracity (or plausibility) of the government's claims. And the district court has made no factfinding at all. The argument thus seems to be that the government can satisfy exacting scrutiny based only on Congress's own assertions about whether the law passes narrow tailoring. That's not how exacting scrutiny works.

### A. The government cannot rely on its own unsubstantiated assertions to satisfy exacting scrutiny.

Even when the government "has an important interest" at stake, *Bonta*, 594 U.S. at 612, it "must affirmatively establish" a record that "substantiate[s]" its claim that the law is narrowly tailored to further an important purpose. *Id.* at 614 (quotation omitted). "[T]here must be

*evidence*; lawyers' talk is insufficient." *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009).

*Bonta* illustrates this point well. There, the state had an important interest in preventing charitable fraud. And the government made plausible arguments about how the law was narrowly tailored. But "the record before the District Court [told] a different story." *Id.* at 613. California failed exacting scrutiny because the trial record lacked "a single, concrete" piece of evidence to "substantiate" the government's claims. *Id.* California's arguments alone were not enough—exacting scrutiny required the state to "demonstrate its need" for disclosure with real evidence. *Id.* at 613–14.

Yet the government here contends that this Court need not even consider the factual basis to satisfy narrow tailoring because "Congress long ago determined that narrow alternatives were 'inadequate.'" Gov't Br. at 54. Who knew it was so easy? Why bother with discovery or a trial, or courts, if the government can avoid judicial review by simply deciding for itself what's necessary and what's important? Of course, the whole point of exacting scrutiny is that the government must "substantiate" its claims, rather than the courts simply taking the

government's word for it. *Bonta*, 594 U.S. at 614. And Article III empowers courts—not Congress—"to decide whether a particular legislative choice is constitutional" under the First Amendment. *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 313 (2022).

The posture here matters. The government supports its claim primarily with congressional reports and claims about "[t]he legislators' reasoning." Gov't Br. at 62–63; *see also id.* at 56. It makes a passing reference to declarations submitted below. *Id.* at 58 n.10. Whatever merit those sources may have, this interlocutory appeal reaches the Court before discovery even began. *See* Order Staying Discovery, R.28, PageID#113. The Buckeye Institute disputes the government's claims that disclosing donor information on a Schedule B is necessary or even useful. But it has had no opportunity to depose witnesses or obtain documents related to those claims. *See* Carson Decl. ¶6, R.49-3, PageID#737; Fed. R. Civ. P. 56(d). The government's argument that it is entitled to judgment as a matter of law before discovery is frivolous. *See Vance v. United States*, 90 F.3d 1145, 1149–50 (6th Cir. 1996).

B.   The little evidence the government does have would entitle The Buckeye Institute—not the government—to judgment as a matter of law.

Even if the Court took the record as it stands, The Buckeye Institute—not the government—would be entitled to judgment as a matter of law. That's because the government's evidence does nothing to shore up the otherwise uncontroverted problems this law has under narrow tailoring.

Under *Bonta*, the government "must . . . demonstrate its need for universal production in light of any less intrusive alternatives." 594 U.S. at 613. Here, as in *Bonta*, that means proving the government needs annual, indiscriminate disclosure, instead of collecting the information in more discrete circumstances. That is a tough (if not impossible) task because the Treasury Department has already acknowledged that it does not need the information on Schedule Bs for 501(c) organizations other than 501(c)(3)s. *See* Revenue Proc. 2018-38, R.36-4, PageID#203; 85 Fed. Reg. at 31963. The other 501(c) organizations are also banned from things like private inurement, self-dealing, and other issues related to qualification—issues the government raises here. *See* Gov't Br. at 59. But the Treasury

Department has admitted that the Schedule B does not meaningfully improve its efforts in detecting those problems. Revenue Proc. 2018-38, R.36-4, PageID#203; 85 Fed. Reg. at 31963.

Nor does it matter that taxpayers can make deductible contributions to 501(c)(3) organizations, but not others. To start, other 501(c) organizations receive this benefit as well. *See* Gov't Br. at 4 n.1. Even still, the IRS has admitted that it does not systematically use Schedule Bs for compliance because it cannot electronically cross-check data on a Schedule B against individual tax returns, IRS Presentation, R.36-8, PageID#241. And despite suggesting that it "can use" Schedule B information in its brief (at 22–23, 34), the government's witnesses' affidavits could not give even one "concrete" example of using Schedule B information for this purpose. *Bonta*, 594 U.S. at 613.

In fact, none of the government's witnesses would even hazard a guess in their affidavits as to how often Schedule B information leads the IRS to initiate an examination or otherwise take action. *See* Resp. to MSJ, R.49, PageID#703–713. That matters because narrow tailoring requires the government to show that indiscriminately collecting donor information provides meaningful benefits in more than just "some

cases." *Bonta*, 594 U.S. at 613. Never mind "some cases." The IRS does not even have one.

Other problems for the government abound. Consider that some 501(c)(3) organizations—religious institutions, for example—are exempt from the disclosure law altogether. The government suggests that this exemption proves the law is narrowly tailored, Gov't Br. at 58, but that's exactly backwards. Courts are "deeply skeptical" of a "speaker-based disclosure requirement that is wholly disconnected from [the government's] informational interest." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777–78 (2018). Nothing in the record explains the government's "need" for indiscriminate, "universal production" of donor information for 501(c)(3)s, *Bonta*, 594 U.S. at 613, unless that 501(c)(3) is a church.

The limited evidence below suggests that The Buckeye Institute—not the government—is entitled to judgment as a matter of law under exacting scrutiny. But at the very least, the government's attempt at evading discovery and trial falls flat.

III. EVEN UNDER *REGAN*'S REASONABLENESS STANDARD, THE BUCKEYE INSTITUTE IS ENTITLED TO PROVE THE ALLEGATIONS IN ITS COMPLAINT.

Even if the Court decides that exacting scrutiny does not apply, it should decline the government's request to uphold the law without further proceedings below.

The Buckeye Institute's complaint alleges that the disclosure rule serves no purpose. Amend Compl. ¶¶ 1, 5, R.68, PageID#877, 879. The government can obtain the information it needs without indiscriminately collecting donor information from 501(c)(3) organizations every year. And the government cannot systematically use this information to detect fraud because it lacks the technological capability to match individual taxpayer returns to the names identified on a Schedule B. MSJ, R.36, PageID#170 (citing IRS Presentation, R.36-8, PageID#241); Resp. MSJ, R.49, PageID#713. Even if The Buckeye Institute is wrong in its claims, it is entitled to a chance at proving them—and *disproving* the government's contrary claims— through discovery "prior to [a] decision on a summary judgment motion." *Vance*, 90 F.3d at 1149–50; Fed. R. Civ. P. 56(d); Carson Decl. ¶6, R.49-3, PageID#737.

That's what happened in *United States v. American Library Association*, 539 U.S. 194 (2003). There, the Supreme Court applied *Regan*'s reasonableness test to uphold a requirement that public libraries receiving federal subsidies install content-filtering software on their computers. In doing so, the Supreme Court relied on a detailed trial record—including expert witness testimony—to explain how the restriction was reasonable in light of "the role of libraries in our society." *Id.* at 203–04, 212–13. The Buckeye Institute is entitled to no less factual development here.

To be sure, that might not always be the case under rational-basis review—the government's preferred characterization of the scrutiny applied in *Regan*. *See, e.g.*, Gov't Br. at 27–38. But the spending-condition cases discuss reasonableness, not rational-basis review. *See, e.g.*, *Am. Library Ass'n*, 539 U.S. at 212–13.[7] This difference matters because rational-basis review "is not subject to courtroom factfinding" and can be based on "speculation" alone. *Alexander v. MSPB*, 165 F.3d 474, 484 (6th Cir. 1999). By contrast, it is well within the

___

[7] *Regan* mentions rational-basis review once when discussing the Equal Protection Clause, not the First Amendment. *Compare Regan*, 461 U.S. at 547, *with id.* at 544–45.

reasonableness review applied to conditional benefits to review evidence—even if that review is deferential. The Buckeye Institute alleges that the donor information serves no purpose in administering or enforcing the tax code, Amend. Compl. ¶¶ 1, 5, R.68, PageID#877, 879, and the Court cannot ignore those allegations and enter judgment in the government's favor as a matter law.

CONCLUSION

The Court should affirm the district court's order and remand the matter to the district court for further proceedings.

November 19, 2025

Robert Alt
David C. Tryon
Jay R. Carson
Alex M. Certo
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, OH 43125

Respectfully submitted by,

/s/ Brett R. Nolan
Alan Gura
Brett R. Nolan
Charles M. Miller
THE INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., Suite 801
Washington, DC 20036
(202) 301-3300
bnolan@ifs.org

*Counsel for The Buckeye Institute*

As required by Federal Rule of Appellate Procedure 32(g) and 6th Cir. R. 32, I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) because it contains 11,356 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced Serif typeface, Century Schoolbook, in 14-point font using Microsoft Word.

/s/ Brett R. Nolan

CERTIFICATE OF SERVICE

I certify that on November 19, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Brett R. Nolan

The Buckeye Institute designates the following as relevant documents from the district court:

| | | |
|---|---|---|
| Complaint | R.1 | PageID#1–12 |
| Government's MTD | R.21 | PageID#56–85 |
| The Buckeye Institute's Response to MTD | R.35 | PageID#140–164 |
| The Buckeye Institute's MSJ | R.36 | PageID#165–84 |
| Government's MTD Reply | R.37 | PageID#436–57 |
| Government's MSJ | R.43 | PageID#474–98 |
| Government's Response to MSJ | R.44 | PageID#678–90 |
| The Buckeye Institute's Response to MSJ | R.49 | PageID#698–718 |
| The Buckeye Institute's MSJ Reply | R.50 | PageID#739–49 |
| Government's MSJ Reply | R.54 | PageID#786–808 |
| Opinion & Order | R.60 | PageID#843–55 |
| Motion to Certify Interlocutory Appeal | R.71 | PageID#908–24 |
| Order Granting Certification | R.73 | PageID#928–31 |