No. 25-3170

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

THE BUCKEYE INSTITUTE,

*Plaintiff-Appellee,*

v.

INTERNAL REVENUE SERVICE, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Ohio, Columbus Division
(No. 2:22-cv-04297, Hon. Michael H. Watson)

_____

**BRIEF OF AMICUS CURIAE
AMERICANS FOR PROSPERITY FOUNDATION
IN SUPPORT OF APPELLEE THE BUCKEYE INSTITUTE
AND AFFIRMANCE**

_____

Cynthia Fleming Crawford
AMERICANS FOR PROSPERITY
FOUNDATION
4201 Wilson Road, Ste. 1000
Arlington, VA 22203
571.329.2227
ccrawford@afphq.org

November 21, 2025          *Attorney for Amicus Curiae*

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 25-3170          Case Name: The Buckeye Institute v. IRS et al.

Name of counsel:  Cynthia Fleming Crawford

Pursuant to 6th Cir. R. 26.1, Americans for Prosperity Foundation

Name of Party

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

---

### CERTIFICATE OF SERVICE

I certify that on _____ November 21, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Cynthia Fleming Crawford

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES ....................................................................ii

INTEREST OF *AMICUS CURIAE* .........................................................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ........................................................................................5

I.  Under *Americans for Prosperity Foundation v. Bonta*, Courts must Apply Exacting Scrutiny to Donor Disclosure ........................................5

II.  *AFPF* Held that Exacting Scrutiny is the Proper Standard for Compelled Disclosure of Donor Information ...........................................7

III.  *AFPF* Relied Heavily on Precedent Protecting Disfavored Viewpoints. ......................................................................................8

IV.  Narrow Application is Not a Substitute for the Means-Ends Requirement of Narrow Tailoring.............................................................9

V.  The Burden of Disclosure Must be Commensurate to the State's Need for the Information. ....................................................................19

CONCLUSION ....................................................................................22

CERTIFICATE OF COMPLIANCE.......................................................23

CERTIFICATE OF SERVICE................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Americans for Prosperity Foundation v. Bonta,*
594 U.S. 595 (2021)
............................................... 3, 5, 7, 8, 9, 10, 14, 18, 19, 20

*Baird v. State Bar of Ariz,*
401 U.S. 1 (1971) ................................................................. 20

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) ............................................................. 13

*Buckley v. Valeo,*
424 U.S. 1 (1976) ................................................................. 20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................................. 13

*Dinner Table Action v. Schneider,*
2025 WL 1939946 (D. Me. July 15, 2025) ......................... 15

*Doe v. Reed,*
561 U.S. 186 (2010) ............................................................... 8

*Fed. Election Comm'n v. Wisconsin Right to Life, Inc.,*
551 U.S. 449 (2007) ............................................................. 20

*Gaspee Project v. Mederos,*
13 F.4th 79 (1st Cir. 2021) ................................... 4, 11, 12, 13

*Gibson v. Florida Legislative Investigation Comm.,*
372 U.S. 539 (1963) ............................................................... 9

*Independence Institute v. Williams,*
812 F.3d 787 (10th Cir. 2016) ............................................. 17

*Louisiana ex rel. Gremillion v. NAACP,*
366 U.S. 293 (1961) ............................................................. 19

*Lorillard Tobacco Co. v. Reilly,*
 533 U.S. 525 (2001) .............................................................. 22

*McCutcheon v. Federal Election Commission,*
 572 U.S. 185 (2014) .............................................................. 10

*NAACP v. Button,*
 371 U.S. 415 (1963) .............................................. 8, 10, 20

*NAACP v. Alabama ex rel. Patterson,*
 357 U.S. 449, 462 (1958) .......................................... 5, 8

*No on EE - A Bad Deal for Colorado, Issue Comm. v. Beall,*
 558 P.3d 671 (Colo. Aug. 4, 2025) .............................. 17, 18

*Shelton v. Tucker,*
 364 U.S. 479 (1960) .............................................................. 9, 19

*Sweezy v. State of N.H. by Wyman,*
 354 U.S. 234 (1957) .............................................................. 9

*Talley v. California,*
 362 U.S. 60 (1960) .............................................................. 5

*Wyoming Gun Owners v. Gray,*
 83 F.4th 1224 (10th Cir. 2023) .................................. 16, 21

Constitution

U.S. Const. Amend. I
 .......................................... 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 19, 20

**Other Authorities**

Anna Burkes, *Eternal Vigilance*, Thomas Jefferson's Monticello
 (Sept. 7, 2010) ..................................................................... 2

## INTEREST OF *AMICUS CURIAE*[1]

Americans for Prosperity Foundation ("AFPF") is a 501(c)(3) nonprofit organization committed to educating and empowering Americans to address the most important issues facing our country, including civil liberties and constitutionally limited government. As part of this mission, it appears as *amicus curiae* before federal and state courts. AFPF is interested in this case because protection of the freedoms of expression and association, guaranteed by the First Amendment, is essential for an open and pluralistic society.

In particular, AFPF has an interest in this case because bypassing the robust protections of *AFPF v. Bonta* threatens the rights of individuals to associate freely for whatever reason they wish—whether temporarily to achieve a single goal, indefinitely for a discrete but ongoing interest, or long-term with broadly aligned organizations. Civil society requires that Americans be open to associating at will and

---

[1]All parties have consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), *amicus curiae* states that no counsel for a party other than AFPF authored this brief in whole or in part, and no counsel or party other than AFPF made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

changing association nimbly to solve issues or simply to express themselves—and our Constitution protects that freedom. Donors to a heterodox blend of organizations may support only a portion of those organizations' activities or share just a single goal. Threats to expose nonprofits' donors place the ability to support diverse projects and opinions at risk by implying broad commonality among unrelated donors, chilling participation to only those circumstances in which all participants are aware of each other and willing to shoulder the multifarious views of other participants. Driving civil society further into tribalism will harm us all.

## SUMMARY OF ARGUMENT

The ways of attempting to circumvent First Amendment protections are limited only by the ingenuity of politicians and lawyers. Inevitably such attempts invoke some variation on the theme that surveillance and control by the government is necessary to keep people safe and promote efficiency. The eternal vigilance on which our liberty rests requires us to be on guard against any such attempts.[2]

---

[2] John Philpot Curran, Dublin, 1790 ("The condition upon which God hath given liberty to man is eternal vigilance,"). *See,* Anna Burkes, *Eternal Vigilance*, Thomas Jefferson's Monticello (Sept. 7, 2010)

This case presents the risk to First Amendment rights created by conflating the government's authority to spend money on promoting activity with the government's lack of authority to burden protected First Amendment rights. Here, the issue is donor disclosure by charities, an issue the Supreme Court addressed in *AFPF v. Bonta*, 594 U.S. 595 (2021) ("*AFPF*"), in which it held that exacting scrutiny applies to donor disclosure schemes because such schemes burden the constitutional right of association.

The only question before this court is which standard of review applies to compelled disclosure on the Schedule B to Form 990 for Section 501(c)(3) non-profit entities. *Amicus* agree with Buckeye that *AFPF*, in which compelled disclosure of donors was recognized as a chill on First Amendment association rights, provides the applicable standard of review: exacting scrutiny.

In *AFPF*, the Court held that exacting scrutiny requires a "means-end fit" between a disclosure mandate and the sufficiently important governmental interest the mandate is claimed to foster. *AFPF*, 594 U.S.

---

available at: https://www.monticello.org/exhibits-events/blog/eternal-vigilance/.

at 611, 614. In *AFPF*, exacting scrutiny was applied to the California Attorney General's mandate for blanket disclosure of donors to charitable organizations. *Id*. at 611. But *AFPF* was not limited to narrow categories of charities or particular formats of disclosure; nor did it include loopholes allowing the government exceptions from the First Amendment that would chill association.

The *AFPF* means-end fit seems to be challenging lower courts with some regularity, exposing charitable donors to unconstitutional risk. Here, the question is whether *AFPF* provides the controlling precedent. But even where *AFPF* has been applied, the means-ends requirement of narrow tailoring has proven challenging. In *Gaspee Project v. Mederos,* for example, the First Circuit blessed a disclosure scheme that replaced a means-end test with an elaborate set of parameters regarding who would be affected by the scheme. 13 F.4th 79, 82, 88–9 (1st Cir. 2021). Rather than focusing on *why* they would be affected, *Gaspee* essentially substituted narrow application for narrow tailoring. *Id*. Since *Gaspee* was decided, it has become a go-to precedent for those wishing to evade *AFPF* in donor disclosure cases, spreading misapplication across circuits.

This Court should be clear that freedom of association is not a government benefit to be granted or denied; that *AFPF* applies to compelled donor disclosure; and that exacting scrutiny under *AFPF* requires narrow tailoring between the government's claimed interest for seeking the donor information and the means it uses to get it.

## ARGUMENT

### I. Under *Americans for Prosperity Foundation v. Bonta*, Courts must Apply Exacting Scrutiny to Donor Disclosure.

*AFPF v. Bonta* provides the standard of review for the IRS's demand for annual Schedule B donor disclosure. Like the "blanket demand for Schedule Bs" in *AFPF*, the identical demand here is subject to *the same level of* scrutiny. *AFPF*, 594 U.S. at 611. Even if the disclosure is purportedly confidential, the associational chill identified in *AFPF* applies. *Id.* at 616 ("Our cases have said that disclosure requirements can chill association even if there is no disclosure to the general public.") (cleaned up). "Exacting scrutiny is triggered by 'state action which may have the effect of curtailing the freedom to associate,' and by the 'possible deterrent effect' of disclosure." *Id.* (quoting *NAACP v. Alabama*, 357 U.S., 449, 460–461 (1958). *See also Talley v. California*, 362 U.S. 60, 65 (1960)

("identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance").

Like in *AFPF*, the IRS here asserts an interest in preventing fraud and self-dealing. Opening Brief for the Appellant, RE 17, Page ID # 45. And like in AFPF, it "goes without saying that there is a substantial governmental interest in protecting the public from fraud." *AFPF* at 612 (cleaned up). But the informational demand here fails the means-end test in the same way *AFPF* failed the means-end test by seeking disclosure of donors that meet characteristics with no causal relationship to wrongdoing.

The IRS argues that *AFPF* can be distinguished from this case because the penalty for non-compliance imposed by California was greater than the penalty imposed by the IRS. Opening Brief for the Appellant, RE 17, Page ID # 52 (comparing penalties for non-compliance). But the magnitude of injury is a distinct question from the level of scrutiny that must be applied. The concerns that informed *AFPF* are present here, chilling the First Amendment rights of donors in the face of government demands to know who is supporting a charity.

## II. *AFPF* Held that Exacting Scrutiny is the Proper Standard for Compelled Disclosure of Donor Information.

*AFPF* was a facial challenge to a regulation requiring charities operating in California to register with the Attorney General's office and disclose major donors by filing Schedule B of their IRS Form 990 with the state. *AFPF*, 594 U.S. at 601–02. The disclosure requirement was not related to any specific activity, speech, or issue, but solely for annual registration renewal. *Id*. at 602. The case came before the Court with the contours of the applicable standard of review unsettled. *Id*. at 607. While the lower courts had nominally applied exacting scrutiny, there was disagreement over whether narrow tailoring was required. *Id*. at 605.

Americans for Prosperity Foundation, a public charity that was subject to the regulation, challenged the blanket donor disclosure requirement on the basis that it burdened the First Amendment associational rights of its donors and that exacting scrutiny required more than the lax standard applied by the Ninth Circuit. *Id*. at 602–03.

The Supreme Court held that, at the least, exacting scrutiny applies to compelled disclosure requirements and narrow tailoring is a necessary element of that standard. *Id*. at 607. Exacting scrutiny thus lies between strict scrutiny, with its least restrictive means test, and the "substantial

relation" standard noted in *Doe v. Reed*, 561 U.S. 186, 196 (2010), to require narrow tailoring, but not least restrictive means. *Id*. at 608.

### III. *AFPF* Relied Heavily on Precedent Protecting Disfavored Viewpoints.

The precedential bases for applying exacting scrutiny to donor disclosure came largely from cases protecting political speech and association disfavored by the government, such as *NAACP v. Alabama ex rel. Patterson*, because "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action" *AFPF*, 594 U.S. at 606 (citing 357 U.S. at 462). The Court also made clear that "it is immaterial to the level of scrutiny whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters. Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *Id*. at 608 (cleaned up). And the government cannot bypass constitutional protection by defining labels for new categories of speech to exclude them from the First Amendment. *NAACP v. Button*, 371 U.S. 415, 429 (1963) ("a State cannot foreclose the exercise of constitutional rights by mere labels"). The precedent underlying *AFPF* was not limited to regulations but also derived from

investigatory demands. *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539 (1963) (legislative committee subpoena); and *Sweezy v. State of N.H. by Wyman,* 354 U.S. 234, 242 (1957) (summons to testify before the Attorney General). It ran the gamut from administrative to law-enforcement-related demands.

Thus, exacting scrutiny squarely applies to donor disclosure regimes where the government relies on the same professed desires that were inadequate to evade exacting scrutiny in *AFPF*.

## IV.  Narrow Application is Not a Substitute for the Means-Ends Requirement of Narrow Tailoring.

Under *AFPF*, "exacting scrutiny requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and that the disclosure requirement be narrowly tailored to the interest it promotes." *AFPF*, 594 U.S. at 611 (cleaned up). Thus, "even a legitimate and substantial" government interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* at 609 (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

The narrow tailoring element is critical in cases involving burdens on the First Amendment, even if the burden is indirect "because 'First

Amendment freedoms need breathing space to survive.'" *AFPF*, 594 U.S. at 609 (quoting *Button*, 371 U.S. at 433). This requires satisfying two factors: 1) a proper scope of application; and 2) a means-ends fit between the method employed and the goal. In *McCutcheon v. Federal Election Commission*, a plurality of the Court explained that "[i]n the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." 572 U.S. 185, 218 (2014) (cleaned up).

In *AFPF*, blanket donor disclosure failed narrow tailoring because it was overbroad and lacked "tailoring to the State's investigative goals." *AFPF*, 594 U.S. at 615. Here, the identical demand for donor disclosure, Schedule B, has the same lack of connection between the demand and the alleged investigatory interest. The IRS tries to rebut the lack of tailoring by arguing that Congress, not the IRS, implemented the broad application. Opening Brief for the Appellant, RE 17, Page ID # 65 ("Congress long ago determined that narrower alternatives were

'inadequate.'"). But which branch of government created the overbroad demand is not relevant. And in any case, the First Amendment applies to Congress by name, so congressional action is not a *Get Out of Jail Free* card with regard to a necessary characteristic of tailoring: a means-end fit between the demand for disclosure and the governmental interest the demand purports to address. Moreover, narrowing the number of targets without a close means-end fit can be misleading because it creates the misimpression that the basis for reducing the number of targets has something to do with alleged interest without demonstrating the relationship. But narrow application is not the same as narrow tailoring.

The peril of substituting narrow application for the scope and means-end requirements of tailoring is already evident in how narrow tailoring has diverged from *AFPF* in recent cases.

*Gaspee Project v. Mederos*, for example, which was decided after *AFPF*, nominally embraced *AFPF* but misapplied the narrow tailoring element. 13 F.4th 79, 85 (1st Cir. 2021). *Gaspee* dealt with disclosure of funding sources for independent expenditures and electioneering communications. 13 F.4th 79, 82 (1st Cir. 2021). The Act in *Gaspee* required filing with the State Board of Elections a report disclosing all

organization donors over $1,000, but it also imposed an on-communication disclaimer identifying the five largest donors from the preceding year. *Id*. at 83. The asserted government interest in *Gaspee* was in an "informed electorate" which it held to be "sufficiently important to support reasonable disclosure and disclaimer regulations." 13 F.4th at 86. But under *AFPF* it is not enough to invoke tautologies such as demanding information for the purpose of being informed. Something more is needed.

Instead of relying on a purpose-based rationale, *Gaspee* resorted to a plethora of characteristics unrelated to a means-end relationship between the government's goal and the First Amendment burden imposed. *Gaspee* focused on time and size limitations—which affect the pool of speakers and messages subject to the law but fail to explain why the law should be applied at all. 13 F.4th at 88–9. Much like a law that applies only to redheads or early risers without any explanation of how narrowing the pool of targets produces the desired end, this type of analysis substitutes an exercise in narrow application for narrow tailoring. But infringing the rights of a small group is still infringement. And limiting a law based on characteristics that do not satisfy the means-

ends requirement raises concerns that the law may be unconstitutionally underinclusive. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993) ("The ordinances are underinclusive for those ends. . . . The underinclusion is substantial, not inconsequential."); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011) ("The consequence is that its regulation is wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it. Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").

Having "tailored" the law to irrelevant characteristics, *Gaspee* went a step further—blessing, rather than condemning as it should, the statutory demand that donors silence themselves by opting out of constitutionally protected messaging to avoid being outed by the organizations to which they donate. 13 F.4th at 89. Donors could avoid exposure under the law by either limiting the size of their donations or by opting out of allowing their donations to be used for the restricted forms of speech. *Id*. Reliance on self-censorship to excuse an unconstitutional law creates a moral hazard by allowing constitutional

protections to be bypassed by shifting the burden to the speaker. Nothing in *AFPF* endorses that approach.

Thus, while *Gaspee* purported to adopt the exacting scrutiny standard from *AFPF*, its analysis misapprehended what it means for a law to be "narrowly tailored to achieve the desired objective," 594 U.S. at 609, and created precedent in the First Circuit replacing the means-end test of narrow tailoring with a narrow application test that evades causation by focusing on who rather than why.

*Gaspee*'s distorted framework has been used to uphold or distinguish disclosure regimes. The opt-out characteristic has gained traction despite having no bearing on the requisite means-end fit and the misdirection of shifting the burden of unconstitutional laws onto the donor. That framing error works a particular mischief in cases like this one because a donor may limit the size of a donation to avoid the reporting trigger, but that form of opt-out works the very mischief that injures both the donor and recipient—and turns chill into realized injury.

More recent cases show how the application of narrow tailoring has diverged from *AFPF*.

In *Dinner Table Action v. Schneider*, the issue was a Maine law that required any person, party committee, or PAC making any "independent expenditure" in excess of $250 during any one candidate's election, to disclose the total contributions from each contributor regardless of the amount of the contribution. No. 24-430, 2025 WL 1939946, at *5 (D. Me. July 15, 2025) (cleaned up). Dinner Table Action claimed that its smaller dollar contributors would not continue to contribute if their identities were subject to disclosure. *Id.* The court relied on *Gaspee* to guide its application of narrow tailoring on two points. First, it compared the $1,000 expenditure limit from *Gaspee* to the $250 expenditure limit in the Maine law. *Id.* at 5. Second, it compared the *Gaspee* opt-out provision to the absence of such an opt-out provision under the Maine law. *Id.* at 6. The court thus found that the Maine disclosure requirement swept so broadly that it provided "no meaningful opportunity for anonymous contributions," thus could not be "described as narrowly tailored to Maine's informational interest." *Id.* at 6. While this holding represented a win for Dinner Table Action and its donors, the narrow tailoring analysis replicated the *Gaspee* errors by: 1) relying on how many people the law applied to rather than on whether there was a causal relationship

between those people and the government's alleged interest, *i.e.* narrow application, not narrow tailoring; and 2) relying on whether the contributor could avoid the unconstitutional burden by not giving.

Similarly, in *Wyoming Gun Owners v. Gray*, Wyoming had a campaign finance scheme that required organizations that spend over $1,000 on an "electioneering communication" to disclose contributions and expenditures related to that communication. 83 F.4th 1224, 1229 (10th Cir. 2023). Wyoming Gun Owners, a non-profit gun rights advocacy group, challenged the constitutionality of the disclosure scheme. *Id*.

The court considered "whether Wyoming narrowly tailored the law" to the state's anticorruption and informational interests and held that it did not, in part because the vague language regarding to whom the statute applied required over-disclosing contributions to avoid missing anyone. *Id*. at 1244, 1247. The court suggested the vagueness issue could potentially be resolved if the law required earmarking specific contributions for electioneering. *Id*. at 1248. That approach would at least make the Wyoming law consistent with a Colorado law the court had previously upheld as satisfying narrow tailoring, because it required "that organizations need only disclose those donors who have specifically

earmarked their contributions for electioneering purposes." *Id.* at 1248

(citing *Independence Inst. v. Williams*, 812 F.3d 787, 797 (10th Cir. 2016).

That approach, the court opined, would not be in tension with the *Gaspee*

opt-out approach. *Id.* at 1249.

*Wyoming Gun Owners* is thus another case that could be considered

a win for narrow tailoring. But like *Gaspee*, much of the analysis turned

on whether donors could opt-in or opt-out of disclosure rather than

whether the state had justified why donors with certain characteristics

or behaviors could be compelled to disclose their identities. The opt-

out/opt-in test, to the extent it has gained traction in the narrow tailoring

analysis, must be justified by a link to the purpose of the disclosure and

not simply provide a way to expand or contract the number of people to

whom the disclosure applies or to shift the burden to the donor.

A Colorado case, by contrast, showed the correct approach to the

means-end test when it reviewed a state law that required an "issue

committee" to disclose the name of the "natural person who is the

registered agent" of the entity paying for the communication supporting

or opposing a ballot issue. *No on EE - A Bad Deal for Colorado, Issue

Comm. v. Beall*, 558 P.3d 671, 673 (Colo. Aug. 4, 2025). No on EE, which

was an issue committee, challenged the registered-agent provision of the law. *Id*. at 675–76.

Applying exacting scrutiny, the court explained that it was required to "consider whether the government has demonstrated its need for the disclosure requirement in light of any less intrusive alternatives." *Id*. at 676–77 (cleaned up). It thus examined whether the links that were claimed to exist between the disclosure and the state's informational interest made sense, holding,

> There can be no serious argument that requiring an issue committee to disclose the name of its registered agent serves the governmental interest in informing the public about an issue committee's sources of funding. There is no requirement in Colorado law that the registered agent be a donor to an issue committee, much less a significant donor. Thus, to the extent the state would assert such an interest in this context, there would be a "dramatic mismatch . . . between the interest [the state] seeks to promote and the disclosure regime that [it] has implemented in service of that end."

*Id*. at 678 (citing *AFPF*, 594 U.S. at 612). Accordingly, because "the defendants don't even try to explain how knowing the name of the registered agent—as opposed to some other person with a closer connection to the issue committee—will actually assist voters" and "the mere possibility that disclosure of the registered agent's name might, in

some cases, provide relevant information to someone can't be sufficient if 'exacting scrutiny' is to mean anything." *Id*. at 679. The court held the requisite link between the informational interest of the state and the name of the registered agent was lacking. It thus followed "that the registered agent disclosure requirement . . . violates issue committees' free speech rights under the First Amendment." *Id*. at 680.

Because "exacting scrutiny is triggered by state action which may have the effect of curtailing the freedom to associate, and by the possible deterrent effect of disclosure," *AFPF*, 594 U.S. at 616 (cleaned up), narrow tailoring must be rigorously applied lest exacting scrutiny be exacting in name only.

## V. The Burden of Disclosure Must be Commensurate to the State's Need for the Information.

The burden imposed by the government's disclosure demand must be commensurate with the burden placed on the target. *AFPF*, 594 U.S. at 609 (citing *Shelton*, 364 U.S. at 488; *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 296 (1961)). The Supreme Court has been clear that "[w]hen it comes to 'a person's beliefs and associations,' [b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *AFPF*, 594 U.S. at

610 quoting (*Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion)). "Such scrutiny . . . is appropriate given the 'deterrent effect on the exercise of First Amendment rights' that arises as an 'inevitable result of the government's conduct in requiring disclosure.'" *AFPF* 594 U.S. at 607 (citing *Buckley v. Valeo*, 424 U.S. 1, 65 (1976)). "Where the First Amendment is implicated, the tie goes to the speaker, not the censor." *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 474 (2007).

This analysis is required even when the claimed injury is chill of constitutional rights. *AFPF*, 594 U.S. at 609 (citing *Button*, 371 U.S. at 433) ("Narrow tailoring is crucial where First Amendment activity is chilled."). Thus, the lower court here got it right when it found that donors would "likely react in predictable ways to the disclosure requirement: the donors reduce their donations to avoid being part of the disclosure." *Buckeye Inst.* No. 22-4297, 2023 WL 7412043, at *3 (S.D. Ohio Nov. 9, 2023), *amended* 2024 WL 770872 (S.D. Ohio Feb. 26, 2024). Unlike a subpoena for private records, where the private party may argue to the court that cost, privilege, or other burdens should excuse disclosure, here the chill on association is constant and well known to

donors who are aware that Schedule B must be filed annually. That chill only grows whenever government records are hacked or an IRS employee leaks confidential information. Thus, the only practical way to retain anonymity is to reduce donations below the level of disclosure even if the donor wishes to be more generous.

The dichotomy between a reportable contribution a donor may wish to make and the artificially depressed level required to remain anonymous imposes a burden that cannot be tied to necessity and thus violates narrow tailoring. Where, as here, the government has not even tried to tie the burden to the need, narrow tailoring cannot be satisfied. As the Tenth Circuit explained in *Wyoming Gun Owners*, identifying the need for the burden is critical.

> Perhaps the Secretary's fix would seem more reasonable if these burdens were inevitable. After all, the lodestar of the narrow-tailoring inquiry is the necessity of the burdens. *Bonta*, 141 S. Ct. at 2385. If the government seriously undertook to address the problems it faces with less intrusive tools readily available to it, we cannot demand it try a bit harder. . . . But less intrusive tools—tools that would not compound WyGO's initial statutory burden—were readily available, and the Secretary offers no reason why Wyoming could not have used them

83 F.4th at 1248 (cleaned up).

Instead, the IRS shifts responsibility for avoiding disclosure onto the donor. But victims of unconstitutional demands do not bear the burden of curing their own injury—that burden must be borne by the government. *Id.* (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001) ("the government must still justify the burden that exists.").

## CONCLUSION

For these reasons, this Court should affirm the district court's decision that exacting scrutiny applies to The Buckeye Institute's First Amendment challenge and return the case to the trial court for further proceedings.

Respectfully submitted,

/s/ Cynthia Fleming Crawford
Cynthia Fleming Crawford
AMERICANS FOR PROSPERITY
FOUNDATION
4201 Wilson Road, Ste. 1000
Arlington, VA 22203
571.329.2227
ccrawford@afphq.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because it contains 4,358 words. This brief also complies with the typeface and type-style requirements of FRAP 32(a)(5)-(6) because it was prepared in a proportionally spaced Serif typeface, Century Schoolbook, in 14-point font using Microsoft Word.

/s/ Cynthia Fleming Crawford
Cynthia Fleming Crawford

Dated: November 21, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2025, I electronically filed the above Brief of Amicus Curiae Americans for Prosperity Foundation in Support of Appellee The Buckeye Institute and Affirmance with the Clerk of the Court by using the appellate CM/ECF system. I further certify that service will be accomplished by the appellate CM/ECF system.

/s/ Cynthia Fleming Crawford
Cynthia Fleming Crawford

Dated: November 21, 2025