# United States Court of Appeals

### *for the*

# Sixth Circuit

---

Case No. 25-3170

BUCKEYE INSTITUTE,

*Plaintiff-Appellee,*

— v. —

INTERNAL REVENUE SERVICE; WILLIAM LONG, in his official capacity as Commissioner of Internal Revenue; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury,

*Defendants-Appellants.*

---

ON APPEAL FROM AN ORDER ENTERED IN THE SOUTHERN DISTRICT
OF OHIO AT COLUMBUS IN CASE NO. 2:22-CV-04297,
MICHAEL H. WATSON, U.S. DISTRICT JUDGE

## BRIEF OF *AMICUS CURIAE* EQUAL PROTECTION PROJECT IN SUPPORT OF PLAINTIFF-APPELLEE BUCKEYE INSTITUTE AND AFFIRMANCE

TIMOTHY R. SNOWBALL
WILLIAM A. JACOBSON
LEGAL INSURRECTION FOUNDATION
*Attorneys for Amicus Curiae
  Equal Protection Project*
18 Maple Avenue, Suite 280
Barrington, Rhode Island 02806
(401) 246-4192

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Rule 26.1 of the Local Rules of the United States Court of Appeals for the Sixth Circuit, Legal Insurrection Foundation, a non-profit organized under the laws of Rhode Island, hereby state that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES.......................................................iii

INTERESTS OF AMICUS CURIAE .......................................... 1

STATEMENT OF THE CASE .................................................. 2

INTRODUCTION ............................................................... 2

ARGUMENT....................................................................... 3

    I.    Anonymous donor information becoming public is not only possible, but probable ...................................... 3

    II.    Due to increased political polarization and violence, donor anonymity is essential to protect free association rights .................................... 9

    III.    American history includes a tradition of using anonymity to protect political participation ........................ 14

CONCLUSION ...................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Americans for Prosperity Foundation v. Bonta*,
 594 U.S. 595 (2021) ..........................................................................2, 20

*In re Office of Personnel Management
 Data Security Breach Litigation*,
 928 F.3d 42 (D.C. Cir. 2019) .................................................................5

*In re Science Applications International Corp. Backup
 Tape Data Theft Litigation*,
 45 F. Supp. 3d 14 (D.D.C. 2014) ...........................................................5

*National Org. for Marriage, Inc. v. United States*,
 24 F. Supp. 3d 518 (E.D. Va. 2014)........................................................6

*Shelton v. Tucker*,
 364 U.S. 479 (1960) .............................................................9, 10, 11, 14


**Constitutional Provisions:**

U.S. Constitution, Amendment I ....................................2, 3, 9, 14, 19, 20


**Statutes & Other Authorities:**

A10Networks.com, Why are Government Agencies So Vulnerable
 to Hacking?, https://www.a10networks.com/blog/why-are-
 government-agencies-so-vulnerable-to-hacking/
 (last visited July 29, 2025) .....................................................................4

ABC news, *'Anonymous,' author of White House tell-all book,
 revealed to be Miles Taylor*,
 https://abcnews.go.com/Politics/anonymous-author-
 white-house-book-revealed-miles-taylor/story?id=73884296
 (last visited July 29, 2025) ...................................................................19

## INTERESTS OF AMICUS CURIAE[1]

The Equal Protection Project (EPP), a project of the non-profit Legal Insurrection Foundation, is dedicated to the fair treatment of all persons without regard to race, ethnicity, or sex. EPP's guiding principle is that there is no "good" form of unlawful discrimination. The remedy for unlawful discrimination is never more unlawful discrimination. EPP has filed civil rights complaints against more than one hundred twenty governmental or federally funded entities that have engaged in alleged discriminatory conduct in more than five hundred fifty programs.

As an organization reliant on donor contributions, in this brief EPP will shed additional light for the Court not only on the importance of donor anonymity in the modern era, but on the strong tradition of anonymous political association in the United States.[2]

---

[1] This brief conforms to Rule 29(a)(4)(E), in that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than the Amicus Curiae Equal Protection Project, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] Pursuant to Rule 29(a)(2), all parties to this appeal consented to the filing of this brief amicus curiae.

## STATEMENT OF THE CASE

Amicus Curiae EPP relies on the Statement of the Case and procedural history set forth in Plaintiff-Appellee's Brief.

## INTRODUCTION

At stake in this case is not only the free association rights of Americans expressing themselves anonymously through donations to charitable organizations, but the ability of those organizations to continue serving the public interest. If it is an unconstitutional infringement of the First Amendment for a state to compel disclosure of donors, *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 618–19 (2021) (finding even the threat of disclosure is likely to scare away donors), the same is true for a federal agency.

If the Internal Revenue Service can force the disclosure of the identities of private donors, it will chill those individuals from continuing to participate through donations. If those donations end, organizations like the Buckeye Institute may cease to exist or curtail their charitable work. This brief offers three additional points to the Plaintiff-Appellee's briefing to discuss and emphasize these issues.

First, we address the *high* likelihood of such potentially government-held private donor information becoming public through technological access to online data or leaks. Second, we examine the worsening ideological divide, and use of political violence, in the United States. Such targeting is likely to occur if and when otherwise anonymous donor information becomes public. Third, we address the long-held tradition in the United States of anonymous political participation. Indeed, many of our Founding Fathers exercised this exact option in order to protect themselves and their property from reprisal.

For these and the additional reasons discussed in the Plaintiff-Appellee's briefing, the Court should apply exacting scrutiny and protect the First Amendment associational freedoms of anonymous donors.

## ARGUMENT

## I. Anonymous donor information becoming public is not only possible, but probable.

The IRS may assure targeted charitable organizations that it can be trusted with their otherwise anonymous donors' sensitive personal information. The government is not only ill-prepared to stop the spread of sensitive donor information, but in terms of animus towards disfavored

associations, at times it is unwilling to do so. The government may also be powerless to stop this information becoming public given that politically motivated cyber criminals have the knowledge, ability, and opportunity to expose it to the public, even if it wanted to.

In 2020, reports indicated the number of exposed government records increased two hundred and seventy eight percent from four and half million breaches of records in the first quarter of 2019, to seventeen million breaches in the first quarter of 2020.[3] The main reasons for this high level of government records' vulnerability is a combination of inadequate IT security expenditure on new equipment, insufficient staff training, and overly bureaucratic and antiquated processes.[4] A "Government Cybersecurity Report" by Security Scorecard notes that government organizations are a primary target. *Id.*

---

[3] Infosecurity Magazine, *278% Rise in Leaked Government Records During Q1 of 2020*, https://www.infosecurity-magazine.com/news/rise-leaked-government-records/ (last visited July 29, 2025).
[4] A10Networks.com, *Why are Government Agencies So Vulnerable to Hacking?*, https://www.a10networks.com/blog/why-are-government-agencies-so-vulnerable-to-hacking/ (last visited July 29, 2025).

The list of government data breaches over the last several decades is long, but several examples help demonstrate the scope of the problem:

- U.S. Postal Service (DC): 60,000,000 records (2018).
- Government Payment Service, Inc. (IN): 14,000,000 records (2018).
- Los Angeles County 211 (CA): 3,200,000 records (2018).
- California Secretary of State (CA): 19,200,000 records (2017).
- Office of Child Support Enforcement (WA): 5,000,000 records (2016).
- Washington Department of Fishing and Wildlife (WA): 2,435,452 (2016).
- Georgia Secretary of State (GA): 6,000,000 records (2015).
- Office of Personnel Management (DC): 21,500,000 records (2015).
- Office of Personnel Management (DC): 4,200,000 records (2015).
- U.S. Postal Service (DC): 3,650,000 records (2014). *Id.*

The federal government has been particularly ineffective at protecting private information from data breaches. *See, e.g., In re Office of Personnel Management Data Security Breach Litigation*, 928 F.3d 42, 49 (D.C. Cir. 2019) (cyber attackers breached multiple databases of the U.S. Office of Personnel Management stealing sensitive personal information of more than twenty one million past, present, and prospective government workers); *In re Science Applications International Corp. Backup Tape Data Theft Litigation*, 45 F. Supp. 3d 14, 20 (D.D.C. 2014) (government data breach involving 4.7 million members of the United States military and their families). This lack of due care includes the agency at the heart of this litigation: the IRS. *See*

*National Org. for Marriage, Inc. v. United States*, 24 F. Supp. 3d 518 (E.D. Va. 2014) (IRS improperly disclosed traditional marriage advocacy group's confidential tax return information).

Many cyber criminals specifically seek the private information of supporters of charitable organizations with potentially controversial viewpoints.[5] There is no indication that these kinds of attacks will lessen in the future. On the contrary, they are only expected to increase.[6] Of course, this also does not account for *intentional* government leaks, or the use of government-held information to target disfavored groups, that have become all too prevalent in recent years.

In February 2023, the FBI retracted a memo from the Richmond, Virginia, field office that detailed an investigation into so-called "radical traditionalist" Catholics after the internal document was leaked to the

---

[5] OSI Beyond, *Why Nonprofits and Associations Are at a Higher Risk of Cyber-Attacks*, https://www.osibeyond.com/blog/why-nonprofits-and-associations-are-at-a-higher-risk-of-cyber-attacks/ (last visited July 29, 2025).
[6] PropertyCasualty360, *The unique risk to nonprofits of a targeted cyber attack*, https://www.propertycasualty360.com/2018/01/12/the-unique-risk-to-nonprofits-of-a-targeted-cyber-attack/?slreturn=20210108 (last visited July 29, 2025).

public and prompted heavy pushback.[7] The memo called for the FBI to develop sources within parishes and online Catholic communities for the purpose of "threat mitigation." The memo expressed concerns about a potential link between "radical traditionalist" Catholics and racially motivated violent extremism. Although the FBI removed the document from its systems and asserted the issue was isolated to one product from one field office, the new report found that multiple field offices were involved in producing the memo, and that it was distributed to more than one thousand FBI employees throughout the country.

In April 2023, the Department of Justice was forced to open an investigation into the leaks of U.S. intelligence documents that were posted publicly on various multiple social media platforms.[8] The documents included classified information on topics ranging from Israel's plans to provide military aid to Ukraine, to intelligence about the United

---

[7] Catholic News Agency, *Senate Judiciary Committee: Anti-Catholic texts found in 13 more Biden-era FBI documents*, https://www.catholicnewsagency.com/news/264545/senate-judiciary-committee-anti-catholic-texts-found-in-13-more-biden-era-fbi-documents (last visited July 29, 2025).
[8] CNN, *DOJ opens investigation into leaks of apparent classified US military documents*, https://www.cnn.com/2023/04/07/politics/pentagon-leaked-ukraine-documents/index.html (last visited July 29, 2025).

Arab Emirates' ties to Russia, South Korean concerns about providing ammunition to the US for use in Ukraine, and the mercenary Wagner Group's operations in Africa.

In November 2024, former Massachusetts Air National Guard member, Jack Teixeira, was sentenced to fifteen years in a federal prison for leaking classified documents about the war in Ukraine.[9] Teixeira, an IT specialist with high-level security clearance had access to all sorts of secret and classified information. Investigators say he shared hundreds of pages of classified documents with a group of friends online over the course of a year. He was arrested in 2023 and eventually pleaded guilty to violating the Espionage Act. There are many other reported instances of intentional leaks of classified documents.

The IRS can provide whatever privacy assurances it likes, but the record of recent government data breaches and purposeful leaks, and the resulting harm to millions of individuals, is well-documented and will continue to occur. This problem will only be worsened if government

---

[9] NPR, *Former airman Jack Teixeira sentenced to 15 years for leaking classified documents*, https://www.npr.org/2024/11/12/nx-s1-5188642/former-airman-jack-teixeira-sentenced-to-15-years-for-leaking-classified-documents (last visited July 29, 2025).

bodies are allowed to access this personal information where, as here, it has not even explained or claimed an interest in the information.

This Court should protect the First Amendment associational freedoms of anonymous donors.

## II. Due to increased political polarization and violence, donor anonymity is essential to protect free association rights.

While the Supreme Court has said that disclosure requirements can chill association "[e]ven if there [is] no disclosure to the general public," *Shelton v. Tucker*, 364 U.S. 479, 486 (1960), it is not only the direct acts of the government based upon otherwise confidential information that anonymous donors have to fear. Instead, a primary threat comes from the actions of private citizens *based* on that government-held information seeking retaliation for political participation.

Americans are more divided over political differences, and more likely to vilify members of the perceived "other side," than at any time in the last two decades.[10] Both self-professed conservatives and liberals have become more solidified in their ideologies, which have increasingly

---

[10] Pew Research Center, *Political Polarization in the American Public*, https://www.pewresearch.org/politics/2014/06/12/political-polarization-in-the-american-public/ (last visited July 29, 2025).

become tied to stable partisan categories. *Id.* As a result, ideological overlap between the two parties has cratered. *Id.* Ninety two percent of Republicans are to the right of the median Democrat, and ninety four percent of Democrats are to the left of the median Republican. *Id.* This is a recipe for conflict.

An American Psychiatric Association's recent survey found that thirty one percent of Americans expect to have a heated political conflict with their own family members.[11] It gets worse. Twenty percent of respondents reported cutting ties with a family member because of disagreement over political issues. *Id.* "When we're seeing so many people having such a dramatic rupture with their loved ones, that's a striking result," says Petros Levounis, MD, the immediate past president of the American Psychological Association and the chair of the psychiatry department at Rutgers New Jersey Medical School in Newark. *Id.*

---

[11] American Psychiatric Association, *While Most Americans Align With Close Family Members on Controversial Political Issues, One in Five Report Family Estrangement Based on These Topics*, https://www.everydayhealth.com/emotional-health/one-in-five-americans-estranged-over-political-disagreement/ (last visited July 29, 2025).

Even more striking, a substantial number of Americans now support the use of violence against perceived political opponents.[12]

Recently, Immigration and Customs Enforcement (ICE) law enforcement officers are facing a nearly seven hundred percent increase in assaults against them because of doxxing websites that have encouraged posting fliers in officers' neighborhoods, including their names, addresses, and pictures of them and their families.[13] These fliers threaten officers with text that says, "NO PEACE FOR ICE" and "CHINGA LA MIGRA" (translation: F**K immigration services).

The presidential campaign season of 2024 saw *two* attempted assassinations on the life of President Donald Trump (R). On July 13, 2024, a gunman opened fire on Trump during a campaign rally in Butler, Pennsylvania.[14] The President was hit and forced to the ground by Secret

---

[12] Network Contagion Research Institute, *Assassination Culture Brief*, https://cbsaustin.com/news/nation-world/new-survey-reveals-disturbing-trend-in-support-of-political-violence-president-trump-left-of-center-elon-musk-liberal (July 29, 2025).

[13] United States Department of Homeland Security, *Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement*, https://www.dhs.gov/news/2025/07/11/anarchists-and-rioters-portland-illegally-dox-ice-officers-and-federal-law (July 29, 2025).

[14] TIME, *A Year Later, Butler Shooting Marks the Defining Moment of Trump's Political Comeback*,

Service agents, likely saving his life. Two months later, in a second plot, another attempt on Trump's life took place at his Florida golf club when a man was arrested after he was spotted by Secret Service with a high-powered rifle at a golf course a few hundred yards away from where President Trump was playing golf.[15]

And of course, there is the recent assassination of Trump ally, Charlie Kirk, who was shot in the neck while in engaging in peaceful debate with university students.[16] Evidence released since the shooter's arrest show he was motivated by ideological opposition to Kirk's speech and politics.[17] That man, twenty-two year old Tyler Robinson, has now been charged with aggravated murder, felony discharge of a firearm, two counts of obstruction of justice, two counts of witness tampering, and

---

https://time.com/7301662/donald-trump-butler-pa-assassination/ (last visited July 29, 2025).
[15] CBS News, *Trump golf course suspect Ryan Routh charged with attempted assassination*, https://www.cbsnews.com/news/trump-attempted-assassination-suspect-ryan-routh-new-charges/ (last visited July 29, 2025).
[16] AP News, *Conservative activist Charlie Kirk assassinated at Utah university*, https://apnews.com/article/charlie-kirk-conservative-activist-shot-546165a8151104e0938a5e085be1e8bd (last visited Sept. 12, 2025).
[17] BBC, *The motive behind Charlie Kirk's killing: What we know and don't know*, https://www.bbc.com/news/articles/c7v1rle0598o (last visited Sept. 23, 2025).

committing a violent offense in the presence of a child.[18] While many Americans are shocked and outraged by these and other violent events, a good many others support them. Thirty-eight percent of survey respondents said it would be "somewhat justified" to murder President Trump, while thirty one percent said the same about Elon Musk.[19]

In regard to Kirk's assassination, teachers, firefighters, elected officials, and even a cable news contributor, are under investigation or have lost their jobs after comments celebrating Kirk's murder.[20] A teacher in South Carolina was fired for a post about Kirk's death that read: "Thoughts and prayers to his children but IMHO America became greater today. There I said it." *Id.* A city councilor in Cornelius, Oregon, wrote the assassination "really brightened up my day." *Id.* Regardless of whether these celebrations of Kirk's assassination are protected speech,

---

[18] CBS News, *Charlie Kirk shooting suspect charged with aggravated murder, could face death penalty*, https://www.cbsnews.com/live-updates/charlie-kirk-shooting-tyler-robinson-charges-court-hearing-utah/ (last visited Sept. 23, 2025).
[19] City Journal, *Why Progressives Increasingly Support Violence*, https://www.city-journal.org/article/progressives-political-violence-donald-trump-assassination-attempt (last visited July 29, 2025).
[20] The Hill, *'Why are yall sad?' Teachers, firefighters, officials on leave or fired over Charlie Kirk posts*, https://thehill.com/homenews/5499708-why-are-yall-sad-teachers-firefighters-officials-on-leave-or-fired-over-charlie-kirk-posts/ (last visited Sept. 12, 2025).

they reflect a culture glorifying and encourage violence against political opponents that is relevant to the issues before the Court in this case.

Whether couched as a tax requirement, or as an outright demand, requiring the disclosure of otherwise anonymous donor information puts anonymous donors in reasonable fear that their identities will be made public and their safety put at risk. The Plaintiff-Appellees, and Amicus's, concerns over the doxing, harassment, and potential violence all but certain to occur against anonymous donors when the information demanded by the IRS becomes publicly available, is very real and the Court should consider it with the importance it deserves.

This Court should protect the First Amendment associational freedoms of anonymous donors.

## III. American history includes a tradition of using anonymity to protect political participation.

While most Americans no doubt hope that political conflict with fellow citizens and neighbors might always be resolved through the "better angels of our nature,"[21] history shows that all too often that has

---

[21] Abraham Lincoln, *First Inaugural Address*, https://avalon.law.yale.edu/19th_century/lincoln1.asp (last visited July 29, 2025).

not been the case. Time and time again anonymity has therefore proved an essential tool in fully participating in the political marketplace of ideas while also protecting oneself and one's family from harm.

The seeds that sowed the American Revolution were planted anonymously. Published on January 10, 1776, the pamphlet "Common Sense" is one of the most influential essays in American history.[22] Without the anonymous author's (who we now know was Thomas Paine) powerful rhetoric making the case for a political break with Great Britain, the history of the United States may have taken a very different turn. But the circumstances on the ground for Paine (and the pamphlet's publisher, Benjamin Rush) to remain anonymous, like anonymous charitable donors today, were dire.

With the surge of anti-British sentiment in the wake of the Battle of Lexington and Concord, "Patriot Committees of Safety" published broadsides including "Wanted" posters (not titled as such at the time) and

---

[22] Luke Wachob, *Protecting Anonymous Speech Used to be 'Common Sense'*, https://www.ifs.org/blog/protecting-anonymous-speech-used-to-be-common-sense/ (last visited July 29, 2025).

the coerced recantation statements of intimidated Loyalists.[23] The purpose of such self-appointed committees "was not justice or a regard for civil rights," writes historian Catherine S. Crary, "but rooting out Loyalists and blocking their support of the British cause." Catherine S. Crary, ed., *The Price of Loyalty: Tory Writings from the Revolutionary Era* (New York: McGraw-Hill, 1973), pp. 55-56.

Circumstances amongst citizens were just as strained during the public debates over the newly proposed Constitution in the late 18th century as they are today. Thousands of authors, Federalist and Anti-Federalist, railed against their opponents in the press.[24] Of course, the most famous writings during this period were the eighty-five essays written anonymously urging adoption of the new Constitution by the citizens of New York, which later became collected as *The Federalist Papers*. Of course, we now know the authors were James Madison,

---

[23] National Humanities Center, *Making the Revolution*, https://americainclass.org/sources/makingrevolution/rebellion/text2/text2.htm (last visited July 29, 2025).
[24] Center for the Study of the American Constitution, *Pseudonyms and the Debate over the Constitution*, https://csac.history.wisc.edu/2022/07/22/pseudonyms-and-the-debate-over-the-constitution/ (last visited July 29, 2025).

Alexander Hamilton, and John Jay. But like Paine, these patriots had every reason to fear public exposure.

One anonymous author during this period warned another to be careful lest "his name may yet be known…if he wishes to escape the just resentment of an incensed people, who perhaps may honor him with a coat of TAR and FEATHERS." (Philadelphia Independent Gazetteer, 28 September 1787). These were not idle threats. Around this same period, a Charleston mob seized John Roberts, a dissenting minister, on suspicion of being an enemy to the rights of America. According to a local paper, "he was tarred and feathered; after which, the populace, whose fury could not be appeased, erected a gibbet on which they hanged him, and afterwards made a bonfire, in which Roberts, together with the gibbet, was consumed to ashes."[25]

Two examples from the modern era show that the use of anonymity to enable political association and participation has remained just as vital as during the Founding Era.

---

[25] Benjamin H. Irvin, *Tar and Feathers in Revolutionary America*, https://revolution.h-net.msu.edu/essays/irvin.feathers.html (last visited July 29, 2025).

In 1996, an anonymous author published a fictionalized account of the presidential campaign of President Bill Clinton.[26] Containing details only someone with close connections to the campaign could have known, the book set off a firestorm of controversy over who the potential author could have been. Eventually, Joe Klein, then a Newsweek columnist, was revealed as the author. In the time leading up to The Washington Post "outing" Klein by publishing evidence linking him to the manuscript, he reports serious concerns over the safety of himself and his family. Klein relates that "[t]here were reporters lurking around the house. And we had young children at the time who walked to elementary school every day. You never know what would happen in a situation like that."

On September 5, 2018, a senior Trump Administration official who feared for their future career prospects should their identity be made public, published an anonymous op-ed essay in the New York Times.[27] In that op-ed, the author (later shown to be Miles Taylor, former chief of

[26] NPR, *'Primary Colors' Author Joe Klein On Anonymous Op-Ed*, https://www.npr.org/2018/09/09/646018095/primary-colors-author-joe-klein-on-anonymous-op-ed (last visited July 29, 2025).
[27] The New York Times, *I am part of the resistance inside the Trump Administration*, https://www.nytimes.com/2018/09/05/opinion/trump-white-house-anonymous-resistance.html (last visited July 29, 2025).

staff in the Department of Homeland Security), wrote: "many of the senior officials in [Trump's] own administration are working diligently from within to frustrate parts of his agenda and his worst inclinations." The media and political classes' response to this piece was swift. After the op-ed was published, President Donald Trump blasted it as "gutless," tweeting, "TREASON?" "If the GUTLESS anonymous person does indeed exist," he wrote on Twitter that day, "the Times must, for National Security purposes, turn him/her over to government at once!"[28]

The ability to associate for political reasons and yet remain anonymous is recognized both in this country's tradition and in this Court's jurisprudence. The same or similar pressures that Founding-era patriots and modern political muckrakers faced apply with equal force to individuals choosing to associate with the Plaintiff-Appellee, and other charitable organizations, through otherwise anonymous donations.

This Court should protect the First Amendment associational freedoms of anonymous donors.

---

[28] ABC news, *'Anonymous,' author of White House tell-all book, revealed to be Miles Taylor*, https://abcnews.go.com/Politics/anonymous-author-white-house-book-revealed-miles-taylor/story?id=73884296 (last visited July 29, 2025).

# CONCLUSION

When it comes to the freedom of association, the protections of the First Amendment are just as triggered by *the risk* of a chilling effect on association as by actual restrictions on an individual's ability to join with others to further shared goals, because "First Amendment freedoms need breathing space to survive." *Bonta*, 594 U.S. at 618-19.

These are the stakes here.

Not only is government-held information regarding anonymous donors likely to become public, those same donors are likely to fear violence against their persons and property as a result. The First Amendment forbids, and the long-held traditions of protecting the anonymity of political participants counsels against allowing the IRS to exert this pressure anonymous donors and charitable organizations. This is true even if the intention is benign, or as here, unstated.

For these and the additional reasons discussed in the Plaintiff-Appellee's briefing, the Court should protect the First Amendment associational freedoms of anonymous donors.

Dated: November 21, 2025      Respectfully submitted,


*/s/ Timothy R. Snowball*
Timothy R. Snowball
William A. Jacobson
Legal Insurrection Foundation
18 Maple Avenue, #280
Barrington, Rhode Island 02806
(401) 246-4192

*Attorneys for Amicus Curiae*
*Equal Protection Project*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), contains 3,698 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point font.

Dated:   November 21, 2025

/s/ Timothy R. Snowball
_____
Timothy R. Snowball

*Attorneys for Amicus Curiae*
*Equal Protection Project*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 21, 2025, an electronic copy of the Brief of *Amicus Curiae* Equal Protection Project in Support of Plaintiff-Appellee Buckeye Institute and Affirmance was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.

*/s/ Timothy R. Snowball*
Timothy R. Snowball

*Attorneys for Amicus Curiae*
*Equal Protection Project*