## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

THE BUCKEYE INSTITUTE,

*Plaintiff-Appellee*

v.

INTERNAL REVENUE SERVICE ; WILLIAM LONG, in his official capacity as Commissioner of Internal Revenue; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury.

*Defendants-Appellants*.

On Interlocutory Appeal from the United States District Court for the Southern District of Ohio at Columbus
No. 2:22-cv-04297

## BRIEF AMICI CURIAE OF THE GOLDWATER INSTITUTE, RIO GRANDE FOUNDATION, AND NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER, INC., SUPPORTING PLAINTIFF-APPELLANT AND IN SUPPORT OF REVERSAL

**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
Timothy Sandefur
500 East Coronado Road
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Counsel for Amici Curiae*
*Goldwater Institute,*
*Rio Grande Foundation and National Federation of Independent Business Small Business Legal Center, Inc.*

November 24, 2025

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, Goldwater Institute (GI), a nonprofit corporation organized under the laws of Arizona, and Rio Grande Foundation (RGF), a nonprofit corporation organized under the laws of New Mexico, and National Federation of Independent Business Small Business Legal Center, Inc., (NFIB Legal Center) a nonprofit corporation organized under the laws of Tennessee, state that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public.

## Rule 29(a) Statement

Counsel for all parties received timely notice of the intent to file the brief and consented in writing to its filing.  Therefore, under Federal Rule of Appellate Procedure 29(a)(2), a motion for leave to file is not necessary.

GI's counsel authored this brief in its entirety.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no other person—other than the amici, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

# Table of Contents

Corporate Disclosure Statement ............................................................... i

Rule 29(a) Statement.............................................................................. i

Table of Contents ................................................................................. ii

Table of Authorities ............................................................................ iii

Interest of Amici Curiae ....................................................................... 1

Statement of the Case ........................................................................... 3

Introduction and Summary of Argument ............................................... 4

Argument .............................................................................................. 5

I.   The IRS's demand fails even the rational basis test. ....................... 5

    A. Compulsory disclosure of this information doesn't even improve the IRS's efficiency. ......................................................................... 5

    B. "Just in case" is not an adequate justification. ........................... 9

II. Disclosure creates a serious risk of harassment, retaliation, violence and chill. .............................................................................................. 13

Conclusion ......................................................................................... 19

Certificate of Compliance .................................................................. 20

Certificate of Service ......................................................................... 21

# Table of Authorities

**Cases**

*Acorn Invs., Inc. v. City of Seattle*, 887 F.2d 219 (9th Cir. 1989) ...........................11

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021)........... 8, 9, 13

*Armour v. City of Indianapolis*, 566 U.S. 673 (2012) .............................. 5, 6, 7, 8, 9

*Carr v. Young*, 231 Ark. 641 (1960)...................................................................18

*Center for Arizona Policy v. Arizona Secretary of State* (Ariz. S. Ct. No. CV-24-0295-PR) .......................................................................................................15

*Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120 (3d Cir. 2002) ................10

*Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) ..............................................9, 10

*Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp.3d 1 (D.D.C. 2020) ...........2

*Empress Casino Joliet Corp. v. Giannoulias*, 556 U.S. 1281 (2009)........................2

*Genusa v. City of Peoria*, 619 F.2d 1203 (7th Cir. 1980)................................ 10, 11

*Heller v. Doe*, 509 U.S. 312 (1993) .........................................................................9

*Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996).............................10

*McLemore v. Gumucio*, 149 F.4th 859 (6th Cir. 2025) ............................................5

*Movie & Video World, Inc. v. Bd. of Cnty. Comm'rs*, 723 F. Supp. 695 (S.D. Fla. 1989) .......................................................................................................11

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ...................................3

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ...................................2

*Rio Grande Foundation v. City of Santa Fe*, 7 F.4th 956 (2021), *cert. denied* 142 S. Ct. 1670 (2022) ......................................................................................................2

*Schlesinger v. Ballard*, 419 U.S. 498 (1975) ...........................................................9

*Shelton v. Tucker*, 364 U.S. 479 (1960)................................................................18

*United States v. Borrero*, No. 1:23-CR-00059, 2023 WL 6976625 (S.D. Ohio Oct. 23, 2023) ........................................................................................................................4

*Volokh v. James*, 148 F.4th 71 (2d Cir. 2025) ......................................................10

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).............................................................................................................5, 10

**Statutes**

26 U.S.C. § 6104(d)(3)(A) ..........................................................................................7

**Regulations**

Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 Fed. Reg. 31959 (May 28, 2020) ..........................................6

**Other Authorities**

Affidavit of David Trabert, Appellants' Appendix at APP.057, *Rio Grande Found. v. City of Santa Fe*, 7 F.4th 956 (10th Cir. 2021), *cert. denied*, 142 S.Ct. 1670 (2022)..................................................................................................................15

Affidavit of F. Vincent Vernuccio, Appellants' Appendix at APP.064, *Rio Grande Found. v. City of Santa Fe,* 7 F.4th 956 (10 Cir. 2021) .....................................16

Affidavit of Lynn Harsh, Appellants' Appendix at APP.061, *Rio Grande Found. v. City of Santa Fe,* 7 F.4th 956 (10 Cir. 2021) .......................................................16

Andrew Campa, *Tesla's Steep Fall from Green Darling to Protest Target*, Los Angeles Times (Mar. 19, 2025) .......................................................................16

Curt Devine, et al., *Election Officials' Homes "Swatted" as Presidential Race Heats Up*, CNN (Mar. 13, 2024) .......................................................................16

Declaration of Cathi Herrod, Ex. 1 to Mot. for Prelim. Inj., *Center for Arizona Policy v. Arizona Sec'y of State,* No. CV2022-016564 (Maricopa Cnty. Super. Ct., filed Dec. 15, 2022)......................................................................................15

Gabrielle Fonrouge, *Nicholas Roske Found Brett Kavanaugh's Address Online, Feds Say*, N.Y. Post (June 8, 2022) ......................................................17

*Hank Rosso's Achieving Excellence in Fund Raising* (Eugene R. Tempel, ed., 2d ed. 2003) ..............................................................................................3

*IRS Bulletin*, Rev. Proc. 2018–38 § 3 ................................................7, 12

Jon Riches, *The Victims of "Dark Money" Disclosure: How Government Reporting Requirements Suppress Speech and Limit Charitable Giving*, Goldwater Institute) (2015) ....................................................................1

Matt Miller, *Privacy and the Right to Advocate: Remembering NAACP v. Alabama and its First Amendment Legacy* , Goldwater Institute (Jan. 3, 2018) ...................1

N'dea Yancey-Bragg, et al., *Charlie Kurk Shot and Killed at Utah Campus Event*, Columbus Dispatch (Sep. 10, 2025).....................................................17

Remarks of Sen. Chuck Schumer regarding the DISCLOSE ACT (Senate Rules and Administration Committee Hearing (July 17, 2012) .....................................14

Ryan J. Reilly & Fiona Glisson, *Jan. 6 Defendant Arrested Near Obama's Home Had Guns And 400 Rounds of Ammunition in His Van*, NBC News (June 30, 2023) ........................................................................................ 16, 17

Sofia Barnett, *How Did Shooter Find Minnesota Lawmakers' Homes? It's Easier Than Most People Think,* Minn. Star Tribune (June 19, 2025)...........................17

Steve Karnowski, *Federal Authorities Investigate Suspected Arson at Offices of 3 Conservative Groups in Minnesota*, AP News (Feb. 2, 2024) ............................16

Ted Hart, *et al., Nonprofit Internet Strategies: Best Practices for Marketing, Communications, and Fundraising Success* (2005) ...........................................2, 3

Thomas Messner, *The Price of Prop 8*, Heritage Foundation (Oct. 22, 2009) .......14

## INTEREST OF AMICI CURIAE

GI is a nonpartisan public policy and research foundation devoted to advancing the principles of limited government through litigation, research, policy briefings and advocacy. Through its Scharf-Norton Center for Constitutional Litigation, GI litigates and files amicus briefs when its or its clients' objectives are directly implicated. Among GI's priorities is the protection of the privacy rights of those who donate to nonprofit research and advocacy groups, and has litigated or participated as amicus curiae in courts around the nation to defend these rights. GI scholars have also published research on the free speech issues raised by donor disclosure mandates like those at issue here. *See* Matt Miller, *Privacy and the Right to Advocate: Remembering NAACP v. Alabama and its First Amendment Legacy* , Goldwater Institute (Jan. 3, 2018);[1] Jon Riches, *The Victims of "Dark Money" Disclosure: How Government Reporting Requirements Suppress Speech and Limit Charitable Giving*, Goldwater Institute) (2015).[2]

RGF is New Mexico's only think tank dedicated to free markets and individual liberty. Founded in 2000, the Foundation participates in state, local, and federal debates on policy matters relating to free markets, lower taxation, and limited

---

[1] https://www.goldwaterinstitute.org/privacy-and-the-right-to-advocate-remembering-naacp-v-alabama-and-its-first-amendment-legacy-on-the-60th-anniversary-of-the-case/.

[2] https://www.goldwaterinstitute.org/wp-content/uploads/2015/08/Dark-Money-paper.pdf.

government.  It also appears as amicus curiae in this and other courts in cases touching on matters related to these interests. *See, e.g., Empress Casino Joliet Corp. v. Giannoulias*, 556 U.S. 1281 (2009); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012); *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp.3d 1 (D.D.C. 2020).

GI attorneys represented RGF in *Rio Grande Foundation v. City of Santa Fe*, 7 F.4th 956 (2021), *cert. denied* 142 S. Ct. 1670 (2022), a case challenging a city-wide donor disclosure mandate.

NFIB Legal Center is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses.  It is an affiliate of the National Federation of Independent Business (NFIB), which is the nation's leading small business association, with the mission of promoting and protecting the right of its members to own, operate, and grow their businesses.  As a 501(c)(3) nonprofit, the NFIB Legal Center receives donations from NFIB members and supporters of the Legal Center's work.

Thus the questions presented here are important not only on the level of principle, but they are also central to Amici's own operations.  Amici believe they owe their many supporters a duty to defend their individual rights to confidentiality.  Nonprofits are ethically bound to protect their donors' privacy. *See, e.g.,* Ted

Hart, *et al., Nonprofit Internet Strategies: Best Practices for Marketing, Communications, and Fundraising Success* 64 (2005) ("It is extremely important to develop ethical rules and guidelines surrounding information and confidentiality. … [D]onors count on nonprofits to respect their privacy."); *Hank Rosso's Achieving Excellence in Fund Raising* 440 (Eugene R. Tempel, ed., 2d ed. 2003) ("[c]onfidentiality is indispensable to the trust relationship that must exist between a nonprofit organization and its constituents.")

In *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958), the Supreme Court said that "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." Amici submit this brief in defense of that privacy both as an institutional interest essential to their work and as one of the constitutional freedoms they are pledged to protect.

## STATEMENT OF THE CASE

Plaintiff Buckeye Institute challenges the constitutionality of the IRS's requirement that nonprofit 501(c)(3)s submit their donors' private information to the IRS on their annual paperwork. The District Court concluded that exacting scrutiny applies, and that is the question that has been certified to this Court. But as

Plaintiff Buckeye points out, the disclosure requirement serves no legitimate purpose, and that is the point this brief addresses. Even if exacting scrutiny applies, the requirement here fails even rational basis review.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The IRS's blanket requirement that 501(c)(3) groups submit their donors' personal identifying information ("PII")[3] to the IRS—without any particularized suspicion of wrongdoing, and without any reason to believe that such information will even improve the administrative efficiency of the government's operations—violates the freedom of speech. Indeed, it fails even the lowest level of constitutional scrutiny, let alone the heightened scrutiny applicable to free speech claims. Worse, such mandatory disclosures tend to encourage retaliation, harassment, intimidation, and even violence against groups and organizations holding controversial viewpoints. This risk is not merely theoretical. The publicizing of donors' personal information has in fact resulted in various types of reprisals and threats that do indeed chill free speech.

---

[3] "Personally identifiable information" is a term of art used in several federal statutes to refer to information that would make a person's identity easily traceable. *United States v. Borrero*, No. 1:23-CR-00059, 2023 WL 6976625, at *1 n.1 (S.D. Ohio Oct. 23, 2023).

# ARGUMENT

## I. The IRS's demand fails even the rational basis test.

### A. Compulsory disclosure of this information doesn't even improve the IRS's efficiency.

Plaintiff's complaint alleges a violation of freedom of speech. Ordinarily such claims trigger some form of heightened constitutional scrutiny. *McLemore v. Gumucio*, 149 F.4th 859, 864 (6th Cir. 2025).[4] But the IRS's requirement that 501(c)(3) organizations turn over their donors' PII fails even the far less demanding rational basis scrutiny, because it lacks any reasonable connection to a legitimate government interest.

Rational basis is not a high bar. It merely requires that the burden the government imposes be reasonably believed to facilitate the government's effort to achieve a genuinely public good. So, for example, in *Armour v. City of Indianapolis*, 566 U.S. 673 (2012), the Supreme Court held that a city's decision to forgive certain financial liabilities owed by some people, but not those owed by other people, satisfied the rational basis test simply because it was cheaper and more convenient for the government, under the circumstances. *Id*. at 682. The city had imposed fees on property owners, but then switched to a new method of calculating

---

[4] The notable exception is truthful disclaimers, accorded rational basis scrutiny under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). As discussed below (Section I.B), the disclosure mandate at issue here cannot be justified under *Zauderer*.

fees, and forgave those who had not paid—while keeping the money from those who had paid.  The latter understandably considered this unfair, and sued, but the Court found that the city's decision was rational because refunding everybody's money "could have proved complex and expensive," and "add[ing] refunds to forgiveness would have meant adding yet further administrative costs, namely the cost of processing refunds."  *Id.* at 682-83.

*Armour* stands at the extreme edge of the rational basis test, establishing the principle that the government can sometimes treat people unequally just because treating them equally would be inconvenient to the government.  Yet even under *that* incredibly forgiving standard, the IRS's demands for donors' private information, at issue here, is unconstitutional—because requiring such disclosures does *not* improve government efficiency.  Five years ago, the IRS admitted that it "can obtain sufficient information from other [sources]" and thus does not need for 501(c)(3) organizations to disclose it.  Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 Fed. Reg. 31959, 31963 (May 28, 2020).[5]  And it has admitted that it "does not need [PII] of donors to be

---

[5] The Guidance says in full: "the IRS does not need the names and addresses of substantial contributors to tax-exempt organizations *not described in section 501(c)(3)*."  *Id.* (emphasis added).  The question here, of course, is whether distinguishing 501(c)(3)s from other 501(c) organizations in this respect is rational.  It is not.

reported on Schedule B." *IRS Bulletin*, Rev. Proc. 2018–38 § 3.[6]  It has therefore

conceded that it has no real use for the PII it demands from Plaintiff, and that it

doesn't demand this information from other, similarly situated groups.

The agency's legitimate interest is in punishing and preventing tax fraud, but

that fraud would be committed by *individual taxpayers*, and the IRS has no means

of aligning the PII disclosed by a nonprofit organization with the information tax-

payers submit.  That means the disclosures don't help it identify potential fraud.  In

other words, the IRS does *not* compare a nonprofit's annual reports with the tax-

return submitted by John Q. Taxpayer to see if he really did donate $100 that he

deducts from his tax liability—and it has no plans either to do this in the future or

to become *capable* of doing this in the future.  The disclosure mandate is therefore

not rationally related to a legitimate government interest.

That alone means the mandate fails even *Armour*'s extremely lenient "ad-

ministrative convenience" standard—but there's more: the collection of this infor-

mation is administratively *in*convenient for the IRS.  As Plaintiff notes, the IRS is

legally required to keep PII confidential by redacting information before producing

information to the public.  26 U.S.C. § 6104(d)(3)(A).  That means that collecting

this information is not only of no benefit to the IRS, but requires additional costs

---

[6] https://www.irs.gov/pub/irs-drop/rp-18-38.pdf.

and manpower to ensure security protocols are followed and to redact information before releasing it.

In *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), the state of California offered an "administrative convenience" argument similar to that approved in *Armour*—but the Supreme Court rejected it. The state argued that it needed unredacted versions of the 501(c)(3)s' IRS filings, not because it suspected any particular person or group of wrongdoing, but simply because having the information on hand made things easier for enforcement officials. The Ninth Circuit agreed, holding that the requirement "'improves the efficiency and efficacy of the Attorney General's important regulatory efforts'" in "preventing charitable fraud and self-dealing." *Id*. at 612 (citation omitted). But the Supreme Court reversed. While acknowledging that these are legitimate state interests, it found that these interests were outweighed by the risk that the disclosure of the PII would result in harassment and intimidation of donors, and thus would chill free speech. *Id*. at 616-17.

Here, the IRS's basis for the demand is weaker than California's was in *Bonta*, because by its own concessions, its demand for the PII in question does *not* improve its efficiency or efficacy in preventing fraud, and, on the contrary, *reduces* its efficiency, the agency must spend time and money on security protocols it would otherwise not have to undertake. Yet on the other side of the balance, the

8

risks of harassment and intimidation remain high.  Thus, under either *Armour* or *Bonta*, the disclosure requirement lacks a rational basis.  It logically follows that it also fails the heightened scrutiny applicable to First Amendment claims.

**B.**     **"Just in case" is not an adequate justification.**

Amicus Tax Law Center (TLC) argues that the disclosure demand is legitimate because "[i]t gives the IRS information that it *can* use to predict noncompliance," "helps the IRS direct its limited audit resources and '*enhance prospects for accurately targeting* those likely to be noncompliant or particular noncompliant practices,'" and "*can* improve the results of audits themselves, by providing information that *can* be used to verify or dispute the positions taken on returns and properly determine tax liability."  TLC Am. Br. at 7 (citation omitted; emphasis added).  Pure speculation about mere possibilities is not enough to satisfy even the rational basis test, however.  Obviously, forcing people to turn over information to the government *might* help the government to do things at some point in the future, or *could* "enhance" the government's "prospects" of "accurately targeting" some future investigation.

But the rationality test doesn't require courts to ignore "the realities of the subject," *Heller v. Doe*, 509 U.S. 312, 321 (1993), or to "manufacture justifications" for a challenged statute.  *Schlesinger v. Ballard*, 419 U.S. 498, 520 (1975) (Brennan, J., dissenting).  TLC's "maybe someday this information could prove

helpful" guesswork falls short even of the kind of "'rational speculation'" that might satisfy rational basis. *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (citation omitted). *Cf. Congregation Kol Ami v. Abington Twp*., 309 F.3d 120, 135 (3d Cir. 2002) ("unfounded fears or speculation" fail to satisfy the rational basis test).

Mandatory disclosures of information have been upheld in certain contexts—most notably, the kind of consumer-protection warnings at issue in *Zauderer, supra*, which applied rational basis review to warning labels.[7] But even under *Zauderer*, the compulsory publication is only justified when it *actually* serves a consumer-protection interest. "[C]uriosity alone is not a strong enough state interest to sustain the compulsion of even an accurate, factual statement." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996). Where there's no rational connection between a disclosure demand and the government's legitimate interest, it fails even the most lenient form of scrutiny—*even though* the information "might" or "could" come in handy someday.

That's why in *Genusa v. City of Peoria*, 619 F.2d 1203 (7th Cir. 1980), the Seventh Circuit found it unconstitutional for the government to require anyone seeking to run an adult business to submit a license application that included PII of

---

[7] As the Second Circuit recently noted, *Zauderer*'s standard is "arguably more stringent than traditional rational basis review." *Volokh v. James*, 148 F.4th 71, 86 n.6 (2d Cir. 2025).

"all persons holding any beneficial interest in the real estate upon which such adult [business] is to be operated." *Id.* at 1216. Such information *might* turn out to be helpful to the government *someday*, and might even "'enhance prospects for accurately targeting those likely to be noncompliant.'" TLC Am. Br. at 7 (citation omitted). But there was no *realistic* connection between the city's interest in regulating adult businesses and the PII of people who had no meaningful involvement in the businesses' operation; thus the requirement "invade[d] plaintiffs' privacy without any legitimate justification." *Genusa*, 619 F.2d at 1216.

Likewise, in *Acorn Invs., Inc. v. City of Seattle*, 887 F.2d 219 (9th Cir. 1989), the court found a city ordinance requiring adult businesses to turn over PII regarding their shareholders had "no logical connection" to the government's interests, since the shareholders were not responsible for the operation of the businesses. *Id.* at 226. A disclosure requirement fails even the most lenient form of constitutional scrutiny when there's no "relevant correlation between the asserted governmental interest in obtaining the information and the information required to be disclosed." *Id. Accord, Movie & Video World, Inc. v. Bd. of Cnty. Comm'rs*, 723 F. Supp. 695, 703 (S.D. Fla. 1989) (finding "no logical relation" between PII of shareholders information and the legitimate purpose of regulating adult businesses).

The same logic applies even more forcefully here, where the IRS has repeatedly and publicly admitted that it doesn't put the PII at issue to use in enforcing the tax laws. Notwithstanding TLC's "maybe" hypotheticals, the IRS does not, in fact, compare 501(c)(3) organizations' forms against those submitted by individual taxpayers, and has no plans to do so. Nor is such a process realistic. After all, it's the taxpayer, not the non-profits, who would be guilty of tax evasion if a taxpayer falsely claims to have made a tax-deductible donation. Disclosure by non-profits, therefore, could only benefit the IRS if it were used to track down individual taxpayers committing fraud—but that doesn't happen.[8]

Even if it did, the IRS has plenty of other ways to get the information it needs. If John Q. Taxpayer submits a return claiming to have donated $100 to a nonprofit, and the IRS suspects that this was untrue, it has plenty of ways to dis-

---

[8] TLC's brief speaks of "the asymmetry between what the tax filer knows … and what the government knows" as though there were some *CSI*-style data control center where tax returns are compared by robots and crack investigators sniff out wrongdoers. TLC Am. Br. at 7. The reality is nothing like that. As TLC itself admits in its very next paragraph, "the IRS's resources are highly constrained." *Id.* at 8. The reality is that the information is *not* actually used in any such high-tech sleuthing, but at best lies around in databases for long periods—and, at worst, is leaked to the public, incurring harassment and intimidation that chills speech. In any event, TLC's "asymmetry" argument is contradicted by the IRS's acknowledgment that "[t]he IRS does not need [PII] of donors to be reported on Schedule B of Form 990 or Form 990-EZ in order to carry out its responsibilities." *IRS Bulletin*, *supra* note 6.

cover the facts: it can demand information from John, or ask the nonprofit to voluntarily turn over information, or obtain a court order to acquire the information. The *Bonta* Court emphasized this point in holding that the state had adequate alternative means of getting information it needed, short of imposing a disclosure mandate. The state, it said, cannot "cast[] a dragnet for sensitive donor information from tens of thousands of charities each year, even though that information will become relevant in only a small number of cases involving filed complaints," when it has "multiple alternative mechanisms through which [it] can obtain [the] information after initiating an investigation." 594 U.S. at 614.

The bottom line is that the disclosure requirement violates the minimal requirement that burdens imposed by the government have some rational connection to a legitimate government interest. It therefore necessarily fails exacting or strict scrutiny. For that reason alone, the Plaintiffs should prevail.

## II. Disclosure creates a serious risk of harassment, retaliation, violence and chill.

Plaintiff has submitted examples of the IRS improperly publicizing Form 990 information, including instances when media organizations obtained and published PII. Pls' Mot. for Summ. J. at 7. The consequence of such disclosures is to chill speech because donors to non-profits fear retaliation, ostracism, intimidation, and even violence.

That fear is eminently reasonable.  Instances abound of organizations and individuals being targeted for harassment and violence.

Probably best known are the various forms of retaliation inflicted on supporters of California's 2008 same-sex ballot initiative, Proposition 8.  Donors to the "yes" campaign had their addresses publicized—indeed, one website created a Google Map pointing to their addresses, the amount they donated, and their employment information.  Thomas Messner, *The Price of Prop 8*, Heritage Foundation (Oct. 22, 2009).[9]  The consequences were predictable: supporters of Prop 8 experienced vandalism of their homes, cars, businesses, and churches; catcalls on the street, harassing phone calls, emails, and hateful messages painted on their cars— as well as death threats and actual instances of physical violence.  *Id.*  This was made possible by laws requiring donors to disclose their addresses and other PII.

Some view these types of retaliation as a good thing.  Senator Charles Schumer testified to a Senate Committee that it was "good" if people experienced intimidation and harassment as a result of their PII being publicized, because that might "have a deterrent effect" against people "trying to influence the government."  Remarks of Sen. Chuck Schumer regarding the DISCLOSE ACT (Senate Rules and Administration Committee Hearing (July 17, 2012).[10]

---

[9] https://www.heritage.org/marriage-and-family/report/the-price-prop-8.
[10] https://www.youtube.com/watch?v=NHX_EGH0qbM.

And, indeed, harassment and retaliation against political opponents has increased in recent years, particularly against groups and individuals identified as politically conservative.  Attorneys for amicus GI have represented many of these people, and can attest to their experiences.  For example, the Center for Arizona Policy—which GI counsel are now representing in a case before the state Supreme Court challenging a law compelling the disclosure of donors' PII[11]—was subjected to a campaign of harassment that included threatening phone calls and social media messages that rose to such severity that the FBI became involved and the Center had to hire armed security for its fundraising events.[12]  Likewise, employees of the Kansas Policy Institute—another free-market-oriented thinktank—received threatening and vulgar messages such as "Hey, asshole, we know … where you live and we're watching you."[13]  The former CEO of the Freedom Foundation, a Washington, D.C.-based free-market non-profit, experienced threats and vandalism at both her office and her home, including having her car's tires slashed and her house

---

[11] *Center for Arizona Policy v. Arizona Secretary of State*, No. CV-24-0295-PR (Ariz. S. Ct. filed Dec. 9, 2024) (pending).

[12] *See* Declaration of Cathi Herrod, Ex. 1 to Mot. for Prelim. Inj., *Center for Arizona Policy v. Arizona Sec'y of State,* No. CV2022-016564 (Maricopa Cnty. Super. Ct., filed Dec. 15, 2022).

[13] Affidavit of David Trabert, Appellants' Appendix at APP.057, *Rio Grande Found. v. City of Santa Fe*, 7 F.4th 956 (10th Cir. 2021), *cert. denied*, 142 S.Ct. 1670 (2022).

graffitied.[14]  Employees of the Mackinac Center, a free-market organization in Michigan, were also subjected to harassment and even physical violence.[15]

Last year, the offices of three conservative groups—the Center for the American Experiment, the Upper Midwest Law Center, and TakeCharge—experienced an arson attack. Steve Karnowski, *Federal Authorities Investigate Suspected Arson at Offices of 3 Conservative Groups in Minnesota*, AP News (Feb. 2, 2024).[16]  Even the owners of Tesla cars have suffered vandalism and harassment due to owner Elon Musk's political activities.  Andrew Campa, *Tesla's Steep Fall from Green Darling to Protest Target*, Los Angeles Times (Mar. 19, 2025).[17]

Political leaders and judges, too, have been targeted for violence recently by people who obtained their home addresses through online databases.  The Secretaries of State of Missouri and Maine, and the chief operating officer of the Georgia Secretary of State, were "swatted" by harassers who found their addresses online. Curt Devine, et al., *Election Officials' Homes "Swatted" as Presidential Race Heats Up*, CNN (Mar. 13, 2024).[18]  A man arrested with weapons near former

---

[14] Affidavit of Lynn Harsh, Appellants' Appendix at APP.061, *Rio Grande, supra.*
[15] Affidavit of F. Vincent Vernuccio, Appellants' Appendix at APP.064, *Rio Grande, supra.*
[16] https://apnews.com/article/suspected-arson-fire-conservative-groups-minnesota-c98730a80787c0fc5b9c9b67e33be597.
[17] https://www.latimes.com/california/story/2025-03-17/torched-and-vandalized-tesla-cybertrucks-follow-in-the-humvees-path.
[18] https://www.cnn.com/2024/03/13/politics/swatting-election-officials-invs.

President Obama's home had tracked down the address from online sources.  Ryan J. Reilly & Fiona Glisson, *Jan. 6 Defendant Arrested Near Obama's Home Had Guns And 400 Rounds of Ammunition in His Van*, NBC News (June 30, 2023).[19]  An armed man appeared at Justice Brett Kavanaugh's home in 2022; he found the Justice's address on a publicly accessible online database.  Gabrielle Fonrouge, *Nicholas Roske Found Brett Kavanaugh's Address Online, Feds Say*, N.Y. Post (June 8, 2022).[20]  Two Minnesota legislators were shot to death this summer by an assassin who found their addresses in an online database.  Sofia Barnett, *How Did Shooter Find Minnesota Lawmakers' Homes? It's Easier Than Most People Think*, Minn. Star Tribune (June 19, 2025).[21]  Right-wing podcaster Charlie Kirk was murdered on a college campus months later while debating students about his beliefs.  N'dea Yancey-Bragg, et al., *Charlie Kurk Shot and Killed at Utah Campus Event*, Columbus Dispatch (Sep. 10, 2025).[22]

Of course, even a single incident of violence—or a single threat of violence—can chill an incalculable amount of speech, since all that's necessary to

---

[19] https://www.nbcnews.com/politics/justice-department/jan-6-defendant-arrested-obamas-home-guns-400-rounds-ammunition-van-rcna92094.

[20] https://nypost.com/2022/06/08/nicholas-roske-found-brett-kavanaughs-address-online-feds-say/.

[21] https://www.startribune.com/local-lawmakers-worry-about-their-safety-after-shooter-visited-people-search-sites-to-find-victims/601374743.

[22] https://www.dispatch.com/story/news/nation/2025/09/10/charlie-kirk-shot-at-utah-valley-university/86080079007/.

cause self-censorship is to make people fear speaking. That's why in *Shelton v. Tucker*, 364 U.S. 479 (1960), the Supreme Court held a mandatory disclosure rule unconstitutional *even though no actual disclosure occurred*. That case involved a rule requiring every public-school employee to identify to the government any nonprofit organizations the employee donated to.

The information was *not* made public—indeed, the lower court found that the disclosure forms were "being treated as confidential and are being kept under lock and key." *Carr v. Young*, 231 Ark. 641, 646 (1960). Yet the Court said this did not matter, because the mere risk is enough to create a chilling effect: "*Even if there were no disclosure to the general public*," it said, "the pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy. Public exposure, bringing with it the possibility of public pressures … would simply operate to *widen and aggravate* the impairment of constitutional liberty." *Shelton*, 364 U.S. at 486–87 (emphasis added).

Similarly, if donors fear their PII will be held in a government database, where it's substantially likely to be published against their will—and, indeed, against the requirements of various privacy laws—it's only logical they will be less likely to donate to nonprofit groups like Buckeye, Goldwater, or Rio Grande. The result is to diminish freedom of speech and to "inhibit[] … freedom of thought." *Id.* at 487. That is the very definition of a chilling effect.

## CONCLUSION

The District Court's decision should be *reversed*.


Respectfully submitted this 24th day of November, 2025 by:

/s/ *Timothy Sandefur*

Timothy Sandefur
**Scharf-Norton Center for**
**Constitutional Litigation**
**at the GOLDWATER INSTITUTE**

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,057 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in 14 point font.

/s/ *Timothy Sandefur*
Timothy Sandefur
*Attorney for Amici Curiae*
Dated:

**CERTIFICATE OF SERVICE**

Document Electronically Filed and Served by ECF this 24th day of November, 2025 on all counsel of record.

/s/ *Kris Schlott*
   Kris Schlott, Paralegal