## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BUCKEYE INSTITUTE,

*Plaintiff-Appellee,*

v.

INTERNAL REVENUE SERVICE, ET AL.

*Defendants-Appellants.*

On Appeal from the United States District Court
For the Southern District of Ohio

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

Jennifer B. Dickey
Jonathan D. Urick
**U.S. CHAMBER
LITIGATION CENTER**
1615 H Street, NW
Washington, DC 20062

Caleb P. Burns
Jeremy J. Broggi
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
JBroggi@wiley.law

NOVEMBER 25, 2025

*Counsel for* Amicus Curiae

# DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Pursuant to Sixth Circuit Rule 26.1, the Chamber of Commerce of the United States of America makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

    No.

Dated: November 25, 2025

*/s/ Jeremy J. Broggi*
Jeremy J. Broggi
*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ....................................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ................................1

ARGUMENT ...........................................................................................3

    I.      The First Amendment Requires The Government To Satisfy Heightened Strict Scrutiny When It Threatens Associational Privacy. 3

    II.     The First Amendment Cannot Be Nullified By Labeling A Law A Subsidy. ...............................................................................6

    III.   The Government's Position Conflicts With The Original Understanding Of The First Amendment. ..........................................11

    IV.   The Government's Sweeping Theory Would Eviscerate The First Amendment's Associational Protections. ..........................................17

CONCLUSION ......................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for International Development v. Alliance for Open Society
International, Inc.*,
570 U.S. 205 (2013)..................................................................................8

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021)................................................. 2, 4, 5, 7, 8, 9, 11, 14, 17, 19

*Buckley v. Valeo*,
424 U.S. 1 (1976)...................................................................................3

*CIC Services, LLC v. IRS*,
936 F.3d 501 (6th Cir. 2019) ...............................................................18

*Defending Education v. Olentangy Local School District Board of
Education*,
__ F.4th __, 2025 WL 3102072 (6th Cir. Nov. 6, 2025)...............................6, 10

*Doe v. Seattle Police Department*,
145 S. Ct. 1539 (2025)............................................................................4

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025)................................................................................3

*In re Gliner*,
133 F.4th 927 (9th Cir. 2025) ...............................................................12

*Grosjean v. American Press Co.*,
297 U.S. 233 (1936)..............................................................................16

*Houston Community College System v. Wilson*,
595 U.S. 468 (2022)..............................................................................14

*Janus v. American Federation of State, County, & Municipal
Employees, Council 31*,
585 U.S. 878 (2018)..............................................................................15

*Lynch v. Donnelly*,
    465 U.S. 668 (1984)..........................................................................................11

*M'Culloch v. Maryland*,
    17 U.S. 316 (1819)..........................................................................................18

*Marks v. United States*,
    430 U.S. 188 (1977)..........................................................................................5

*McConnell v. FEC*,
    540 U.S. 93 (2003)..........................................................................................15

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995)..........................................................................11, 12, 13, 14

*McLemore v. Gumucio*,
    149 F.4th 859 (6th Cir. 2025) ..........................................................................11

*Monge v. California*,
    524 U.S. 721 (1998)..........................................................................................18

*NAACP v. Alabama*,
    357 U.S. 449 (1958)..........................................................................................4, 9, 10

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998)..........................................................................................7

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)..........................................................................................5

*NLRB v. Midland Daily News*,
    151 F.3d 472 (6th Cir. 1998) ..........................................................................15

*NRSC v. FEC*,
    117 F.4th 389 (6th Cir. 2024) ..........................................................................15, 16

*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir. 2013) ..........................................................................7

*Regan v. Taxation With Representation of Washington*,
    461 U.S. 540 (1983)..........................................................................6, 8, 10, 11

iv

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984)...................................................................3

*Speiser v. Randall*,
  357 U.S. 513 (1958)................................................................7, 9

*Talley v. California*,
  362 U.S. 60 (1960)...........................................................9, 12, 17

*United States v. Rahimi*,
  602 U.S. 680 (2024)..............................................................11, 17

*United States v. Sittenfeld*,
  128 F.4th 752 (6th Cir. 2025) ...................................................15

*Vidal v. Elster*,
  602 U.S. 286 (2024)....................................................................11

*Williams v. Homeland Insurance Co. of New York*,
  18 F.4th 806 (5th Cir. 2021) ......................................................17

**Statutes**

26 U.S.C. § 6033 .............................................................................16

**Constitutional Provisions**

U.S. Const. amend. I .........................................................................3

**Other Authorities**

4 Annals of Cong. (1794).................................................................14

Robert G. Natelson, *Does "The Freedom of the Press" Include a
  Right to Anonymity? The Original Meaning*, 9 N.Y.U. J. L. &
  Liberty 160 (2015) ................................................................12, 13

Robert M. Chesney, *Democratic-Republican Societies, Subversion,
  and the Limits of Legitimate Political Dissent in the Early
  Republic*, 82 N.C. L. Rev. 1525 (2004) .......................................14

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber has a profound interest in this case. The Internal Revenue Service ("IRS") asserts authority to demand that nonprofit 501(c)(3) organizations hand over to the Government lists of individuals that provide substantial monetary support for their missions. That disclosure requirement impermissibly chills the free expression and association guaranteed by the First Amendment.

The business community has experienced this chill firsthand. For one, the Chamber's charitable arm is directly subject to the disclosure requirement. The U.S. Chamber of Commerce Foundation ("Foundation") is a 501(c)(3) charitable

---

[1] All parties have consented to the filing of this brief. No counsel for any party authored this brief in whole or in part. No entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(a)(4)(E).

organization that harnesses the power of business for social good and educates the public on emerging issues and creative solutions that will shape the future. It does so through a variety of charitable and educational programs. Chamber members also contribute to a variety of other 501(c)(3) organizations that participate in the nation's marketplace of ideas through charity, education, and other expressive activities.

Many donors to these organizations prefer to remain anonymous to protect themselves from being targeted by the Government or others with different views, to avoid further requests for solicitations, or simply because they do not wish to publicize their charitable good deeds. Without anonymity, Chamber members and Foundation donors may be deterred from supporting charitable and educational initiatives that benefit the nation's business community. That reluctance harms the public and hampers healthy democratic debate.

The District Court below rightly held that the IRS must satisfy rigorous First Amendment review to compel 501(c)(3) organizations to disclose their donors. Both precedent and the First Amendment's original understanding require such heightened scrutiny. Indeed, four years ago, the Supreme Court struck down a California law that compelled disclosure of exactly the same information at issue in this case: donors identified on "Schedule B to [IRS] Form 990." *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 602 (2021). The only dispute among the Justices that controlled the outcome there was whether "strict scrutiny" or

"exacting scrutiny" applied. Not even the dissenting Justices argued, as the Government does here, for rational-basis review. "Rational basis is the appropriate standard for laws that do not implicate 'fundamental constitutional rights' at all." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 495 (2025). Speech and association, of course, are fundamental rights. The Government's attempt to escape heightened First Amendment scrutiny by labeling its disclosure requirement a tax subsidy is therefore unconvincing and, if accepted, would gut the First Amendment's protections for anonymous speech and associational privacy.

The Court should affirm.

## ARGUMENT

**I. THE FIRST AMENDMENT REQUIRES THE GOVERNMENT TO SATISFY HEIGHTENED STRICT SCRUTINY WHEN IT THREATENS ASSOCIATIONAL PRIVACY.**

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech, or of the press … or the right of the people peaceably to assemble." U.S. Const. amend. I. The Amendment guarantees the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

The right to associate entails the right to do so privately. The Supreme Court has "repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v.*

*Valeo*, 424 U.S. 1, 64 (1976) (per curiam); *see also Doe v. Seattle Police Dep't*, 145 S. Ct. 1539, 1540 (2025) (Statement of Alito, J.) (explaining that First Amendment's "protection for the right to engage in anonymous political expression" guards against compelled "disclosure"). "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may" act as "a restraint on freedom of association." *Americans for Prosperity Foundation v. Bonta ("AFP")*, 594 U.S. 595, 606 (2021) (quoting *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)).

Donors may wish "to remain anonymous" for many reasons. *AFP*, 594 U.S. at 617. These include to avoid being identified with opinions disfavored by the Government, fear of reprisals, or simply a desire to preserve privacy at a time when it is easier than ever for bad actors to access "sensitive details" about "anyone else," including "a person's home address or the school attended by his children." *Ibid.* Absent "privacy in one's associations," an organization and its members will face difficulty in "their collective effort to foster" and express their chosen "beliefs"— particularly "dissident beliefs." *NAACP v. Alabama*, 357 U.S. 449, 462–63 (1958).

The "deterrent effect" of such "disclosures," *id.* at 463, triggers heightened First Amendment scrutiny. Indeed, six Justices recently held that *all* compelled disclosures trigger heightened First Amendment scrutiny. Chief Justice Roberts and Justices Kavanaugh and Barrett applied "exacting scrutiny," *AFP*, 594 U.S. at 607–08, Justice Thomas urged "strict scrutiny," *id.* at 619–20, and Justices Alito and

Gorsuch signaled agreement with Justice Thomas but did not "decide which standard should be applied" because they agreed that the compulsion at issue "fail[ed] exacting scrutiny," *id.* at 622–23. Thus, this Court can apply either strict or exacting scrutiny, *see Marks v. United States*, 430 U.S. 188, 193 (1977), but strict scrutiny is better supported by the doctrine.[2] Either way, this Court must apply rigorous First Amendment scrutiny with "real teeth" requiring, at minimum, "narrow tailoring and consideration of alternative means of obtaining the sought-after information." *AFP*, 594 U.S. at 622 (Alito, J., concurring).

Heightened First Amendment scrutiny is directly compelled in this case by *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021). There, the Supreme Court considered a California regulation that required charities to hand over their "Schedule B to [IRS] form 990," which "requires organizations to disclose the names and addresses of donors who have contributed more than $5,000 in a particular tax year (or, in some cases, who have given more than 2 percent of an organization's total contributions)." *Id.* at 602. That is the exact same information sought by the IRS disclosure in this case. *See id.* at 616 ("tax-exempt charities already provide their Schedule Bs to the IRS"). Thus, the only difference between

---

[2] Because a disclosure requirement "directly burden[s]" a First Amendment right, it "should be subject to the same scrutiny as laws directly burdening other First Amendment rights." *AFP*, 594 U.S. at 620 (Thomas, J., concurring); *accord New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (declining to create "a second-class right" for a freedom the "bill of Rights guarantees").

that case and this one is that the recipient of the compelled disclosure is a federal, rather than state, entity. And that distinction is immaterial because the First Amendment constrains all those "wielding state power." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, __ F.4th __, 2025 WL 3102072, at *5 (6th Cir. Nov. 6, 2025) (en banc); *see also ibid.* (explaining "First Amendment" is "incorporated against the States by the Fourteenth Amendment"). The District Court was thus correct to hold that *AFP* requires rigorous First Amendment review here.

## II. THE FIRST AMENDMENT CANNOT BE NULLIFIED BY LABELING A LAW A SUBSIDY.

The Government attempts to escape both *AFP* and its First Amendment burden by labeling its law a "tax subsidy." It argues that because the Government need not give 501(c)(3) organizations tax benefits, any condition on such benefits need only pass rational-basis review under *Regan v. Taxation With Representation of Washington*, 461 U.S. 540 (1983). That is wrong.

*First*, as Appellee convincingly explains (at 37–46), *Regan*'s reasoning simply has no application to the disclosure requirement. *Regan* turned on the notion that "Congress" made a choice "not to subsidize" a specific activity—"lobbying"— with "public funds." 461 U.S. at 544; *see id.* at 545 ("Congress has merely refused to pay for the lobbying out of public monies."), 551 ("The issue in this case is not whether [an organization] must be permitted to lobby, but whether Congress is required to provide it with public money with which to lobby."). That funding

decision is entirely unremarkable. "Congress may 'selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998) (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)).

That government-funding principle is not in play here. When Congress elects not to fund an expressive activity it does not abridge freedom of speech because those who wish to engage in the activity "are as unconstrained … as they were before." *Finley*, 524 U.S. at 595 (Scalia, J., concurring); *see Pahls v. Thomas*, 718 F.3d 1210, 1239 (10th Cir. 2013) ("freedom of speech is a negative liberty"). But when Congress *compels* disclosure of private affiliations, that *necessarily* burdens associational freedoms "[r]egardless of the type of association." *AFP*, 594 U.S. at 608. Congress, in that circumstance, is not subsidizing (or refusing to subsidize) *anything*; it is compelling the disclosure of First Amendment protected confidential information as a condition of a government benefit. *See Speiser v. Randall*, 357 U.S. 513, 515 (1958) (holding unconstitutional the "exaction of" speech "as a condition of obtaining a tax exemption"). If that distinction did not matter, then *AFP* should have come out the other way because the organizations there (just like in *Regan*) were tax-exempt charities. *Accord* Appellee Br. 49 n.6.

The Government's own description of its interest and fit proves the point. It claims (at 33–38) that the donor-disclosure requirement is a "valuable *enforcement tool*" to police tax fraud. But in *Regan*, Congress's interest was whether to "subsidize substantial lobbying by charities"—"a matter of policy and discretion" over how to use the public fisc. *Regan*, 461 U.S. at 549–50. The IRS's interest in enforcement efficacy—rather than a policy decision about what activities to subsidize—belies any analogy to *Regan*. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) (explaining that *Regan* is distinct from other unconstitutional-conditions cases because the condition at issue in *Regan* "specif[ied] the activities Congress wants to subsidize"). The same goes for fit. In *Regan*, conditioning 501(c)(3) status on a lobbying prohibition furthered Congress's decision not to subsidize lobbying. But here, conditioning 501(c)(3) status on a disclosure requirement does not further a decision not to subsidize an activity. Indeed, *AFP* expressly held that a disclosure condition aimed at "preventing wrongdoing by charitable organizations," 594 U.S. at 612, is subject to heightened review. There, as here, the Government must satisfy rigorous First Amendment scrutiny.

*Second*, and relatedly, there was no suggestion in *Regan* that the statute chilled speech or association. Congress's decision not to subsidize lobbying there in no way *inhibited* 501(c)(3) organizations from engaging in protected speech and association.

That makes this case fundamentally different from *Regan*. The Supreme Court has repeatedly explained that the "compelled disclosure of affiliation with groups engaged in advocacy" operates as "a restraint on freedom of association" *because* it creates a "chilling effect." *AFP*, 594 U.S. at 606; *id.* at 616 (explaining that "unnecessary risk of chilling" from "disclosure requirement" was the source of "violation of the First Amendment"); *see also NAACP*, 357 U.S. at 462 (explaining that "compelled disclosure" created constitutional problem because of the "fear of exposure of … beliefs … and … the consequences of this exposure"); *Talley v. California*, 362 U.S. 60, 65 (1960) ("The reason for those [compelled-disclosure] holdings was that identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance."). The chilling effect from disclosure distinguishes this case from *Regan* and thus warrants heightened First Amendment scrutiny.

That this case and *Regan* both involve the tax code does not alter the analysis. Indeed, *NAACP v. Alabama*—the Supreme Court's seminal compelled-disclosure case—explained that "[s]tatutes imposing *taxes* upon rather than prohibiting particular activity have been struck down when perceived to have the consequence of unduly curtailing" First Amendment rights. 357 U.S. at 461 (emphasis added) (citing *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943)); *accord Speiser*, 357 U.S. at 518 (applying First Amendment

9

rigor to tax condition because "[i]t is settled that speech can be effectively limited by the exercise of the taxing power"). Plainly then, a tax subsidy is not the get-out-of-the-First-Amendment-free card that the IRS claims. Where, as here, a substantive policy effected through the tax code creates a chilling effect on protected speech and association, the Supreme Court's compelled-disclosure cases demand rigorous First Amendment review.

*Third*, even if the Court views the disclosure requirement here as a condition on a *Regan*-esque tax subsidy, it still triggers rigorous First Amendment scrutiny because it operates "in such a way as to aim at the suppression of dangerous ideas." *Regan*, 461 U.S. at 548 (quotations omitted). That is because, as the Supreme Court has explained, disclosures have a "particularly" pernicious effect on "group[s]" that "espouse[ ] *dissident* beliefs." *NAACP*, 357 U.S. at 462 (emphasis added). In other words, those who support unpopular ideas are more likely to face reprisals and chill than those who support popular ideas. Disclosures thus functionally operate as a "heckler's veto"—a form of "odious viewpoint discrimination"—because they disproportionally increase the likelihood of "violence," "threats," and "other unprivileged retaliatory conduct" against those whose speech is out of favor. *Cf. Defending Educ.*, 2025 WL 3102072, at *9. Because the disclosure requirement "discourage[s] the expression of particular views," it "present[s] a very different

question" than the government-funding issue decided in *Regan*. *Regan*, 461 U.S. at 551 (Blackmun, J., concurring).

For each of these reasons, the Court should reject the IRS's arguments and affirm that the Supreme Court's compelled-disclosure cases—and not *Regan*—control this compelled-disclosure case.

## III. THE GOVERNMENT'S POSITION CONFLICTS WITH THE ORIGINAL UNDERSTANDING OF THE FIRST AMENDMENT.

Not only does the Government's approach conflict with precedent, it also conflicts with what "history reveals was the contemporaneous understanding of [the First Amendment's] guarantees." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984); *accord Vidal v. Elster*, 602 U.S. 286, 295–300 (2024) (assessing scope of First Amendment protections for trademarks using history and tradition); *McLemore v. Gumucio*, 149 F.4th 859, 868–70 (6th Cir. 2025) (Bush, J., concurring) (employing similar analysis for auctioneer regulations); *United States v. Rahimi*, 602 U.S. 680, 717 (2024) (Kavanaugh, J., concurring) ("For more than 200 years, this Court has relied on history when construing vague constitutional text in all manner of constitutional disputes.").

The First Amendment has always been understood to protect the "right to remain anonymous" in one's speech and associations. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995); *AFP*, 594 U.S. at 619–20 (Thomas, J., concurring) ("The text and history of the Assembly Clause suggest that the right to

11

assemble includes the right to associate anonymously."); *see also In re Gliner*, 133 F.4th 927, 933 (9th Cir. 2025) ("The United States has a long tradition of anonymity in public discourse, dating back to our founding era").

History and tradition confirm that right. "Founding-era Americans opposed attempts to require that anonymous authors reveal their identities on the ground that forced disclosure violated the 'freedom of the press.'" *McIntyre*, 514 U.S. at 361 (Thomas, J., concurring). That opposition stemmed from their experience under the Crown. In the years leading up to the Revolution, the Colonists were subject to England's law of seditious libel under which authors were punished—even sentenced to death—for "writing, printing or publishing books." *Talley*, 362 U.S. at 64–65. As a result, "colonial patriots frequently had to conceal their authorship" to avoid "prosecutions by English-controlled courts." *Id.* at 65.

Anonymous authorship continued to dominate the civic landscape after the Revolution. James Madison, Alexander Hamilton, and John Jay famously published the Federalist Papers, advocating for ratification under the pseudonym "Publius." *See* Robert G. Natelson, *Does "The Freedom of the Press" Include a Right to Anonymity? The Original Meaning*, 9 N.Y.U. J. L. & Liberty 160, 177 (2015). The works of their opponents—staunch anti-Federalists Robert Yates, George Clinton, Oliver Ellsworth, and Richard Henry Lee—published their responses as "Brutus," "Cato," "Landholder," and "Federal Farmer," respectively. *See id.* at 178 n.69. In

fact, "during the founding era *most* writing about the Constitution was pseudonymous or anonymous." *Id.* at 177 (emphasis altered).

During this period, attempts to undermine anonymous speech were swiftly rebuked. In 1787, for example, "a Federalist, writing anonymously himself," called for newspapers to refrain from publishing anonymously authored works. *McIntyre*, 514 U.S. at 363 (Thomas, J., concurring). Several Federalist-owned newspapers then proceeded to adopt policies disfavoring anonymous speech. *See id.* at 363–64. In response, Anti-Federalists leveled "withering criticism," arguing that these policies undermined the Colonists' hard-won "freedom of the Press." *Id.* at 364–66 (citations and quotations omitted). In the face of this criticism, there was "an open Federalist retreat on the issue," and the offending newspapers reversed course. *See id.* at 366–67. Particularly telling is that throughout the controversy, the pro-disclosure writers "urged it upon the editors and printers as good policy," but "*[n]o one* suggested that disclosure be mandated by the government." Natelson, *supra*, at 195 (emphasis in original).

After the Constitution was ratified, the tradition of anonymous political debate continued. "[A]ctual names were used rarely, and usually only by candidates who wanted to explain their positions to the electorate." *McIntyre*, 514 U.S. at 369 (Thomas, J., concurring); *see also* Natelson, *supra*, at 179 ("[N]on-disclosure of one's identity was a nearly-universal practice in letters, essays, and pamphlets

dealing with political subjects"). During the first federal elections, for example, "anonymous political pamphlets and newspaper articles remained the favorite media for expressing views on candidates." *McIntyre*, 514 U.S. at 369 (Thomas, J., concurring).

The nation's early Congress defended the right to anonymous association even in divisive, politically charged contexts. For example, in the early 1790s, Democratic-Republican societies "sprang up like mushrooms" to express discontent with the fledgling American government. *See* Robert M. Chesney, *Democratic-Republican Societies, Subversion, and the Limits of Legitimate Political Dissent in the Early Republic*, 82 N.C. L. Rev. 1525, 1537–39 (2004). They often "met in secret," *AFP*, 594 U.S. at 620 (Thomas, J., concurring), and drew criticism for their "anonymity," Chesney, *supra*, at 1571. "[F]ollowing the Whiskey Rebellion," President Washington himself urged Congress to "denounce" these "self-created societies." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 480 (2022). However, "James Madison and others opposed, and ultimately defeated, the effort in the House of Representatives," *ibid.*, relying on principles of free expression and association, *see, e.g.*, 4 Annals of Cong. 900–02 (1794). This saga further solidified "that the right to assemble includes the right to associate anonymously." *AFP*, 594 U.S. at 619–20 (Thomas, J., concurring).

The Constitution's protections for anonymous speech and association also reach contributions. It is well settled that "contributions of money for the propagation of opinions" is an essential part of the liberty guaranteed by the First Amendment. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 893 (2018) (quoting A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950)). The First Amendment thus protects the privacy of those who contribute resources to advance ideas. *See supra* Section I; *accord United States v. Sittenfeld*, 128 F.4th 752, 805 (6th Cir. 2025) (Bush, J., dissenting) ("The right to donate anonymously to political organizations … is one of the strongest protections of the First Amendment's right to freely associate."); *McConnell v. FEC*, 540 U.S. 93, 253 (2003) (Scalia, J., concurring) ("an attack upon the funding of speech is an attack upon speech itself"); *NLRB v. Midland Daily News*, 151 F.3d 472, 475 (6th Cir. 1998) (holding that subpoena to compel disclosure of anonymous advertiser did not satisfy First Amendment scrutiny).

Again, history bears this out. At the Founding, activists leaned heavily on "[c]oordinated political money" to "effect fundamental political change." *NRSC v. FEC*, 117 F.4th 389, 412–18 (6th Cir. 2024) (en banc) (Bush, J., concurring), *cert. granted*, 145 S. Ct. 2843 (2025). This coordinated spending was often "kept secret" as its disclosure would undermine messaging and subject donors and recipients to

"injurious" consequences.  *Id.* at 413 (discussing funding by colonial activists for Thomas Paine's publications); *see also id.* at 415–16 (discussing contributions to "pa[y]" for "news media" to publish pseudonymous Federalist Papers).

The donor-disclosure requirement urged by the IRS runs headlong into the history and tradition of the First Amendment.  By requiring an organization to disclose "the names and addresses of all substantial contributors," 26 U.S.C. § 6033(b)(5), the Government directly abridges the longstanding right to anonymous speech and association.  And it "advances no fairly drawn principle from history or text showing that" this disclosure requirement "is relevantly similar to laws that our tradition is understood to permit."  *NRSC*, 117 F.4th at 411 (Bush, J., concurring) (quoting *Rahimi*, 602 U.S. at 692).

To the contrary, history and tradition squarely reject the notion that the Government may undermine expression via a condition on a tax benefit.  "The framers of the First Amendment," the Supreme Court has explained, acted in part to end the "obnoxious taxes" that England "imposed … upon all newspapers and upon advertisements" with the aim of "suppress[ing]" speech "objectionable to the Crown."  *Grosjean v. Am. Press Co.*, 297 U.S. 233, 246–48 (1936); *see id.* at 246 ("the revolution really began when, in 1765, that government sent stamps for newspaper duties to the American colonies").  The founding generation expressly acted in opposition to conditions against anonymity that accompanied government

benefits—namely, the "press licensing law of England" that acted to "lessen the circulation of literature critical of the government" by conditioning licensure on the "exposure of the names of printers, writers and distributors." *Talley*, 362 U.S. at 64.

Because the IRS's disclosure requirement conflicts with the original understanding of the First Amendment, this Court should decline to extend *Regan*. *See, e.g.*, *Rahimi*, 602 U.S. at 730 (Kavanaugh, J., concurring) ("the [constitutional] text, as well as pre-ratification and post-ratification history, may appropriately function as a gravitational pull on the Court's interpretation of precedent"); *Williams v. Homeland Ins. Co. of New York*, 18 F.4th 806, 818–19 (5th Cir. 2021) (Ho, J., concurring) (similar). The IRS's disclosure requirement burdens associational rights; under the First Amendment, therefore, the Government must at a minimum prove that the requirement is "narrowly tailored to an important government interest." *AFP*, 594 U.S. at 617.

## IV. THE GOVERNMENT'S SWEEPING THEORY WOULD EVISCERATE THE FIRST AMENDMENT'S ASSOCIATIONAL PROTECTIONS.

Were precedent and history not enough, the staggering implications of the Government's constitutional theory offer yet more reason to reject it. If the Court were to accept that burdens on speech and association imposed through the tax code need only satisfy the "rational-basis standard" because all matters of taxation "are gestures of legislative grace," IRS Br. 17, it would do immeasurable harm to the First Amendment's protections.

Taxes are both ubiquitous and potent. The Government uses taxes to "regulate an ever-expanding sphere of everyday life"—often with "reporting requirement[s]" backed by "criminal sanctions." *CIC Servs., LLC v. IRS*, 936 F.3d 501, 507 (6th Cir. 2019) (en banc) (Thapar, J., dissenting); *see also* Appellee Br. 49–53. The taxing power is no paper tiger either. "[T]he power to tax involves the power to destroy." *M'Culloch v. Maryland*, 17 U.S. 316, 431 (1819). To broadly exempt this awesome power from the normal (heightened) standard of First Amendment review would be to invite disastrous constitutional abuses.

Consider the reach of such an exception. Under the IRS's theory, the Government could impose confiscatory levels of taxation—perhaps a 100% tax on all income—and then grant exemptions conditioned on onerous limits on speech or association. As the IRS sees it, those burdens on expression would be nothing more than "condition[s] of a voluntary, opt-in" "federal subsidy program" subject to mere rational-basis review. IRS Br. 20. But "[i]f the protections extended to" Americans "by the Bill of Rights can be so easily circumvented, most of them would be … vain and idle enactments, which accomplished nothing, and most unnecessarily excited Congress and the people on their passage." *Monge v. California*, 524 U.S. 721, 738–39 (1998) (Scalia, J., dissenting) (alterations accepted).

But the Court need not rely on hypothetical First Amendment burdens, given the tangible ones that already exist. Just a few years ago in *AFP*, the Supreme Court

had occasion to consider the burdens of a disclosure regime just like the one before this Court. It found a "deterrent effect" from the disclosure based on "the filings of hundreds of organizations as *amici curiae*" that "span[ned] the ideological spectrum." *AFP*, 594 U.S. at 617.

Consider just a few examples of organizations that were chilled by the disclosure requirement. A 501(c)(3) organization that sought to advance its traditional views about marriage saw its "supporters … targeted with death threats." *See* Br. of Proposition 8 Legal Defense Fund 12, *available at* https://tinyurl.com/2f977z6k. One of the organization's opponents warned that supporters of the group's message were "in danger of being shot or firebombed." *Id.* at 12–13. A different group "dedicated to advancing a peaceful transition to democracy in China" reported that one of its "consistent major donor[s]" was "imprisoned" by Chinese officials, while "[a]nother major donor discontinued his support after learning that the Chinese government had discovered his donations." Br. of Citizen Power Initiatives for China 1, 7, *available at* https://tinyurl.com/ytw64twx. A libertarian group reported that its supporters faced "harassment campaigns," attempted boycotts, and efforts to have them "fired from" their jobs. Br. of Freedom Foundation 3–5, *available at* https://tinyurl.com/yc6xexnu. These fears, the Supreme Court explained, are "real and pervasive." *AFP*, 594 U.S. at 617.

The Court should not accept an argument that would subject the Government merely to rational-basis review when it threatens Americans' First Amendment rights.

## CONCLUSION

The Court should affirm.

Dated: November 25, 2025

Respectfully submitted,

*/s/Jeremy J. Broggi*

Jennifer B. Dickey
Jonathan D. Urick
**U.S. CHAMBER**
**LITIGATION CENTER**
1615 H Street, NW
Washington, DC 20062

Caleb P. Burns
Jeremy J. Broggi
Boyd Garriott
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
(202) 719-7000
JBroggi@wiley.law

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 4,458 words.

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced 14-point Times New Roman font using Microsoft Word.

Dated: November 25, 2025

*/s/ Jeremy J. Broggi*
Jeremy J. Broggi

## CERTIFICATE OF SERVICE

I certify that on November 25, 2025, I caused the foregoing to be served upon all counsel of record via the Clerk of Court's CM/ECF notification system.

*/s/ Jeremy J. Broggi*
Jeremy J. Broggi