# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

BUCKEYE INSTITUTE,

*Plaintiff-Appellee,*

*v.*

INTERNAL REVENUE SERVICE, ET AL.

*Defendants-Appellants.*

On Interlocutory Appeal from the United States District Court
for the Southern District of Ohio at Columbus, Hon. Michael H. Watson
No. 2:22-cv-04297

## *AMICI CURIAE* BRIEF OF
## NATIONAL TAXPAYERS UNION FOUNDATION,
## PELICAN INSTITUTE, AND DEFENSE OF FREEDOM INSTITUTE
## IN SUPPORT OF APPELLEE AND AFFIRMANCE

Tyler Martinez
NATIONAL TAXPAYERS UNION FOUNDATION
122 C Street N.W., Suite 700
Washington, D.C. 20001
703.683.5700
tmartinez@ntu.org

November 26, 2025          *Counsel for* Amicus Curiae

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3170      Case Name: Buckeye Institute v. IRS, et al.

Name of counsel: Tyler Martinez

Pursuant to 6th Cir. R. 26.1, Nat'l Taxpayers U. Found; Pelican Inst; Defense of Freedom Inst

*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No

## CERTIFICATE OF SERVICE

I certify that on _____ November 26, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Tyler Martinez

_____

_____

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND
FINANCIAL INTERESTS ........................................................................... i

TABLE OF CONTENTS ............................................................................ ii

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF *AMICI CURIAE* ............................................................... 1

SUMMARY OF ARGUMENT ..................................................................... 2

ARGUMENT ............................................................................................... 5

   I.    DRAGNET DONOR DATA COLLECTION BY THE IRS IS SUBJECT
      TO THE FIRST AMENDMENT'S EXACTING SCRUTINY. ........................... 5

   II.   THE IRS DONOR DEMANDS ON SCHEDULE B CANNOT SURVIVE
      EXACTING SCRUTINY ....................................................................... 10

     A.    The Regular and Universal Collection of Donor Data on Schedule B is
       Not Necessary to Enforce the Tax Laws. ........................................... 10

       1.    All Publicly Available Information Suggests that the IRS is Not Using
         the Donor Data it Collects. ........................................................... 11

       2.    Schedule L is Better Tailored to the Government's Asserted Interest. .. 13

     B.    The IRS Cannot Keep the Donor Data Secure and the Government is not
       Vigilant in Correcting Data Breaches. ............................................. 16

CONCLUSION .......................................................................................... 21

CERTIFICATE OF COMPLIANCE ......................................................... 23

CERTIFICATE OF SERVICE ................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Americans for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021) ........................................................ 5, 6, 7, 8, 10, 11, 14, 16

*Bates v. Little Rock*,
    361 U.S. 516 (1960) ............................................................... 5, 6, 8, 11

*Brown v. Socialist Workers '74 Campaign Comm.*,
    459 U.S. 87 (1982) .........................................................................8

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ............................................................... 5, 6, 8

*Fed. Election Comm'n v. LaRouche Campaign*,
    817 F.2d 233 (2d Cir. 1987) ..............................................................9

*Gibson v. Florida Legislative Comm.*,
    372 U.S. 539 (1963) ....................................................................5, 9

*Kusper v. Pontikes*,
    414 U.S. 51 (1973) .........................................................................6

*Lady J. Lingerie v. City of Jacksonville*,
    176 F.3d 1358 (11th Cir. 1999) .............................................................9

*NAACP v. Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) ............................................................... 5, 6, 8, 9

*NAACP v. Button*,
    371 U.S. 415 (1963) .....................................................................5, 6

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) .......................................................................7

*Nat'l Small Bus. United v. Yellen*,
    721 F. Supp. 3d 1260 (N.D. Ala. 2024) ..................................................7, 8

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ............................................................... 5, 6, 8

*Talley v. Cal.*,
   362 U.S. 60 (1960) ...............................................................5

*United States v. Littlejohn*,
   D.C. Cir. No. 24-3019 ........................................................20

**Other Authorities**

Ali Sullivan, "IRS Worker Gets 5 Years For Airing Tax Info On Trump, Others"
   Law360 Tax Authority (Jan. 29, 2024)..................................... 18, 20

Andrew Wilford and Andrew Moylan, "What's the Fallout From the ProPublica
   Leak?" Nat'l Taxpayers U. Found. (July 27, 2021) ........................19

Anna Scott Farrell, "Gov't Shrugs Off Sentencing Errors, IRS Leaker Tells DC
   Circ." Law360 Tax Authority (Aug. 21, 2025) ..............................20

Chris Frates, "IRS believes massive data theft originated in Russia,"
   CNN (June 4, 2015).............................................................18

Government Accountability Office, "Information Technology, IRS Needs to
   Address Operational Challenges and Opportunities to Improve Management,"
   GAO-21-178T (Oct. 7, 2020)...................................................16

Government Accountability Office, "Priority Open Recommendations: Internal
   Revenue Service," GAO-25-108066 (Sept. 26, 2025) ................. 16, 17

Government Accountability Office, *Financial Audit: IRS's FY 2024 and FY 2023
   Financial Statements*, GAO-25-107202 (Nov. 7, 2024) ......................17

Government Accountability Office, *IRS Financial Reporting: Improvements
   Needed in Information System and Other Controls*,
   GAO-25-107930 (Mar. 18, 2025) ...........................................17

H.R. Rep. No. 91-413 (1969), *reprinted in* 1969 U.S.C.C.A.N. 1645 ....................7

IRS, "Instructions for Schedule L (Form 990) (12/2024)".............................. 14, 15

IRS, Data Book, 2023 Pub. No. 55-B (Apr. 2024)..............................................12

IRS, Data Book, 2024 Pub. No. 55-B (May 2025) .............................................11

Nat'l Public Radio, "Ex-IRS contractor sentenced to 5 years in prison for leaking Trump's tax records," (Jan. 30, 2024) .................................................................19

NAT'L TAXPAYER ADVOCATE, ANNUAL REPORT TO CONGRESS 2013, Vol. 1 (Dec. 31, 2013) ...........................................................................................13

NAT'L TAXPAYER ADVOCATE, ANNUAL REPORT TO CONGRESS 2024 (Dec. 31, 2024) ...................................................................................... 12, 13

Raphael Satter and A.J. Vicens, "US Treasury says Chinese hackers stole documents in 'major incident,'" REUTERS (December 31, 2024) .......................18

Roger Colinvaux, *Associational Rights Versus Nonprofit Transparency: Information Reporting in the Internet Age*, 2025 U. ILL. L. REV. 1353 (2025).........................................................................12

Treas. Inspector Gen. for Tax Admin, *Thousands of Notifications to Taxpayers Affected by the Large-Scale Data Breach Were Returned Undeliverable*, No. 2025-IE-R019 (May 27, 2025) ............................................................ 18, 19

# INTEREST OF *AMICI CURIAE*[1]

Founded in 1973, the National Taxpayers Union Foundation ("NTUF") is a non-partisan research and educational organization dedicated to showing Americans how taxes, government spending, and regulations affect everyday life. NTUF advances principles of limited government, simple taxation, and transparency on both the state and federal level. NTUF's Taxpayer Defense Center advocates for taxpayers in the courts, produces scholarly analyses, and engages in direct litigation and *amicus curiae* briefs upholding taxpayers' rights and challenging administrative overreach by tax authorities.

The Pelican Institute for Public Policy is a non-profit, non-partisan research institute whose mission is to research and develop policy solutions that advance individual liberty, free enterprise, and opportunity for all Louisianans. Founded in 2008, the Pelican Institute believes that every Louisianan should have the opportunity to flourish in communities where good opportunities abound and economic prosperity is achievable through hard work and ingenuity. To that end, the Pelican Institute advocates for the removal of government barriers to economic mobility.

---

[1] *Amici Curiae* confirm that this brief was not authored in whole or in part by counsel for any party, and no person or entity other than *Amici* and its counsel made a monetary contribution to the preparation or submission of this brief. All parties consented to the filing of this brief.

The Defense of Freedom Institute ("DFI") is a nonprofit, nonpartisan 501(c)(3) institute dedicated to defending and advancing freedom and opportunity for every American family, student, entrepreneur, and worker, and to protecting the civil and constitutional rights of Americans at school. Like the vast majority of nonprofit entities, DFI emphasizes the privacy rights and interests of its donors and other supporters, and works to protect against the dangers posed to their First Amendment rights by unwanted or unnecessary disclosures. In addition, DFI's Senior Litigation Counsel has extensive experience with First Amendment challenges to government action, including with regard to the rights of expressive association specifically implicated in this case.

Accordingly, *Amici* have institutional interests in this case.

## SUMMARY OF ARGUMENT

The Internal Revenue Service ("IRS") requires the list of all substantial donors to thousands of nonprofit organizations on Form 990 Schedule B. This dragnet data collection subjects to government disclosure citizens' associations and political, religious, and cultural beliefs—all for little gain by the government. The District Court subjected this requirement to the First Amendment's "exacting scrutiny" standard and set the case for trial. This Court should affirm since the government must prove its disclosure demand survives the First Amendment.

The government claims this data collection is for "information it can use," Opening Brief 22, to enforce the tax laws but mere "useful" financial data does not alone survive exacting scrutiny. The cases at the foundation of the right of donor privacy, indeed, all involved what could by some be described as mere financial disclosures. It should not change that the IRS needs to prove that its collection of a nonprofit's donor data is actually used to enforce the relevant tax laws and is narrowly tailored to gather only the information it needs.

But contrary to the government's assertions, collection of Schedule B cannot be justified as giving information needed to administration of the nation's tax laws. The IRS does not use Schedule B regularly in its enforcement or litigation efforts surrounding exempt organizations. Less than 10 percent of examinations even touch on Form 990 generally, and only nine cases in active litigation, nationwide, touched on nonprofit contributions. And most of those cases are focused on non-monetary contributions of real estate, not cash donations to entities like the Buckeye Institute. The government requires mass disclosure for apparent little fruitful enforcement.

Furthermore, the IRS has a "less intrusive alternative" to collecting every major donor of a § 501(c)(3) organization. The asserted interest from the government's briefing in this case is to prevent private inurement. Schedule L is focused on exposing self-dealing by any interested person of a nonprofit, not just a substantial contributor. Schedule L focuses on directors, substantial contributors,

officers, and the family of any of these groups as a possible source of inappropriate benefits. If the government is worried about private inurement, then Schedule L, not a long list in Schedule B, is the tailored alternative for the stated interest.

Nor can the IRS keep this donor data secure. Breach after breach, data hack after data hack, show that the IRS is simply not able to protect the sensitive financial information it warehouses. And when ideological actors gain access to this data and disclose it to news outlets like *The New York Times* and ideological websites like ProPublica, the government gives little attention to robust enforcement. For example, Charles Littlejohn exposed the information of the President as well as 406,000 others across the country, and the government merely sought a single count of violating the privacy laws. This shocked the judge reviewing the case and should give pause to the idea the government is interested in protecting donor data.

This case is on interlocutory appeal. The government asserts that donor privacy is subject to mere rational basis review and wants to avoid a trial. But the case law is clear that the heightened standard of exacting scrutiny applies, and the government must meet its burden of showing a substantial interest and narrow tailoring the disclosure to that interest. This Court should therefore affirm the District Court below.

**ARGUMENT**

## I. DRAGNET DONOR DATA COLLECTION BY THE IRS IS SUBJECT TO THE FIRST AMENDMENT'S EXACTING SCRUTINY.

The Internal Revenue Service ("IRS") demands the lists of substantial donors from thousands of § 501(c)(3) organizations in a dragnet of data collection on Form 990 Schedule B, but the government argues that this program must only survive rational basis review. *See, e.g.*, Opening Br. 27. But under *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ("*AFPF*") and other landmark cases dating back to the Civil Rights era,[2] *any* government demand for membership or donor lists must survive the First Amendment's exacting scrutiny. This case is the first to test the government's need for this data under the modern articulation of the proper level of scrutiny under the First Amendment. The District Court's order for a trial on the matter is correct and should be affirmed to see if the government really needs to collect and warehouse this information at the core of the freedom of association. *See* Opinion, RE 60, PageID #854.

The First Amendment's exacting scrutiny "requires that there be a substantial relation between the disclosure requirement and a sufficiently important

---

[2] *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam); *NAACP v. Button*, 371 U.S. 415 (1963) ("*Button*"); *Gibson v. Florida Legislative Comm.*, 372 U.S. 539 (1963); *Talley v. Cal.*, 362 U.S. 60 (1960); *Shelton v. Tucker*, 364 U.S. 479 (1960); *Bates v. Little Rock*, 361 U.S. 516 (1960); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ("*NAACP*").

governmental interest" and that "the disclosure requirement be narrowly tailored to the interest it promotes." *AFPF*, 594 U.S. at 611 (citations omitted). Under the First Amendment, all Americans have the right "to pursue their lawful private interests privately and to associate freely with others in so doing." *NAACP*, 357 U.S. at 466. This "basic constitutional protection[]," *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973), "'lies at the foundation of a free society,'" *Buckley*, 424 U.S. at 25 (quoting *Shelton*, 364 U.S. at 486).

Privacy of financial records helps enable these constitutional rights. That is because the Freedom of Association must be protected "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference," such as registration and disclosure requirements and the attendant sanctions for failing to disclose. *Bates*, 361 U.S. at 523 (collecting cases); *see also Button*, 371 U.S. at 433 (noting that the freedoms of speech and association are "delicate and vulnerable" to "[t]he threat of sanctions [which] may deter their exercise almost as potently as the actual application of sanctions"). Indeed, just four years ago the Supreme Court reaffirmed that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and there is a "vital relationship between freedom to associate and privacy in one's associations" via financial support. *AFPF*, 594 U.S. at 606 (citations omitted, brackets in *AFPF*). Consequently, the Supreme Court has long

protected the right not only to associate, but to do so privately, free from government surveillance or interference.

The government claims this data collection is for "information it can use," Opening Brief 22, but mere "useful" financial data does not alone survive exacting scrutiny.[3] This was patently rejected in *AFPF*. While recognizing that there may be "an important interest in preventing wrongdoing by charitable organizations," nonetheless "[t]here is a dramatic mismatch, however, between the interest that the Attorney General seeks to promote and the disclosure regime that he has implemented in service of that end." *AFPF*, 594 U.S. at 612. Collecting tens of thousands of Schedule B lists in the aid of hoping to find "information it can use" is not sufficient under exacting scrutiny.

Indeed, "[t]he chain here is weak indeed," for "[i]t would be a 'substantial expansion of federal authority' to permit Congress to bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials access to that data." *Nat'l Small Bus. United v. Yellen*, 721 F. Supp. 3d 1260, 1289 (N.D. Ala. 2024) (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 560 (2012) in the context of a challenge to the Corporate Transparency Act). That is because "[a]ll

---

[3] The government also argues that Schedule B was "geared toward "'provid[ing] the Internal Revenue Service within formation needed to enforce the tax laws,'" quoting a 1969 House Report. Opening Br. at 8 (quoting H.R. Rep. No. 91-413 (1969), *reprinted in* 1969 U.S.C.C.A.N. 1645). As discussed in Section II(A), *infra*, that publicly available information suggests otherwise.

Congress would have to do to craft a constitutional law is simply impose a disclosure requirement and give tax officials access to the information." *Id*. The First Amendment does not allow for that.

Indeed, the Civil Rights era cases on donor privacy were generated by generally-applicable business statutes that could be banally described as mere routine disclosure of financial records. *NAACP* centered on the state's use of foreign corporation registration statutes as a means of getting the civil rights group's donor list. *NAACP*, 357 U.S. at 451. *Bates*, 361 U.S. at 517, examined the city's use of business license tax registration. *Shelton*, 364 U.S. at 481, dealt with employment paperwork to be employed as schoolteacher. *AFPF*, 594 U.S. at 600, centered on what should be routine charities registration with the Attorney General of California. But financial records are deeply personal and "financial transactions can reveal much about a person's activities, associations, and beliefs." *Buckley*, 424 U.S. at 96 (cleaned up, citation omitted).

These cases on financial privacy protect not only political dissent, *see e.g.*, *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982), but also simple privacy in investments. For instance, the Eleventh Circuit ruled that a city violated the First Amendment when it sought to "require[] corporate applicants for adult business licenses to disclose the names of 'principal stockholders'" privately to a regulatory agency, and invalidated the ordinance when the agency was unable

to demonstrate a sufficient need for that information. *Lady J. Lingerie v. City of Jacksonville*, 176 F.3d 1358, 1366, 1367 (11th Cir. 1999) (citation omitted). Likewise mere assertion of the need for information for an investigation is not enough, alone, to survive exacting scrutiny. For example, in *Federal Election Commission v. LaRouche Campaign*, 817 F.2d 233 (2d Cir. 1987), the Second Circuit reversed the district court for requiring proof of "reprisals, harassment, or threats," and required the government to show a need for private information "beyond its mere relevance to a proper investigation." *Id*. at 234–35.

The IRS needs to prove that its collection of a nonprofit's donor data is actually used to enforce the relevant tax laws and is narrowly tailored to gather only the information it needs. That is because the First Amendment protects "[t]he strong associational interest in maintaining the privacy of membership lists of groups engaged in the constitutionally protected free trade in ideas and beliefs" which belongs to "all legitimate organizations," *Gibson*, 372 U.S. at 555–56, and "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious[,] or cultural matters," *NAACP*, 357 U.S. at 462. If the government does not need the information nor can it keep it out of public view, then the disclosure requirement fails under exacting scrutiny.

## II. THE IRS DONOR DEMANDS ON SCHEDULE B CANNOT SURVIVE EXACTING SCRUTINY.

### A. The Regular and Universal Collection of Donor Data on Schedule B is Not Necessary to Enforce the Tax Laws.

Contrary to the government's assertions, collection of Schedule B cannot be justified as giving information needed for the administration of the nation's tax laws. *See*, *e.g.*, Opening Br. at 8–9 (relying on conclusory statements in legislative history); *id*. at 33 (same). In *AFPF*, 594 U.S. at 613, the Supreme Court held that "even if the State relied on up-front collection in some cases, its showing falls far short of satisfying the means-end fit that exacting scrutiny requires." That is because the government "is not free to enforce *any* disclosure regime that furthers its interests. It must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id*. (emphasis in original).

It therefore becomes imperative to know if (1) the IRS uses Schedule B regularly in its enforcement, and (2) if the IRS has a "less intrusive alternative" to collecting every major donor of a § 501(c)(3) organization. That these may be contentious fact-based issues does not matter. The District Court below in this case has ordered a trial to find out if the government actually uses the information, and affirmance will allow that trial record to develop. *See* Opinion, RE 60, PageID #854.

### 1. All Publicly Available Information Suggests that the IRS is Not Using the Donor Data it Collects.

The government cannot show "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," *AFPF*, 594 U.S. at 607 (citation and quotation marks omitted), when it does not even use the information it demands. The IRS appears to not regularly use Schedule B in its enforcement of exempt organizations.[4] Instead, IRS personnel look at very few Form 990 filings and litigate less than a dozen charitable contribution cases—and even those cases are mostly about real estate, not cash donations to public charities.

Last year, less than 10 percent of Form 990 returns (not counting private foundations) were examined by IRS personnel. *See* IRS, DATA BOOK, 2024 Pub. No. 55-B at 53, table 21 (May 2025)[5] (comparing the total returns of tax-exempt organization, employee retirement plan, government entity, tax-exempt bond returns, and related taxable returns examined, 7,013, with total examinations of

---

[4] One pro-government *amicus* suggests that collection of donor data on Schedule B is important to assure voluntary compliance with the nation's tax laws. *See*, *e.g.*, Br. of Tax L. Cntr. at NYU Law 5. But that tendency of government mandated disclosure to deter even lawful behavior is precisely the "more subtle governmental interference" of associational rights found to be violative of the First Amendment in the Civil Rights era cases. *See*, *e.g.*, *Bates* 361 U.S. at 523 (collecting cases). The specter of tax enforcement, combined with tax law's complexity, garners a visceral reaction in law-abiding citizens, including those that lead nonprofit groups. That everyone is afraid of the tax man knocking at the door is even *more* reason to be cautious of compelled disclosure.

[5] *Available at*: https://www.irs.gov/pub/irs-pdf/p55b.pdf.

Forms 990, 990–EZ, and 990–N, 666). In 2023 "the IRS examined just 1,029 returns in the Form 990 series (including Form 990, Form 990-EZ, and Form 990-N and not including the Form 990-PF for private foundations)." Roger Colinvaux, *Associational Rights Versus Nonprofit Transparency: Information Reporting in the Internet Age*, 2025 U. ILL. L. REV. 1353, 1412 n. 227 (2025) (citing IRS, DATA BOOK, 2023 Pub. No. 55-B at 53 (Apr. 2024)).[6] Examining public charities' Form 990 Schedule B lists appears to not be much of a priority for the IRS, based on its own data reporting of what its employees investigate.

Nor is civil litigation on Schedule B-based information a priority for the government. In its 2024 report to Congress, the Taxpayer Advocate identified just "nine opinions in business cases issued during the reporting period on the deductibility of charitable contributions." NAT'L TAXPAYER ADVOCATE, ANNUAL REPORT TO CONGRESS 2024 at 157 (Dec. 31, 2024).[7] And even then, "[a]gain this year, most of these cases arose due to the increased IRS focus on curtailing abuse in the syndicated conservation easement arena," of real estate donations, not cash donations to § 501(c)(3) public charities like the Buckeye Institute or *Amici*. *Id*. This

---

[6] *Available at*: https://www.irs.gov/pub/irs-prior/p55b--2024.pdf.
[7] *Available at*: https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2024/12/ARC24_FullReport.pdf.

was similarly true a dozen years ago as it is today. *See*, *e.g.*, Nat'l Taxpayer Advocate, Annual Report to Congress 2013, Vol. 1 at 395–96 (Dec. 31, 2013).[8]

This is born out in litigation statistics too. Last year, the vast majority of tax cases in the "U.S. [D]istrict [C]ourts, U.S. Bankruptcy Courts, Courts of Appeals, Court of Federal Claims, and the U.S. Supreme Court" are on enforcement of federal tax liens (27 cases with issued opinions), civil actions for a refund brought by the taxpayer (25 cases with issued opinions), and summons enforcement (24 cases with issued opinions). Annual Report to Congress 2024 at 162. Charitable deductions of the like for Schedule B are simply not a litigation priority for the IRS.

Therefore, the IRS requires thousands of charities to list their substantial contributors on Form 990 Schedule B, and then does not appear to use it in any meaningful way to audit or litigate enforcement of the tax laws. With exempt organizations being such a low enforcement priority for the IRS, it appears that the government does not have a "substantial interest" in universal disclosure, and therefore Schedule B's demands fail exacting scrutiny.

## 2. Schedule L is Better Tailored to the Government's Asserted Interest.

With both civil auditing and civil litigation of public charity donations so low, the First Amendment's exacting security must ask if the IRS even needs the data it

---

[8] *Available at*: https://www.taxpayeradvocate.irs.gov/reports/2013-annual-report-to-congress/full-report/.

collects. The government claims it needs the data to protect against private inurement—donors shielding their self-dealing with the charities they support. *See*, *e.g.*, Opening Br. at 6 n.3 (citing interest in preventing private inurement); *id*. at 7 (same); *id*. at 8 (same); *id*. at 21 (same); *id*. at 34 (same); *id*. at 35 (same); *id*. at 59 (same); *id*. at 61 (same); *id*. at 63 (same); *id*. at 64 (same). But whatever the rationale, the IRS "must… demonstrate its need for universal production in light of any less intrusive alternatives." *AFPF*, 594 U.S. at 613.

Schedule B is not the best or most tailored means for detecting private inurement: Schedule L is designed precisely for that purpose. While Schedule B is a long list of an organization's supporters, Schedule L, in contrast, focuses on "financial transactions or arrangements between the organization and a disqualified person(s) under section 4958 or other interested persons." IRS, "Instructions for Schedule L (Form 990) (12/2024)."[9] Schedule L lists any benefit given to a "current or former officer, director, trustee, or key employee." *Id*. The lookback is the up to the prior five years. *See id*. (emphasis removed). Schedule L also requires disclosure of benefits to "substantial contributors"—the very same as those listed in Schedule B—if they have a reportable transaction. *Id*. (emphasis removed). And the family and employees of a substantial contributor must also be disclosed if they receive a benefit from the nonprofit. *See id*. (requiring the listing "[a] family member of any

---

[9] *Available at*: https://www.irs.gov/instructions/i990sl.

individual described above" and "an employee (or child of an employee) of a substantial contributor") (emphasis removed).

If the government wants to stop private inurement, it will find it by looking at Schedule L, not Schedule B. Schedule L will list each transaction between the regulated person (*i.e.*, director, officer, substantial contributor, *etc.*) and the charity's actions. *See id*. ("Part I. Excess Benefit Transactions"). Schedule L will show possible improper loans to and from interested persons. *See id*. ("Part II. Loans to and/or From Interested Persons"). Schedule L will show other grants or assistance given to regulated persons, including substantial contributors. *See id*. ("Part III. Grants or Assistance Benefiting Interested Persons"). And Schedule L lists business transactions that involve the interested persons. *See id*. ("Part IV. Business Transactions Involving Interested Persons"). It is Schedule L that shows the relationship between the charity and someone with significant control over the charity. All Schedule B does is list substantial donors.

The IRS does not need donor information to enforce tax law. Enforcement of laws concerning self-dealing, excess benefit transactions, transactions with interested persons, and the like are important government interests. Schedule L already serves these interests by providing a highly detailed view of potential conflicts of interest, payments to officers and directors, organizational finances, and

the like. Schedule B, in contrast, is simply a list of supporters that is warehoused on government computers—and ripe for misuse and hacking, as detailed below.

### B. The IRS Cannot Keep the Donor Data Secure and the Government is not Vigilant in Correcting Data Breaches.

A key consideration in the articulation of exacting scrutiny in *AFPF* was that case's trial testimony of California failing to keep donor data private and secure. *See AFPF*, 594 U.S. 595, 604–05 (discussing the lack of data control and availability of information on a public website). Despite the IRS citing the privacy protections in law for taxpayer information, Opening Brief 59–60, *other branches* of the government recognize that the IRS struggles to keep this donor data secure. *See*, *e.g.*, Government Accountability Office, "Information Technology, IRS Needs to Address Operational Challenges and Opportunities to Improve Management," GAO-21-178T at 6-7 (Oct. 7, 2020).[10] In light of the troubles of the IRS to keep data secure, it needs to collect less sensitive information, not more.

Just weeks ago, on September 26, 2025, the Government Accountability Office ("GAO") faulted the IRS for failing to fully comply with the government's own recommendations to better secure taxpayer data. GAO, "Priority Open Recommendations: Internal Revenue Service," GAO-25-108066 at 2 (Sept. 26, 2025).[11] Specifically, the "IRS does not have a complete inventory to ensure it has

---

[10] *Available at*: https://www.gao.gov/assets/gao-21-178t.pdf.
[11] *Available at*: https://www.gao.gov/products/gao-25-108066.

implemented safeguards to protect taxpayer information being processed or stored on all of its systems, applications, and databases." *Id*. This is after an August 2023 GAO recommendation and past financial audits of the IRS financial statements. *See id*. (citing, *inter alia*, GAO, *IRS Financial Reporting: Improvements Needed in Information System and Other Controls*, GAO-25-107930 (Mar. 18, 2025)[12] and GAO, *Financial Audit: IRS's FY 2024 and FY 2023 Financial Statements*, GAO-25-107202 (Nov. 7, 2024)).[13]

The GAO identified these issues as a "High Risk Area," and told the IRS it "needs to update its databases and sources that inform its inventory to ensure they have complete and accurate information" on what systems store and process sensitive taxpayer information—a recommendation dating back to 2023. *Id*. at 16. That is because "continuing control deficiencies related to information systems and safeguarding assets increase the risk of unauthorized access to and modification of data and programs, disclosure of sensitive data, and disruption of critical operations." *IRS Financial Reporting*, GAO-25-107930 at 6.

The risks are real and even have national security implications. In 2015, the IRS failed to protect 100,000 taxpayer returns that were subject to an attack of its security by Russia. *See*, *e.g.*, Chris Frates, "IRS believes massive data theft

---

[12] *Available at*: https://www.gao.gov/products/gao-25-107930.
[13] *Available at*: https://www.gao.gov/products/gao-25-107202.

originated in Russia," CNN (June 4, 2015).[14] A year ago the U.S. Treasury said that Chinese state-sponsored hackers stole IRS documents and data. *See*, *e.g.*, Raphael Satter and A.J. Vicens, "US Treasury says Chinese hackers stole documents in 'major incident,'" REUTERS (December 31, 2024).[15] Vast databases of the financial lives of American citizens are an obvious attack point for foreign states.

But beyond national security, IRS data is vulnerable to politically-motivated disclosure—and the government has done little to stop it. Charles Littlejohn, an IRS contractor, accessed and stole tax returns and return information of the President of the United States and information from conservative entities and individuals. Ali Sullivan, "IRS Worker Gets 5 Years For Airing Tax Info On Trump, Others" LAW360 TAX AUTHORITY (Jan. 29, 2024);[16] *see also* Treas. Inspector Gen. for Tax Admin ("TIGTA"), *Thousands of Notifications to Taxpayers Affected by the Large-Scale Data Breach Were Returned Undeliverable*, No. 2025-IE-R019 (May 27, 2025).[17] Between August and October 2019, Littlejohn disclosed the President's tax return information to *The New York Times*. *Id*. TIGTA's Office of Investigations

[14] *Available at*: https://www.cnn.com/2015/05/27/politics/irs-cyber-breach-russia/index.html.

[15] *Available at*: https://www.reuters.com/technology/cybersecurity/us-treasurys-workstations-hacked-cyberattack-by-china-afp-reports-2024-12-30/.

[16] *Available at*: https://www.law360.com/tax-authority/articles/1791078/irs-worker-gets-5-years-for-airing-tax-info-on-trump-others.

[17] *Available at*: https://www.tigta.gov/sites/default/files/reports/2025-08/2025ier019fr.pdf.

also reported that, "in July and August 2020, Littlejohn separately stole tax returns and return information associated with thousands of the nation's wealthiest individuals." TIGTA, *Large-Scale Data Breach* at 1. Then, "in November 2020, Littlejohn disclosed this tax return information to a second news organization," which is ProPublica. *Id.*; *see also* Andrew Wilford and Andrew Moylan, "What's the Fallout From the ProPublica Leak?" NTUF (July 27, 2021).[18] What is clear, by Littlejohn's own statements, was that this was an ideological task, saying he "acted out of a sincere, if misguided, belief I was serving the public interest." Nat'l Public Radio ("NPR"), "Ex-IRS contractor sentenced to 5 years in prison for leaking Trump's tax records," (Jan. 30, 2024).[19]

Littlejohn, though he accessed and disclosed 78,761 tax returns and nonprofit donor data comprising information from 406,000 taxpayers, was sentenced based on *only a single count* of disclosing information without authorization.[20] *See* TIGTA, *Large-Scale Data Breach* at 2 ("TIGTA's OI identified and shared information with the IRS on 8,418 individual and 70,343 business taxpayers affected by the large-

---

[18] *Available at*: https://www.ntu.org/foundation/detail/whats-the-fallout-from-the-propublica-leak.

[19] *Available at*: https://www.npr.org/2024/01/30/1227826718/ex-irs-contractor-sentenced-to-5-years-in-prison-for-leaking-trumps-tax-records.

[20] The IRS, meanwhile, struggles to notify all the taxpayers and organizations affected by Littlejohn's leak. *See*, *e.g.*, TIGTA, *Large-Scale Data Breach* at 2–3 (noting "thousands of taxpayers did not receive the initial letters that the IRS mailed" to inform them of their data may be leaked as part of the breach).

scale data breach."); Anna Scott Farrell, "Gov't Shrugs Off Sentencing Errors, IRS Leaker Tells DC Circ." LAW360 TAX AUTHORITY (Aug. 21, 2025)[21] ("Littlejohn pled guilty in October 2023 to one count of unauthorized disclosure of tax return information, which Republicans called a 'sweetheart deal.' He admitted to downloading thousands of returns while on the job with the Internal Revenue Service through his employer, Booz Allen Hamilton.").

The judge overseeing the Littlejohn trial "questioned why Littlejohn faced a single felony count of unauthorized disclosure of tax returns and return information." NPR, "Ex-IRS contractor sentenced to 5 years."[22] Such a light charging therefore limited the ability of the court to punish Littlejohn. The district court therefore imposed the maximum penalty for the single charged count, calling the breach an "intolerable attack on our constitutional democracy." Sullivan, "IRS Worker Gets 5 Years." Even then, Littlejohn is currently appealing his sentence, claiming it was too harsh. *United States v. Littlejohn*, D.C. Cir. No. 24-3019.

While it is apparent that the government does not regularly use Schedule B to enforce the tax laws, it cannot keep the donor data secure, even from its own

---

[21] *Available at*: https://www.law360.com/tax-authority/federal/articles/2379593?nl_pk=c1fa2079-8a1c-42cd-95f6-f00c84c1eff4.

[22] *Available at*: https://www.npr.org/2024/01/30/1227826718/ex-irs-contractor-sentenced-to-5-years-in-prison-for-leaking-trumps-tax-records.

employees and contractors.[23] The government's own accounting and oversight watchdogs have repeatedly told the IRS it cannot keep data secure. This has resulted in hundreds of thousands of individual taxpayers and nonprofit tax returns being stolen or leaked to everyone from foreign nations to ideological foes. Worse, the government has shown little incentive to prosecute such large leaks, giving easy deals to Charles Littlejohn to serve only time on only one count of illegal disclosure when hundreds of thousands of returns were disclosed. Just like in *AFPF*, it is clear that the government cannot keep the donor data secure from public dissemination. Schedule B cannot survive exacting scrutiny.

## CONCLUSION

For the foregoing reasons, the decision of the District Court should be affirmed: upholding exacting scrutiny is applied to the IRS demand for donors on Form 990 Schedule B and going forth for a trial to determine if the government actually needs the donor lists of nonprofits nationwide.

---

[23] Currently TIGTA reports that a "total of 91,661 users, of which 5,068 were contractors…were authorized to access one or more of the 276 sensitive systems." TIGTA, *Assessment of Processes to Grant Access to Sensitive Systems and to Safeguard Federal Tax Information*, No. 2024-IE-R008 at 1 (Feb. 6, 2024) *available at*: https://www.atr.org/wp-content/uploads/2024/02/TIGTA-report-2024.pdf.

Respectfully submitted,

/s/ Tyler Martinez
Tyler Martinez
NATIONAL TAXPAYERS UNION FOUNDATION
122 C St. N.W., Suite 700
Washington, D.C. 20001
(703) 683-5700
tmartinez@ntu.org

Dated: November 26, 2025          *Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because this brief contains 4,811 words, as counted by Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ Tyler Martinez
Tyler Martinez
NATIONAL TAXPAYERS UNION FOUNDATION

Dated: November 26, 2025

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing using the court's CM/ECF system. A Notice of Docket Activity will be emailed to all registered attorneys currently participating in this case, constituting service on those attorneys:

/s/ Tyler Martinez
_____
Tyler Martinez
NATIONAL TAXPAYERS UNION FOUNDATION

Dated: November 26, 2025          *Counsel for* Amici Curiae