# United States Court of Appeals

## *for the*

# Sixth Circuit

Case No. 25-3170

BUCKEYE INSTITUTE,

*Plaintiff-Appellee,*

— v. —

INTERNAL REVENUE SERVICE; WILLIAM LONG, in his official capacity as Commissioner of Internal Revenue; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury,

*Defendants-Appellants.*

ON APPEAL FROM THE U.S. DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF OHIO AT COLUMBUS
CASE NO. 2:22-CV-04297 THE HONORABLE MICHAEL H. WATSON

## BRIEF OF THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, THE NONPROFIT ALLIANCE FOUNDATION, AND 52 CHARITABLE ORGANIZATIONS LISTED IN APPENDIX AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE

WILL CREELEY
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
will@thefire.org

RONNIE LONDON
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION
700 Pennsylvania Avenue, NE, Suite 340
Washington, DC 20003
ronnie.london@thefire.org

KAREN DONNELLY
ERROL COPILEVITZ
COPILEVITZ, LAM & RANEY, P.C.
310 West 20th Street, Suite 300
Kansas City, MO 64108
(816) 472-9000
kdonnelly@clrkc.com

*Counsel for* Amici Curiae

## DISCLOSURE STATEMENT

Pursuant to 6th Cir. R. 26.1, the Foundation for Individual Rights and Expression and fellow *amici* make the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   **No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

   **No.**

<u>/s/ Karen Donnelly</u>
Karen Donnelly

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES ................................................. iii

INTERESTS OF THE *AMICI CURIAE* ........................................1

SUMMARY OF ARGUMENT ...............................................3

ARGUMENT .............................................................5

I.    An industry perspective on the nonprofit sector
and donor privacy ....................................................5

    A.    Charitable solicitation and the building of a donor file
are critical to the survival of our nation's charitable
organizations and the success of their eleemosynary,
educational, and religious programs ..........................7

    B.    The First Amendment protects charitable speech
and association .........................................11

    C.    In practice and in public statements, the IRS has
acknowledged it has no need for the sensitive donor
information collected, that it has inadvertently leaked
this confidential information in the past, and that
continued disclosure involves significant risk of
future leaks and misuse ...........................13

II.    Supreme Court precedent requires at least exacting
scrutiny to analyze the government's compelled
disclosure of a charity's major donors ...............17

    A.    The District Court correctly held exacting
scrutiny applies .......................................18

    B.    Federally mandated disclosure of donor information
cannot withstand exacting scrutiny..........................22

CONCLUSION .......................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l,*
570 U.S. 205 (2013)........................................................20

*Americans for Prosperity Foundation v. Bonta,*
594 U.S. 595 (2021)................................................... *passim*

*Bartnicki v. Vopper,*
532 U.S. 514 (2001)........................................................16

*Bates v. City of Little Rock,*
361 U.S. 516 (1960)........................................................12

*Buckley v. Valeo,*
424 U.S. 1 (1976)............................................................22

*Elrod v. Burns,*
427 U.S. 347 (1976)........................................................28

*McCutcheon v. Fed. Elec. Comm'n,*
572 U.S. 185 (2014)........................................................22

*NAACP v. Alabama ex rel. Patterson,*
357 U.S. 449 (1958)........................................ 4, 11, 12, 17

*NAACP v. Button,*
371 U.S. 414 (1963)........................................ 23, 25, 26

*Planet Aid v. City of St. Johns,*
782 F.3d 318 (6th Cir. 2015) ...........................................18

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015)........................................................18

*Regan v. Taxation with Representation of Washington,*
461 U.S. 540 (1983)........................................ 19, 20, 21

*Riley v. Nat'l Fed'n of Blind,*
487 U.S. 781 (1988)........................................ 18, 25

*Roberts v. United States Jaycees,*
468 U.S. 609 (1984)........................................................11

*Sec'y of Md. v. Joseph H. Munson Co.*,
 467 U.S. 947 (1984) .................................................................. 26, 27

*Shelton v. Tucker*,
 364 U.S. 479 (1969) ........................................................................22

*Vill. of Schaumburg v. Citizens for a Better Env't*,
 444 U.S. 620 (1980) ........................................................................25

*Williams-Yulee v. Fla. Bar*,
 135 S. Ct. 1656 (2015) .....................................................................18

**Statutes & Other Authorities:**

26 C.F.R. § 1.6033-2(a)(2)(ii)(F) ........................................... 3, 14

84 Fed. Reg. 47452 .........................................................................17

85 Fed. Reg. at 31963 ................................................................ 14, 15

85 Fed. Reg. 31959 (May 28, 2020) ...............................................3

26 U.S.C. § 6033(b)(5) .....................................................................7

I.R.C. § 501(c) ...................................................... 3, 14, 15, 27

I.R.C. § 501(c)(3) .................................................................. *passim*

I.R.C. § 501(c)(4) ................................................. 3, 14, 28

I.R.C. § 507(d)(2)(A) ........................................................................7

I.R.C. § 4958 ............................................................... 24, 26

I.R.C. § 6104 ...................................................................................17

I.R.C. § 6104(d)(3)(A) .....................................................................3

T.D. 9898 .........................................................................................3

Rev. Proc. 2018-38..........................................................................15

S. Rep. 91-552.................................................................................13

Treas. Proposed Rules,
 84 Fed. Reg. 47447 (Sept. 10, 2019) .......................................15

*2024 Instructions for Schedule A (Form 990), Public Charity Status
 and Public Support*, IRS (Nov. 19, 2024) ...............................25

Alex Reid, *Why is Charitable Activity Tax-Protected? Think Freedom, Not Finances*, Philanthropy Roundtable (Dec. 23, 2021)..............................19

Alexis De Tocqueville, *Democracy In America*, Ch. V (Vol. 2 1840) ....................6

Andrea Peterson, *The Sony Pictures hack, explained*, Wash. Post (Dec. 18, 2014) ......................................................16

Brett Molina, *Capital One data breach: A look at the biggest confirmed breaches ever*, USA Today (Jul. 30, 2019) ....................................16

Elizabeth McGuigan, *Donor Privacy: A Constitutional Right for American Givers*, Philanthropy Roundtable 2-5 (Nov. 2021).............9, 10

Ellen P. Aprill & Lloyd Hitoshi Mayer, *Tax Exemption Is Not a Subsidy— Except for When It Is*, Tax Notes Fed. (Sept. 20, 2021)................................19

*Equifax Data Breach Settlement*, FTC (Nov. 2024)................................................16

*Fundraising-FAQs*, BoardSource (Aug. 31, 2023) ................................................10

*Giving USA 2025, The Annual Report on Philanthropy for the Year 2024, Key Findings*, Giving USA 61 (2025)........................................6, 8

*Grants to noncharitable organizations*, IRS (Jan. 30, 2025) ..................................28

*Handbook of Nonprofit Governance*, BoardSource 174 (2010)..............................10

*Health of The U.S. Nonprofit Sector*, Indep. Sector 1 (2024)....................................6

*IRS Notifies Thousands of Taxpayers That They Were Victims of a Data Breach*, Greenberg Traurig, LLP (Apr. 30, 2024) .......................16

Jacob Bogage, *Democrats warn Trump team against 'weaponizing' the IRS*, Wash. Post (Oct. 22, 2025)......................................12

Kelly Phillips Erb, *Timeline of IRS Tax Exempt Organization Scandal*, Forbes (May 7, 2014) ..................................................................................12

*Organizational Information: What's Public? What's Private?*, BoardSource (Mar. 25, 2024) ......................................................................10

*Our Charity Rating Process*, CharityWatch............................................................11

*Protect your nonprofit's tax-exempt status*, Nat'l Council of Nonprofits.........................................................................27

Sarah Hall Ingram, Comm'r, Tax Exempt & Gov't Entities,
IRS, Remarks Before the Georgetown Univ. Law Ctr.
Continuing Legal Educ. (June 23, 2009).........................................................6

Sheldon Richman, *Tax Breaks Aren't Subsidies*,
Found. for Econ. Educ. (Apr. 1, 2004).........................................................20

*The Secret IRS Files*, ProPublica ...........................................................16

*World Giving Index,* Charities Aid Found. 6 (2024) ................................................5

## INTERESTS OF THE *AMICI CURIAE*[1]

The Foundation for Individual Rights and Expression ("FIRE") is a nonpartisan nonprofit that defends the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide through public advocacy, targeted litigation, and *amicus curiae* filings, without regard to speakers' political views. FIRE is concerned that allowing the Internal Revenue Service ("IRS") to compel annual disclosure of charitable organizations' significant donors as a condition to remaining tax-exempt under § 501(c)(3) of the Internal Revenue Code ("the Code") chills free speech and association. Properly applied, the First Amendment prevents that kind of mandated disclosure, and this Court should affirm that exacting scrutiny applies.

People for the Ethical Treatment of Animals, Inc. ("PETA") is the largest animal rights organization in the world, with more than 10 million members and supporters between all PETA entities. PETA is dedicated to ending the suffering of animals, particularly suffering caused by the food industry, the clothing trade, laboratories, and the entertainment industry. PETA works through public education, cruelty investigations, newsgathering and reporting, research, animal rescue,

---

[1] Counsel of record for the parties consented to the filing of this brief. No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici curiae* made a monetary contribution to prepare the brief.

legislation, litigation, and protest campaigns to educate and peacefully persuade people and governments to cease practices that involve cruelty to animals. PETA relies on contributions from individual donors to fund its charitable operations.

The Nonprofit Alliance Foundation ("TNPAF") is a charity that works to promote, protect, and strengthen the philanthropic sector through education, coalition building and, when necessary, litigation. Representing the voice of hundreds of nonprofit organizations nationwide, TNPAF educates, informs, and unites the sector and the public in an increasingly complex fundraising and regulatory landscape. Donor privacy is critical to the success of the sector. A thriving nonprofit sector has the resources to meaningfully change the world.

*Amici*, including the 52 charities listed in the appendix, represent organizations of various missions and sizes across the country affected by the IRS's compelled disclosure of confidential donor information. *Amici* seek to ensure donor privacy and preserve civil liberties for all charitable organizations and their supporters. This Court's clarification that the First Amendment requires the government to satisfy exacting scrutiny before collecting charities' donor lists will not only protect *amici*'s and their donors' constitutional rights, but also allow the rich history of all charities' vital contributions to this country's character and culture to continue into the future.

**SUMMARY OF ARGUMENT**

Since 1969, in order to maintain § 501(c)(3) status, charities have been forced to divulge their major donors' names, addresses, and contributions to the IRS on Schedule B (*Schedule of Contributors*) of their IRS Form 990 (*Return of Organization Exempt from Income Tax Return*). The government's forced disclosure of charities' major donors violates the charities' and their donors' freedoms of association and speech under the First Amendment, as recently affirmed in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 605 (2021). It chills the First Amendment rights of all charities, not just those before this Court.

The challenged compelled disclosure requirement applies only to *charitable* organizations recognized as exempt from federal income tax under § 501(c)(3) of the Code. It does not apply to any other tax-exempt nonprofit under § 501(c). The IRS voluntarily removed the non-statutory donor disclosure requirements for all other tax-exempt nonprofit organizations under § 501(c), including those recognized as exempt under § 501(c)(4). The IRS did so after determining it does not need confidential donor information to administer the tax laws. T.D. 9898, 85 Fed. Reg. 31959, 31968 (May 28, 2020) (*amending* 26 C.F.R. § 1.6033-2(a)(2)(ii)(F)).

At the same time, despite its statutory obligation to protect charities' major donor information from public disclosure under I.R.C. § 6104(d)(3)(A), the IRS acknowledges numerous incidents involving the unlawful disclosure of confidential

donor information to the public. Worse, the IRS and the Treasury Department concede an ongoing risk of public disclosure due to difficulties in redacting confidential information prior to responding to public information requests, and the IRS has repeatedly raised concerns about continued disclosure of protected information due to leaks, mistakes in redactions, cybersecurity issues, and an accompanying and reasonable fear of harassment or reprisals because of those risks.

Four years ago in *Bonta*, the Supreme Court struck down a nearly identical compelled disclosure requirement imposed by the State of California, which mandated disclosure to the state of the same donor information on Schedule B as a condition precedent to engaging in charitable solicitation in the state. The Court condemned both California's repeated and inadvertent leaks of donors' private information, including home addresses, and its excuse for collecting it in the first instance, which boiled down to administrative convenience. The Court held the appropriate standard of First Amendment review for the compelled disclosure of private donor information is, at a minimum, exacting scrutiny. *Bonta* requires the same standard here, and the same result.

The Supreme Court's rulings in *Bonta* and *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), make clear that compelled disclosure of donor lists to an executive agency arms the government with the power to abuse donors' private information and target causes it dislikes, which could be just as devastating as that

office's inadvertent leak of the confidential information to the media or to the public. From the Federalist and Anti-Federalist Papers to charitable giving in today's increasingly polarized society, the desire to remain anonymous in one's association and speech on political, religious, social, economic, and cultural issues predates the Founding and remains a cornerstone of First Amendment protection. With the political winds of executive agencies shifting from administration to administration, the risk of threats, harassment, reprisals, and even political targeting by government based on one's association with certain causes shifts as well, which is especially worrisome for supporters of charities working on controversial or unpopular issues.

Because the disclosure mandate chills the First Amendment freedoms of all charities and their supporters, no matter their mission, this Court should affirm exacting scrutiny is the standard.

## ARGUMENT

### I. An industry perspective on the nonprofit sector and donor privacy

Charities are fundamental to American civic life and stronger here than in most nations.[2] Indeed, the charitable sector is the essence of American democracy, creating opportunities for individuals to associate voluntarily to alleviate societal ills, advocate for social, economic, or faith-based issues, and to advance

---

[2] *World Giving Index,* Charities Aid Found. 6 (2024), https://www.cafonline.org/docs/default-source/inside-giving/wgi/wgi_2024_report.pdf.

philanthropic causes the private and public sectors cannot. Alexis de Tocqueville identified the art of joining in voluntary associations as the fundamental science of American democracy.[3]

Charities are essential to our national fabric—without them, who would feed the needy, aid the poor, advocate for individual rights, protect our animals, enrich our arts and culture and lead our nation's churches, mosques, and synagogues?[4] Grounded in the constitutional principles of freedom of association, freedom of speech, and freedom of religion, charities provide necessary services to those in need in ways our government and for-profit entities do not. *Id.* at 2. They have done so for more than 250 years.

In 2023, nonprofit organizations contributed an estimated $1.4 trillion to the U.S. economy, comprising 5.2% of our nation's gross domestic product.[5] The total number of charitable organizations registered with the IRS under § 501(c)(3) climbed to 1.51 million by 2023, up 2.3% from 2022.[6] These charitable donations support a vast range of voluntary activities from providing health care, shelter, and

---

[3] *See* Alexis De Tocqueville, *Democracy In America*, Ch. V (Vol. 2 1840).
[4] Sarah Hall Ingram, Comm'r, Tax Exempt & Gov't Entities, IRS, Remarks Before the Georgetown Univ. Law Ctr. Continuing Legal Educ. (June 23, 2009), https://www.irs.gov/pub/irs-tege/ingram__gtown__governance_062309.pdf.
[5] *See Health of The U.S. Nonprofit Sector*, Indep. Sector 1 (2024), https://independentsector.org/resource/health-of-the-u-s-nonprofit-sector/.
[6] *Giving USA 2025, The Annual Report on Philanthropy for the Year 2024, Key Findings*, Giving USA 61 (2025).

food, to providing public and private education at all levels. The funds may also engage controversial issues affecting individual civil liberties or other matters of social, political, and economic importance in our increasingly polarized society.

### A. Charitable solicitation and the building of a donor file are critical to the survival of our nation's charitable organizations and the success of their eleemosynary, educational, and religious programs.

Section 6033(b)(5) of the Code requires all charities exempt from federal income tax under § 501(c)(3) to disclose annually to the government "the names and addresses of all substantial contributors." 26 U.S.C. § 6033(b)(5). A "substantial contributor" is "any person who contributed … more than $5,000" in a reported year "if such amount is more than 2 percent of the total contributions … received." IRS Br. 7 (quoting I.R.C. § 507(d)(2)(A)).

Yet, many donors will not give without anonymity and the ability to deduct their charitable contribution, which are both critical to charities soliciting significant donations. Charities recognized as exempt under § 501(c)(3) depend on these significant charitable contributions from individuals to fund their civil-rights, public advocacy, animal protection, religious, educational, or other exempt purposes. Other sources of support include gifts or grants from foundations and governmental entities and contributions from an organization's members. Gifts from individual

donors represent the majority of charitable contributions made in the U.S. each year.[7]

Nonprofit organizations engage in charitable solicitation activity through a variety of means, not just to raise money but to spread the organization's charitable message, create name recognition, and build a donor file. Whether via email or door-knocking, each contact affords charities an opportunity to raise awareness about their cause and increase name recognition.

The donor file—a list of supporters and/or members—is a nonprofit organization's most valuable asset. The donor file is the lifeblood of the organization, a trade secret, and confidential, non-public information. Charities spend decades developing this asset. An organization's donor file includes its major donors, who are the largest contributors to the organization's cause. Major donors are critical to every charity's survival and success. Relationships with major donors require years of development and cultivation, and those relationships are built on trust and integrity.

Historically, many major donors do not want their name and association with a particular issue or cause in the hands of an executive agency or the public for three primary reasons: (1) loss of privacy; (2) if leaked to the public, others would solicit them and perhaps denigrate the organization (or the donor); and (3) the donor may not want his or her support of a particular cause or issue made known to the political

---

[7] *Giving USA 2025*, *supra* n.6, at 22.

officers of the executive who are collecting it or to the public (for any number of reasons—*e.g.*, family, religion, modesty, privacy, fear of reprisal personally or professionally, harassment, and so forth).[8] Likewise, nonprofit organizations do not want to divulge their donor list, including and especially their major donors, because disclosure conflicts with their duty to honor their donors' intent to remain anonymous, and they want to protect their most valuable asset and relationships. *Id.*

Protecting the privacy of donors is paramount to any nonprofit organization; it ensures donors feel secure in entrusting them with their identities and their private contributions and support for particular causes or issues. The possibility of repeat donations gives charities a strong incentive to strictly protect donor information, including and especially from government intrusion and risks of inadvertent leaks of that sensitive information.

Best practices adopted by the nonprofit sector encourage charities to implement and maintain privacy policies and a Donor Bill of Rights that sets the standards for the organization's fundraising activities and ensures donor intent is honored. For example, BoardSource, a leader in board governance training, explains that a Donor Bill of Rights "outlines the donor's right to receive proper recognition,

---

[8] Elizabeth McGuigan, *Donor Privacy: A Constitutional Right for American Givers*, Philanthropy Roundtable 2-5 (Nov. 2021), https://prtcdn.philanthropyroundtable.org/wp-content/uploads/2022/02/29145808/Donor-Privacy-A-Constitutional-Right-For-American-Givers.pdf.

gain access to the organization's financial statements, obtain information on how funds are being distributed, *and stay anonymous if desired*."[9] BoardSource confirms that donors have a right to remain anonymous.[10] In its *Handbook of Nonprofit Governance*, BoardSource advises "[w]hen a donor wishes to remain anonymous, the organization must respect the donor's wishes…."[11] Philanthropy Roundtable, a respected policy leader in the nonprofit sector, agrees that donor privacy is a critically important principle for nonprofit organizations. It enables potentially controversial or less popular causes to receive financial support from individuals without posing a public risk to donors.[12]

Best practices also require charitable organizations to implement data protection, management, and security standards respecting donor privacy to ensure the confidentiality of donor information and to protect against cybersecurity threats. In addition to best practices, charities are "graded" by various rating organizations and watchdog groups based on a myriad of criteria, including how donor information is secured. For example, CharityWatch reports on a charity's privacy policy as an

---

[9] *Fundraising-FAQ*s, BoardSource, https://boardsource.org/resources/fundraising-faqs/ (Aug. 31, 2023) (emphasis added).

[10] *Organizational Information: What's Public? What's Private?*, BoardSource (Mar. 25, 2024), https://boardsource.org/resources/organizational-information-whats-public-whats-private/.

[11] *Handbook of Nonprofit Governance*, BoardSource 174 (2010), http://gife.issue lab.org/resources/19261/19261.pdf.

[12] McGuigan, *supra* n.8.

informational benchmark for potential donors.[13] It grades charities based on strength of their privacy policies, providing donors with a clear picture of how well a charity protects confidential donor information. *Id*.

**B. The First Amendment protects charitable speech and association.**

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Bonta*, 594 U.S. at 606. As the Court explained in *Bonta*, "[p]rotected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'" *Id.* (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). The right of charities to associate with individuals and to receive anonymous support without Congress or the IRS unduly burdening their First Amendment freedoms is well settled.

Equally protected is the donor's right to choose which cause to support and to anonymously associate with that cause. *Id*. at 606 (affirming "vital relationship between freedom to associate and privacy in one's associations"); *NAACP*, 357 U.S. at 463 (striking down state's demand for charity's member list as it sought to oust

---

[13]  *See Our Charity Rating Process*, CharityWatch, https://www.charitywatch.org/ourcharity-rating-process.

charity from state during Civil Rights Era); *Bates v. City of Little Rock*, 361 U.S. 516, 520-21, 524 (1960) (invaliding city's demand for NAACP's contributor list in politically targeted attack). From *NAACP* to *Bonta*, the Supreme Court has recognized the forced disclosure of an organization's donor names and addresses stifles individuals' ability to "pursue their collective effort to foster beliefs which they admittedly have the right to advocate." *NAACP*, 357 U.S. at 463. In addition, history demonstrates compelled disclosures of donor information "may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *Id.*

There are many reasons donors choose to give anonymously, and protecting their ability to do so is of critical importance. This is especially true in the current political climate, when sentiments and tolerance of the majority may vary by administration and by term, subjecting charities to fears of reprisal that swing like a pendulum, while media headlines buzz about one administration or another threatening to "weaponize" the IRS to target the politically disfavored.[14] "[I]t is

---

[14] *See, e.g.,* Jacob Bogage, *Democrats warn Trump team against 'weaponizing' the IRS*, Wash. Post (Oct. 22, 2025), https://www.washingtonpost.com/business/2025/10/22/democrats-warn-trump-irs/; Kelly Phillips Erb, *Timeline of IRS Tax Exempt Organization Scandal*, Forbes (May 7, 2014) (involving IRS's political targeting of conservative "Tea Party" charities during Obama administration), https://www.forbes.com/sites/kellyphillipserb/2015/03/02/updated-timeline-of-irs-taxexempt-organization-scandal/?sh=22d3f6c66a6b.

hardly a novel perception that compelled disclosure of affiliation with groups

engaged in advocacy may constitute as effective a restraint on freedom of association

as [other] forms of governmental action." *Bonta*, 594 U.S. at 606.

Congress and the IRS acknowledge the "chilling effect" of compelled

disclosure on the rights of individuals and organizations to speak and associate

freely: "Some donors prefer to give anonymously," and risk of "public disclosure in

these cases might prevent the gifts." *See* IRS Br. at 62-63 (citing S. Rep. 91-552, at

53 (1969)).

**C. In practice and in public statements, the IRS has acknowledged it has no need for the sensitive donor information collected, that it has inadvertently leaked this confidential information in the past, and that continued disclosure involves significant risk of future leaks and misuse.**

Any "reasonable assessment of the burdens imposed by disclosure should

begin with an understanding of the extent to which the burdens are unnecessary,"

*Bonta*, 594 U.S. at 611, but in practice and in public statements, the IRS and Treasury

have acknowledged this sensitive donor information is simply not necessary for its

routine administration of the tax laws.

The IRS cannot demonstrate any specific instance of its actual use of Schedule

B in the routine administration of the tax laws. *See* IRS Br. 56-65. The IRS has not

provided evidence other than "we say so" to establish it actually uses Schedule B in

its day-to-day business, and there are ample public statements by the IRS and

Treasury admitting the government simply has no need to collect this confidential information *en masse*. The IRS has conceded it does not use Schedule B to cross-check compliance with other filers (i.e., substantial contributors). Pl. MSJ, Dkt. 36 at 7. Treasury further acknowledges that if the need to investigate arises, it "can obtain sufficient information from other elements of the Form 990 or Form 990–EZ" or open an examination for that specific case. 85 Fed. Reg. at 31963. These prior admissions contradict the government's new, bald assertions of "need." The record lacks even "a single, concrete instance in which pre-investigation collection of a Schedule B did anything to advance the [IRS's] investigative, regulatory or enforcement efforts." *Bonta*, 594 U.S. at 613.

Moreover, Treasury previously issued regulations requiring other § 501(c) exempt organizations, including § 501(c)(4) organizations (which are also subject to prohibitions on private inurement and self-dealing and to expenditure limitations), to report their substantial contributors. IRS Br. 11 n.7 (citing Treas. Reg. 1.6033-2(a)(2)(ii)(F) (1971)). However, over five years ago, on their own initiative, IRS and Treasury eliminated the compelled disclosure requirements for those other exempt organizations because "the information was not necessary for efficient tax administration." *Id.*; 85 Fed. Reg. at 31963. "The IRS does not need personally identifiable information of donors to be reported on Schedule B of Form 990 or Form 990-EZ in order for it to carry out its responsibilities." 85 Fed. Reg. at 31963.

While the IRS eliminated the unconstitutional donor disclosure requirement for all other Form 990 exempt filers under § 501(c), it could not waive the requirement for § 501(c)(3) organizations because it is imposed by statute. Notwithstanding, the IRS and Treasury have explained the compelled disclosure requirement "increases compliance costs …, consumes IRS resources in connection with the redaction of such information, and poses a risk of inadvertent disclosure of information that is not open to public inspection." Rev. Proc. 2018-38 at 5; Treas. Proposed Rules, 84 Fed. Reg. 47447, 47451 (Sept. 10, 2019) (same); *see also* IRS Br. at 55, 63 (recognizing lack of resources).

Treasury has admitted in particular that the IRS and its staff are under-resourced and unreliable when it comes to maintaining the confidentiality of Schedule Bs given the redaction requirements. *Id.* Treasury also admits that, notwithstanding that Schedule B's purpose is to reduce the likelihood of violations of the prohibition on disclosure of confidential donor information, the IRS has "experienced incidents of inadvertent disclosure." 85 Fed. Reg. at 31963; Pl. MSJ, Dkt. No. 36 at 7 (May 3, 2023). "The IRS knows of at least 14 unauthorized disclosures of Form 990 information since 2010." Pl. MSJ, Dkt. 36 at 7 (citing Ex. G, IRS Talking Points at 3); *compare* IRS Br. at 60 n.11 (IRS does not dispute 14 previous leaks). Breaches of confidentiality by the IRS do not happen in a vacuum. They come in an era when hacks of government and corporations alike are

increasingly common. Massive data breaches involving Equifax, Yahoo!, Capital One, Target and Sony have made headlines and put the confidential data of millions at risk.[15] Recent security breaches of government agencies are no exception.

For example, in April 2024, the IRS announced the second of two related data breaches affecting thousands of taxpayers, each of which was perpetrated by the same independent contractor working for the IRS.[16] The independent contractor stole the tax return information of thousands of high-net-worth individuals and their associated entities and disclosed it to media outlets.[17] The risk of a contractor or employee leaking confidential donor information for publication online is significantly greater today, in the digital age, than when Congress enacted the donor disclosure requirement 50 years ago. Given the current climate, the requirement to disclose donor information on Schedule B presents a massive risk of loss of privacy. Unpopular charities and those who advocate with respect to controversial issues are

---

[15] *Equifax Data Breach Settlement*, FTC (Nov. 2024), https://www.ftc.gov/enforcement/refunds/equifax-data-breach-settlement; Brett Molina, *Capital One data breach: A look at the biggest confirmed breaches ever*, USA Today (Jul. 30, 2019); Andrea Peterson, *The Sony Pictures hack, explained*, Wash. Post (Dec. 18, 2014).

[16] *IRS Notifies Thousands of Taxpayers That They Were Victims of a Data Breach*, Greenberg Traurig, LLP (Apr. 30, 2024), https://www.gtlaw.com/en/insights/2024/4/irs-notifies-thousands-of-taxpayers-that-they-were-victims-of-a-data-breach.

[17] *See, e.g.*, *The Secret IRS Files*, ProPublica, https://www.propublica.org/series/the-secret-irs-files. The First Amendment protects the right to publish confidential or statutorily protected material, so long as the publisher is not complicit in unlawful access. *See*, *e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001).

especially vulnerable in our increasingly polarized nation. This risk, when coupled with the IRS's systemic failures to protect confidential information, is egregious.

Indeed, the IRS and Treasury publicly recognize the continuing risk of inadvertent disclosure despite the duty to keep major donor information confidential under I.R.C. § 6104 "because … Schedule B generally must be redacted from an otherwise disclosable information return." 84 Fed. Reg. at 47452. They concede that "[b]y reducing the number of organizations providing the names and addresses of contributors on Schedule B, the potential for inadvertent disclosure of names and addresses can be decreased". *Id.* Once a Schedule B has been publicly disseminated, there is no way to meaningfully restore confidentiality. There is no way to claw it back. Thus, the government has publicly acknowledged that the way to ensure fewer breaches of donor privacy moving forward is to collect this confidential donor information from *fewer organizations*. *Id.*

## II. Supreme Court precedent requires at least exacting scrutiny to analyze the government's compelled disclosure of a charity's major donors.

For more than 60 years, the Supreme Court has applied at least exacting scrutiny to compelled disclosures that burden charitable association and speech outside the election context, including and especially mandates that nonprofit organizations turn over their confidential donors. *Bonta*, 594 U.S. at 607-11; *NAACP*, 357 U.S. at 465. Accordingly, the government may regulate in this area if it has a compelling interest and "only with narrow specificity." *Bonta*, 594 U.S. at 611.

**A. The District Court correctly held exacting scrutiny applies.**

Four years ago in *Bonta*, a three-justice plurality of the Supreme Court affirmed the high standard for donor privacy cases is "exacting scrutiny." *Id*. at 612. Another justice concurred in the judgment but disagreed with the plurality's parlance, noting the standard should be "strict scrutiny." *Id.* at 619 (Thomas, J., concurring). Two other justices explained in concurrence that the exacting and strict scrutiny standards are synonymous and that they would not have decided which applies because the compelled disclosure fails either. *Id.* at 622 (Alito and Gorsuch, JJ., concurring).

In cases involving charitable speech and association, the Court has historically applied "exacting" or "strict" scrutiny. *See id.*; *Riley v. Nat'l Fed'n of Blind,* 487 U.S. 781, 798-800 (1988) (applying the most exacting scrutiny to compelled speech restriction); *see also Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1664 (2015) (explaining exacting scrutiny applies to laws restricting charitable speech, requiring a compelling interest and narrowly tailored means). The Supreme Court elaborated on this history in *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), holding laws that target charitable speech are content-based because they regulate based on subject matter and/or the topic of charitable speech. *See Planet Aid v. City of St. Johns*, 782 F.3d 318, 328-29 (6th Cir. 2015) (pre-*Reed* but reaching same conclusion required under a *Reed* analysis). *Reed* thus affirmed longstanding precedent applying

strict scrutiny to laws that single out charitable speech for restriction, including, as here, compelled disclosure of donor speech through charitable giving. If there was any doubt as to the controlling standard of scrutiny in donor privacy cases, the Court resolved that in *Bonta* and clarified exacting scrutiny is the minimum.

Correctly applying *Bonta's* exacting scrutiny, the district court found the challenged mandatory disclosure compels all 1.51 million charitable organizations filing Form 990, including the Buckeye Institute, to disclose their major donors to the federal government and that the cross motions for summary judgment raised serious doubts as to whether the IRS needs upfront collection of this private associational information as it now posits. Order, Dkt. 60 at 10-12. Under *Bonta*, Schedule B is plainly a compelled disclosure requiring at least exacting scrutiny. *Id.*; 594 U.S. at 608 ("disclosure requirements are reviewed under exacting scrutiny.").

Relying on *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), the government counters that *Bonta's* exacting scrutiny framework is inapplicable because "Plaintiff voluntarily chose to take advantage of the 501(c)(3) tax benefit."[18] Order at 10. But as the district court pointed out, the cases since *Regan*

---

[18] Legal scholars have cast serious doubt as to whether tax exemptions and the charitable deduction can be construed as a "subsidy," which is in accord with Treasury's and Congress' own statements that they are not expenditures. *See* Ellen P. Aprill & Lloyd Hitoshi Mayer, *Tax Exemption Is Not a Subsidy—Except for When It Is*, Tax Notes Fed. (Sept. 20, 2021), https://www.taxnotes.com/featured-analysis/tax-exemption-not-subsidy-exceptwhenit/2021/09/17/7830q; Alex Reid, *Why is Charitable Activity Tax-Protected? Think Freedom, Not Finances*,

have limited its application, including and especially in the donor privacy context. Order at 10-11 (explaining *Bonta* developed and limited *Regan*). Indeed, the cases since *Regan* have held: "if Congress denies a benefit because an organization will not comply with a restriction on First Amendment activities, that denial may be unconstitutional." *Id.* (*citing Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 218, (2013)) (invalidating law requiring organizations that received certain federal funding to "adopt—as their own—the Government's view on an issue of public concern").

Here, if a charity does not disclose its substantial donors—a clear restriction on its First Amendment activities—the IRS will deny 501(c)(3) status. Thus, the district court explained, "this is not an example of the Government 'simply insisting that public funds be spent for the purposes for which they were authorized." *Id.* at 11. Rather, the IRS will deny § 501(c)(3) tax protection entirely to organizations that resist the disclosure requirement. *Id.* Because "the Disclosure Requirement is unconstitutional, it would be an unconstitutional condition on" tax exemption. *Id.*

Although the government attempts to distinguish California's compelled disclosure in *Bonta* as a "mandatory disclosure regime" and the IRS's compelled

---

Philanthropy Roundtable (Dec. 23, 2021), https://www.philanthropyroundtable.org/almanac/why-is-charitable-activity-tax-protected-think-freedom-not-finances/; Sheldon Richman, *Tax Breaks Aren't Subsidies*, Found. for Econ. Educ. (Apr. 1, 2004), https://fee.org/articles/tax-breaks-arent-subsidies.

disclosure here as a "voluntary/opt-in" registration for 501(c)(3) status, that argument lacks merit. *Bonta* involved a nearly identical government-compelled-disclosure of major donors as a condition precedent to charities voluntarily registering to solicit charitable donations in that state. Under the government's opt-in theory, the charities in *Bonta* should have simply opted not to register and solicit contributions in California if they did not like the "condition" precedent the state imposed—i.e., the mandatory disclosure of their associations with individual supporters on Schedule B. That misses the mark—each disclosure mandate restricts charities' ability to solicit anonymous charitable contributions and donors' charitable association and giving, which are protected First Amendment rights. 594 U.S. at 618. As the district court explained, the government's reliance on *Regan* to support its opt-in theory is misplaced, and in the context of compelled disclosures of charitable association, *Regan* is stale.

This case does not involve Congress' or Treasury's decision not to fund certain programs or activities of a recipient. Order at 10-11. To the contrary, this case involves the denial of a tax protection and registered status *if* the charity does not disclose its private associations and its donors' speech to the government. This is an unconstitutional condition on First Amendment freedoms. The issue in this case is essentially identical to that considered in *Bonta*.

## B. Federally mandated disclosure of donor information cannot withstand exacting scrutiny.

The district court explained that to pass exacting scrutiny, the government must demonstrate (1) "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and (2) narrow tailoring. Order at 9 (quoting *Bonta*, 594 U.S. at 607). The "strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* In addition, the disclosure requirement must be "narrowly tailored to the government's asserted interest." *Id.*; *Bonta*, 594 U.S. at 611. Even if the government establishes "a substantial relation to an important interest, that is not enough to save a disclosure regime that is insufficiently tailored." *Bonta*, 594 U.S. at 609; *McCutcheon v. Fed. Elec. Comm'n*, 572 U.S. 185, 218 (2014); *Shelton v. Tucker*, 364 U.S. 479, 488 (1969) (even "legitimate and substantial" governmental interests "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved"); *Buckley v. Valeo*, 424 U.S. 1, 25 (1976).

This disclosure mandate is insufficiently tailored. First, the government admits the confidential donor information it collects *en masse* is not necessary for its administration of the tax laws. *See supra* I.C. Thus, the IRS's claim in its principal brief that it "needs" the information to cross-check compliance with the tax laws lacks merit, *see* IRS Br. 34-38, and it contradicts its prior statements that it does not need or use the donor information for purposes of tax law administration.

Second, requesting the amount of the contributions on Schedule B without demanding the donors' names and home addresses would accomplish any future cross-checking needs if the IRS were to implement a cross-checking process for 1.51 million filers. Thus, as in *Bonta*, the IRS's "need" for this information boils down to mere administrative convenience accompanied by a continuing risk of public disclosure. "Narrow tailoring is crucial where First Amendment activity is chilled— even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *Bonta*, 594 at 609 (quoting *NAACP v. Button*, 371 U.S. 414, 433 (1963)). This same lack of need, failure to protect donor information, and ongoing risk of disclosure permeated in *Bonta*.

Astonishingly, the IRS attempts to distinguish this case from *Bonta* by comparing its track record of inadvertent public disclosures to the California Attorney General's public disclosures of confidential donor information on Schedule B. IRS Br. at 60 ("[T]he amount of careless mistakes made by the Attorney General's Registry is shocking" and "[i]nadvertent disclosure of Schedule B by the IRS, by comparison, is almost non-existent"). But the IRS ignores recent news reports of its widespread leaks of confidential information from thousands of taxpayer filings spanning the last four years, *see supra* I.C, in addition to at least 14 leaks of Form 990 information over the past decade. Worse, the IRS says an average of one leak per year, while unfortunate, is perfectly acceptable. IRS Br. 60 n.11.

Even if the government had not admitted the upfront collection of donor information is unnecessary, all purported interests now claimed in the government's principal brief can be satisfied through other information already provided in Form 990, and the government fails to establish otherwise. The government now claims it "needs" the confidential donor information from all 1.51 million § 501(c)(3) charitable organizations to deter "misbehavior" and to verify whether each organization (1) meets the public support test required of public charities, (2) is "potentially" involved in an excess benefit transaction under I.R.C. § 4958, or (3) is a supporting organization in compliance with § 4958. *See* IRS Br. 57. But, as in *Bonta*, the IRS's generalized deterrence interest bears no relation to the substantial First Amendment burden imposed on charities by this requirement to disclose all major donors, regardless of whether there is any evidence of violations of law. 594 U.S. at 612 (noting importance of California's interest in preventing charitable fraud and self-dealing, but highlighting that the enormous amount of sensitive information collected through Schedule B did not form an integral part of California's fraud-detection efforts). The IRS identifies no concrete use of Schedule B for its similar fraud-detection purpose.

Equally problematic, the disclosure requirement operates on the assumption that every registering charity is guilty of wrongdoing until proven innocent. Such prophylactic rules burdening charitable speech and association have consistently

been stricken by the Supreme Court as facially overbroad. *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (invalidating broad, prophylactic rule burdening charitable speech, noting that treatment of all charities as if they are suspected of fraud is constitutionally impermissible); *Riley*, 487 U.S. at 800 (striking down "prophylactic, imprecise, and unduly burdensome rule" compelling charitable speech where "more benign and narrowly tailored options are available"); *Button*, 371 U.S. at 438 ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone…."). "[A]dministrative convenience does not remotely 'reflect the seriousness of the actual burden' that the demand for Schedule Bs imposes on donors' association rights." *Bonta*, 594 U.S. at 615 (quoting *Reed*, 561 U.S. at 196).

Turning to the government's enumerated interests, the IRS's public-support-test argument likewise fails because whether an organization is publicly supported is ascertainable on Schedule A of the IRS Form 990. There, charitable organizations report total contributions and answer whether any person's contribution exceeds 2% of total contributions.[19] The IRS then uses the numbers reported in Schedule A to calculate whether the charity passes the public support test.[20] The information

---

[19] *See* 2024 IRS Form 990, Schedule A, Parts II-III, https://www.irs.gov/pub/irs-prior/f990--2024.pdf.

[20] *2024 Instructions for Schedule A (Form 990), Public Charity Status & Public Support*, IRS (Nov. 19, 2024) ("Schedule A … is used … to provide the required information about public charity status and public support"), https://www.irs.gov/pub/irs-pdf/i990sa.pdf.

reported in Schedule A of Form 990, therefore, answers the same question posed on Schedule B but without the need for any individual donor's name and address. This negates the government's asserted need for Schedule B for the public-support-test purpose. In addition, the non-Schedule-B portions of the 2024 IRS Form 990 already ask about whether an organization has engaged in an excess benefit transaction and require much more detailed information regarding self-dealing, private inurement, and supporting organization compliance under § 4958.[21] As explained above, the information provided in other parts of the Form 990 specifically addresses all of the IRS's stated interests.

In *Bonta*, the Supreme Court affirmed its holding in *NAACP* and made it abundantly clear that broadly-applied compelled disclosure laws violate the First Amendment. The across-the-board, upfront collection of 1.51 million donor lists "lacks any tailoring to the [government's] investigative goals, and the [government's] interest in administrative convenience is weak. As a result, every demand that might deter association 'creates an unnecessary risk of chilling' in violation of the First Amendment." *Bonta*, 594 U.S. at 598 (quoting *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984)). "It does not make a difference in these cases if there is no disclosure to the public, [or] if some donors do not mind

---

[21] *See, e.g.* 2024 IRS Form 990, *supra* n.19, at Part IV, Lines 25a-b; Part VI, Lines 12a-c; Schedule A, Parts III-V.

having their identities revealed ….” *Id.* (internal citation omitted). As the *Bonta* Court concluded, “each governmental demand for disclosure brings with it an additional risk of chill.” *Id*. at 618.

The government's proffered alternatives for compliance with the disclosure mandate are debilitating or impossible in most cases. The government suggests charities simply give up 501(c)(3) status if they do not want to disclose confidential donor information. But in *Bonta*, the Court understood well that if a charity did not comply with the disclosure, California “[could] prevent charities from operating in the State altogether,” and this chilling effect violated their First Amendment rights. *Id.* Here, the chilling effect of the IRS's compelled disclosure is far worse. If a charity refuses to submit Schedule B to the IRS, then the IRS could revoke its exemption, making it practically impossible to operate anywhere. Without 501(c)(3) status, which is contingent upon charities' disclosure of their donor lists to the government every year, charities would have to shut their doors. Order at 11. “Loss of tax-exempt status can have disastrous consequences for a charitable nonprofit.”[22]

Moreover, the government's argument that a charity not wanting to share its donor list with the government can simply reorganize as a different type of 501(c) organization “does not change this conclusion.” Order at 12. Even if Appellee and

---

[22] *Protect your nonprofit's tax-exempt status*, Nat'l Council of Nonprofits, https://www.councilofnonprofits.org/running-nonprofit/governance-leadership/ protect-your-nonprofits-tax-exempt-status.

*amici* charities could reorganize to be free from the disclosure requirement, *e.g.,* as a 501(c)(4) organization (an impossibility in many cases because of operational and/or purpose limitations, statutory or otherwise), they would still lose tax-deduction status, thereby preventing gifts. If contributions are not tax-deductible, this leads to reduced giving overall and no giving from private foundations and donor advised funds, which are generally limited to making grants only to other 501(c)(3) organizations.[23] Congress has made the benefit of the charitable tax deduction contingent upon the unconstitutional compelled disclosure of the charity's private associations. This threatens American democracy and tramples the freedoms of conscience, association, and speech.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because this compelled disclosure violates charities' and their donors' First Amendment freedoms, it causes irreparable harm.

## CONCLUSION

To succeed in the marketplace of ideas, charities must safeguard the confidential information of their supporters, including and especially their major donors. Compelled disclosure of donor lists by the federal government is destructive

---

[23] *See Grants to noncharitable organizations*, IRS (Jan. 30, 2025), https://www.irs.gov/charities-nonprofits/private-foundations/grants-to-noncharitable-organizations.

not only to civil liberties, but also to charities' ability to raise funds to support their causes. Donor anonymity is too important a First Amendment right to be sold at so cheap a price. For the reasons stated above, this Court should affirm exacting scrutiny is the constitutional minimum standard of review in donor privacy cases.

Respectfully submitted,

/s/ Karen Donnelly

KAREN DONNELLY
ERROL COPILEVITZ
COPILEVITZ, LAM & RANEY, P.C.
310 West 20th Street, Suite 300
Kansas City, MO 64108
(816) 472-9000
kdonnelly@clrkc.com

*Counsel for* Amici Curiae

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), contains 6,489 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

Dated:    November 26, 2025

<u>/s/ Karen Donnelly</u>
Karen Donnelly

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 26, 2025, an electronic copy of the Brief of *Amici Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system.

The undersigned also certifies that all participants are registered CM/ECF users and will be served via the CM/ECF system.

Dated:    November 26, 2025

/s/ Karen Donnelly<br>
Karen Donnelly

## APPENDIX
### List of *Amici*

African Christian College – USA
American Atheists
American Gastroenterological Association
American Friends Musées d'Orsay et de l'Orangerie
And Then There Were None
AMVETS National Service Foundation
ASPCA Los Angeles
Best Friends Animal Society
Beyond My Borders
Catholic Charities of Kansas City-St. Joseph
Catholic Medical Mission Board
Catholic Writers Guild
Cornerstones for Care
Comic Book Legal Defense Fund
Creative Visions Foundation
DC Bar Pro Bono Center
Easterseals
Feeding America
Foundation for Individual Rights and Expression (FIRE)
Friends of Flight 93 National Memorial
Global Media Outreach
GO2 for Lung Cancer
James Beard Foundation
KC Pet Project
KinderUSA
Landmark Legal Foundation
Locks of Love
Midwest Innocence Project
National Caregiving Foundation
National Children's Cancer Society

National LGBTQ Task Force Action Fund
Nonprofit Connect
Paralyzed Veterans of America
People for the Ethical Treatment of Animals (PETA)
Physicians Committee for Responsible Medicine
Prairie Paws
ProLove Ministries
Regent University
Rise for Animals
Special Olympics International
Steps of Faith
St. Bonaventure Indian Mission & School
STOMP Out Bullying, Corp.
Students for Life of America
The Freedom to Read Foundation
The Manufacturing Institute
The Nonprofit Alliance Foundation (TNPAF)
The Woodhull Freedom Foundation
Two Bit Circus Foundation
United States Justice Foundation
Vietnam Veterans of America
350.org