No. 25-3170

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

BUCKEYE INSTITUTE,

*Plaintiff-Appellee*,

v.

INTERNAL REVENUE SERVICE; WILLIAM LONG,
in his official capacity as Commissioner of Internal Revenue;
U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT,
in his official capacity as Secretary of the Treasury

*Defendants-Appellants*.

Appeal from the United States District Court
for the Southern District of Ohio at Columbus
No. 2:22-cv-04297-MHW-EPD
The Honorable Michael H. Watson

# BRIEF OF THE CENTER FOR INDIVIDUAL RIGHTS,
# NEW CIVIL LIBERTIES ALLIANCE, AND HAMILTON LINCOLN
# LAW INSTITUTE AS *AMICI CURIAE*
# IN SUPPORT OF PLAINTIFF-APPELLANT

Darpana Sheth
Todd F. Gaziano
THE CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Avenue, N.W.
Suite 625
Washington, D.C. 20036
Telephone: (202) 833-8403

Samuel Eckman
*Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7204
*seckman@gibsondunn.com*

Elizabeth A. Kiernan
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: (214) 698-3100

*Counsel for Amici The Center for Individual Rights, New Civil
Liberties Alliance, and Hamilton Lincoln Law Institute*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3170      Case Name: Buckeye Institute v. IRS, et al.

Name of counsel: Samuel Eckman

Pursuant to 6th Cir. R. 26.1, Amicus Curiae Center for Individual Rights
<em>Name of Party</em>

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> None known.

## CERTIFICATE OF SERVICE

I certify that on _____ November 26, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Samuel Eckman

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3170          Case Name: Buckeye Institute v. IRS, et al.

Name of counsel: Samuel Eckman

Pursuant to 6th Cir. R. 26.1, Amicus Curiae New Civil Liberties Alliance
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

## CERTIFICATE OF SERVICE

I certify that on _____ November 26, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Samuel Eckman

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 25-3170          Case Name: The Buckeye Institute v. IRS, et al.

Name of counsel: Samuel Eckman

Pursuant to 6th Cir. R. 26.1, Amicus Curiae Hamilton Lincoln Law Institute
Name of Party

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No.

CERTIFICATE OF SERVICE

I certify that on _____ November 26, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Samuel Eckman

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Page

Interest of *Amici* ................................................................ 1

Introduction ..................................................................... 4

Argument ........................................................................ 7

    I.     The IRS Disclosure Requirement Violates The Unconstitutional-Conditions Doctrine. ........................................................... 7

    II.    The IRS Disclosure Requirement Is Subject To And Fails Strict Scrutiny. ......................................................... 15

Conclusion ..................................................................... 23

Certificate of Compliance ...................................................... 25

Certificate of Service ......................................................... 26

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*Agency for Intern. Dev. v. All. for Open Soc'y Intern., Inc.*,
570 U.S. 205 (2013) ......................................................... 5, 8, 11, 12, 13

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ............................................................ 2, 5, 18, 19

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ................................................................. 16

*Buckley v. Valeo*,
424 U.S. 1 (1976) ...................................................................... 20

*Elonis v. United States*,
575 U.S. 723 (2015) .................................................................. 1

*FEC v. Nat'l Conservative Pol. Action Comm.*,
470 U.S. 480 (1985) ................................................................. 16

*Friedrichs v. Cal. Tchr.'s Ass'n*,
578 U.S. 1 (2016) ...................................................................... 1

*Frost & Frost Trucking Co. v. R.R. Comm'n*,
271 U.S. 583 (1926) ......................................................... 9, 10, 15

*Greenberg v. Haggerty*,
491 F. Supp. 3d 12 (E.D. Pa. 2020) ........................................ 2

*John Doe #1 v. Reed*,
561 U.S. 186 (2010) .................................................................. 20

*Knox v. Serv. Emps. Int'l Union*,
567 U.S. 298 (2012) .................................................................. 17

*La. Debating & Literary Ass'n v. City of New Orleans*,
42 F.3d 1483 (5th Cir. 1995) ................................................... 17

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001) ........................................................... 11

*Leroy v. Livingston Manor Cent. Sch. Dist.*,
    2025 WL 3029421 (2d Cir. Oct. 30, 2025) ........................... 2

*Morse v. Frederick*,
    551 U.S. 393 (2007) ............................................................. 1

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .............................................................. 2

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ........................................ 15, 16, 17, 20

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ................................................. 8, 10, 11

*Regan v. Tax'n With Representation of Wash.*,
    461 U.S. 540 (1983) ........................................................... 12

*Rosenberger v. Rectors & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ............................................................. 1

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ..................................................... 12, 13

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990) ............................................................. 17

*Seal v. Morgan*,
    229 F.3d 567 (6th Cir. 2000) .............................................. 18

*Shapiro v. Thompson*,
    394 U.S. 618 (1969) ........................................................... 19

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ........................................................... 16

*Speiser v. Randall*,
    357 U.S. 513 (1958) ................................................. 8, 10, 15

*State Emp. Bargaining Agent Coal. v. Rowland*,
    718 F.3d 126 (2d Cir. 2013) ................................................................. 17

*Stock v. Gray*,
    663 F. Supp. 3d 1044 (W.D. Mo. 2023) .................................................. 2

*Sypniewski v. Warren Hills Reg'l Bd. Of Educ.*,
    307 F.3d 243 (3d Cir. 2002) ................................................................... 1

*W. Union Tel. Co. v. Foster*,
    247 U.S. 105 (1918) ................................................................................ 9

*W. Union Tel. Co. v. Kansas*,
    216 U.S. 1 (1910) ............................................................................... 5, 9

**Statutes & Regulations**

26 C.F.R. § 1.6033-2 ................................................................................. 21

26 U.S.C. § 501 ......................................................................................... 14

Guidance Under Section 6033 Regarding the
    Reporting Requirements of Exempt Organizations,
    85 Fed. Reg. 31,31959 (May 28, 2020)
    (codified at 26 C.F.R. 1) ...................................................................... 14

**Other Authorities**

Alan Rappeport,
    *In Targeting Political Groups, I.R.S. Crossed Party Lines*,
    N.Y. Times (Mar. 25, 2018) ................................................................. 23

Brian Schwartz, Richard Rubin & Joel Schectman,
    *Trump Team Plans IRS Overhaul to Enable Pursuit of*
    *Left-Leaning Groups*,
    Wall St. J. (Oct. 15, 2025) ................................................................... 23

CBS News,
    *Massive IRS Data Breach Much Bigger Than First*
    *Thought* (Feb. 29, 2016) ...................................................................... 22

Cong. Rsch. Serv.,
*IRS Will No Longer Require Disclosure of Certain
Nonprofit Donor Information* (Aug. 14, 2018) .................................... 22

Cong. Rsch. Serv.,
*Nonprofit Donor Information Disclosure*
(Aug. 1, 2019) .................................................................................... 21

Kelsey Snell,
*IRS Targeted NAACP in 2004,*
Politico (May 13, 2013) ...................................................................... 22

R. Randall Kelso,
*Clarifying the Four Kinds of "Exacting Scrutiny" Used in
Current Supreme Court Doctrine,*
127 Penn St. L. Rev. 375 (2023) ......................................................... 19

Richard H. Fallon, Jr.,
*Strict Judicial Scrutiny,*
54 UCLA L. Rev. 1267 (2007) ........................................................ 18, 19

Treasury Dep't.,
*Treasury Department and IRS Announce Significant
Reform to Protect Personal Donor Information to Certain
Tax-Exempt Organizations* (July 16, 2018) ................................. 13, 22

U.S. Government Accountability Office,
*Taxpayer Information Keeps Ending Up in the Wrong
Hands. What Can IRS Do to Better Protect It?*
(Sept. 26, 2023)................................................................................ 22

The Center for Individual Rights (CIR) is a national public interest law firm dedicated to defending individual rights essential to a free and flourishing society. Founded in 1989, CIR has a vital interest in preserving the guarantees of freedom of expression secured by First Amendment precedents. Through its Freedom of Speech practice, CIR has represented clients in a wide variety of First Amendment cases, *e.g.*, *Friedrichs v. Cal. Tchr.'s Ass'n*, 578 U.S. 1 (2016); *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995); *Sypniewski v. Warren Hills Reg'l Bd. Of Educ.*, 307 F.3d 243 (3d Cir. 2002), and has also participated as *amicus curiae* in cases implicating significant First Amendment issues, *e.g.*, *Elonis v. United States*, 575 U.S. 723 (2015); *Morse v. Frederick*, 551 U.S. 393 (2007).

The New Civil Liberties Alliance (NCLA) is a nonpartisan, nonprofit civil rights organization and public interest law firm devoted to defending constitutional freedoms from the administrative state's

---

[1] No counsel for any party authored this brief in whole or in part. No party, counsel for any party, or person other than *amici* or their counsel contributed money intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

depredations. Professor Philip Hamburger founded NCLA to challenge multiple constitutional defects in the modern administrative state through original litigation, *amicus curiae* briefs, and other advocacy. Through this work, NCLA frequently defends the First Amendment rights of individuals and organizations, in both original litigation, *e.g.*, *Murthy v. Missouri*, 603 U.S. 43 (2024), and as *amicus curiae*, *e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021).

Hamilton Lincoln Law Institute (HLLI) is a public interest organization dedicated to protecting free markets, free speech, limited government, and separation of powers against regulatory abuse and rent-seeking. In its litigation practice, HLLI has successfully worked to protect clients' First Amendment rights. *See*, *e.g.*, *Leroy v. Livingston Manor Cent. Sch. Dist.*, 2025 WL 3029421 (2d Cir. Oct. 30, 2025) (school district violated student's First Amendment rights by disciplining him for off-campus speech); *Stock v. Gray*, 663 F. Supp. 3d 1044 (W.D. Mo. 2023) (enjoining viewpoint-based restriction on pharmacist speech); *Greenberg v. Haggerty*, 491 F. Supp. 3d 12 (E.D. Pa. 2020) (preliminarily enjoining viewpoint-based restriction on attorney speech).

*Amici* submit this brief to emphasize that the right to anonymous association is essential to preserving a vibrant civil society in which individuals feel free to support causes they believe in without fear of retaliation. This case presents the Court with an opportunity to vindicate this bedrock principle and ensure the government cannot use tax policy as a backdoor to chill constitutional freedoms.

## INTRODUCTION

For decades, Congress granted tax-exempt status to charitable organizations without requiring disclosure of donor information. That changed in 1969, when Congress introduced a reporting requirement broadly obligating most tax-exempt nonprofit organizations to annually disclose the names and addresses of their "substantial contributors." In 2020, Congress eliminated this disclosure requirement for nearly all other tax-exempt entities, concluding that disclosure was not needed for enforcement and that the requirement increased compliance costs and the risk of inadvertent disclosures. Yet today, the disclosure requirement remains in force only for most, but not all, 501(c)(3) organizations—an arbitrary and constitutionally untenable distinction. This vestige of a bygone era of tax regulation imposes profound burdens on nonprofit organizations' First Amendment rights and should be struck down for two independent reasons.

***First***, the requirement that 501(c)(3) organizations disclose the names and addresses of their "substantial contributors" on the IRS's "Schedule B" form—submitted in connection with the nonprofits' annual reporting of their income, expenses, and activities—violates the

unconstitutional-conditions doctrine. The U.S. Supreme Court has long recognized that Congress may not condition a public benefit on the surrender of constitutional freedoms—especially when the condition bears no relation to the program's purpose. *See W. Union Tel. Co. v. Kansas*, 216 U.S. 1 (1910); *Agency for Intern. Dev. v. All. for Open Soc'y Intern., Inc.*, 570 U.S. 205 (2013). By requiring 501(c)(3) organizations to disclose the identity of their donors to secure the tax benefits available under that provision of the Tax Code, the disclosure requirement seeks to do indirectly what the government cannot do directly—namely, compel organizations and their members to forgo the right to associate anonymously in pursuit of their shared values.

**Second**, the IRS disclosure requirement, which implicates both the freedom of speech and association, must—but cannot—satisfy strict scrutiny. Although the U.S. Supreme Court recently struck down a materially similar disclosure requirement in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), that opinion did not yield a majority on the precise level of scrutiny that applies to such regulations. But precedent is clear that laws directly burdening the right to associate anonymously, including compelled disclosure laws, should be subject to

strict scrutiny, just like laws directly burdening other First Amendment rights.

While some Supreme Court cases purport to apply "exacting scrutiny" to disclosure requirements, that is the result of a historical confusion regarding terminology. When the U.S. Supreme Court first began to review the constitutionality of statutes under varying tiers of scrutiny, the terms "strict scrutiny" and "exacting scrutiny" were used interchangeably to refer to the most demanding standard. Only later did exacting scrutiny evolve into a distinct (and more permissive) standard, applicable primarily in the realm of campaign finance.

The balance of interests that might warrant less demanding scrutiny of disclosure laws regarding campaign contributions—including the government's interest in stemming *quid pro quo* corruption and the diminished risk that core First Amendment speech will be substantially curtailed—is not the same in the context of contributions to 501(c)(3) organizations. Not only must 501(c)(3) organizations refrain from participating in electoral politics, but there is an unsettling history of more than a dozen breaches of IRS data—to say nothing of the targeting of perceived political enemies by the IRS itself.

This case perfectly illustrates why the disclosure requirement cannot stand. In 2013, the IRS targeted the Buckeye Institute for an audit immediately after it had publicly opposed Medicaid expansion. Fearing further retaliation, donors stopped giving or else began making smaller, anonymous donations that fell below the reporting threshold and forgoing tax deductions to protect themselves. This chilling effect on association and speech—caused by a disclosure requirement the IRS admits it does not need—epitomizes the First Amendment harms the unconstitutional-conditions doctrine and strict scrutiny are designed to prevent.

For these reasons, the Court should strike down the disclosure requirement as an unconstitutional condition and because it fails to satisfy strict scrutiny.

## ARGUMENT

### I. The IRS Disclosure Requirement Violates The Unconstitutional-Conditions Doctrine.

The requirement that 501(c)(3) organizations disclose the names and addresses of their "substantial contributors" impermissibly conditions the receipt of a public benefit on the release of constitutional protections—namely, the First Amendment rights to speak and associate

freely. This is a flagrant violation of the unconstitutional-conditions doctrine, which holds that, "though a person has no 'right' to a valuable governmental benefit and even though the government may deny him that benefit for any number of reasons," it may not "deny a benefit to a person on a basis that infringes on his constitutionally protected interests—especially, his interest in freedom of speech . . . or associations." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Notably, this doctrine has been applied to tax benefits conditioned on the plaintiff forgoing certain First Amendment rights. *See Speiser v. Randall*, 357 U.S. 513 (1958).

While the unconstitutional-conditions doctrine does not prohibit the government from imposing conditions that "define the limits of the government" benefit, *Agency for Intern. Dev.*, 570 U.S. at 214—for example, by restricting the use of government funds to certain purposes—the disclosure requirement does nothing of the sort. Unlike the statutory provisions delineating the activities in which 501(c)(3) organizations may (and may not) engage, the disclosure requirement is entirely disconnected from how tax benefits are used and by whom.

1.    The unconstitutional-conditions doctrine reflects a longstanding judicial concern with the indirect erosion of constitutional

rights. One of its earliest modern articulations appeared in *Western Union Telegraph Co. v. Kansas*, in which the Supreme Court held unconstitutional a state law that conditioned the privilege to do business in the state on the surrender of protections under the Commerce Clause and Fourteenth Amendment. 216 U.S. at 18. In doing so, the Court acknowledged the government's right to set conditions for obtaining privileges but cautioned that such conditions must not be "repugnant to the Constitution." *Id.* at 35–36 (internal quotation marks omitted). "To hold otherwise," the Court explained, would "allow form to control substance" and provide the government an indirect route to an unconstitutional result. *Id.* at 37; *accord W. Union Tel. Co. v. Foster*, 247 U.S. 105, 114 (1918) (citing *Kansas* for the proposition "that a constitutional power cannot be used by way of condition to attain an unconstitutional result").

The doctrine gained clearer form in *Frost & Frost Trucking Co. v. Railroad Commission*, 271 U.S. 583 (1926). There, the Court considered whether a state could circumvent the Fourteenth Amendment's protection against converting a private carrier into a common carrier by the simple expedient of conditioning the use of a public highway on a

private carrier "dedicating [its] property to the quasi public use of public transportation." *Id.* at 591. The Court was unequivocal in its rejection of this attempt: The government "may not impose conditions which require the relinquishment of constitutional rights." *Id.* at 593–94.

The Court has applied this principle in the First Amendment context, rejecting attempts to achieve indirectly what the First Amendment prohibits doing directly. In *Speiser v. Randall*, the Court considered a California law that conditioned the receipt of a property tax exemption for veterans on a recipient signing a loyalty oath promising not to advocate for the overthrow of the government. 357 U.S. at 515. Again, the Court held the line, explaining that by "deny[ing] an exemption to claimants who engage[d] in certain forms of speech," California "in effect . . . penalize[d] them" for the same speech. *Id.* at 518.

And in *Perry v. Sindermann*, a former college professor complained his First Amendment rights were violated when his university did not extend his contract because he publicly criticized the school administration. 408 U.S. at 595–96. Although the Supreme Court acknowledged that the professor lacked "a contractual or tenure right to re-employment," it concluded that this was not sufficient to defeat his

claim. As the Court explained, "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited," which "would allow the government to produce a result which it could not command directly." *Id.* at 597 (cleaned up).

**2.** Notwithstanding the broad scope of the unconstitutional-conditions doctrine, the Supreme Court has made clear that it does not prohibit the government from imposing *any* conditions on the receipt of public benefits. Instead, the Court distinguishes between conditions that are meant to "define the limits of the government" benefits (*i.e.*, "those that specify the activities Congress wants to" support) and "conditions that seek to leverage [benefits] to regulate" constitutional rights "outside the contours of the program itself." *Agency for Intern. Dev.*, 570 U.S. at 214. Because that line is not always clear, courts must guard against governmental attempts to "manipulat[e]" the analysis by "recast[ing] a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Id.* at 215 (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)).

Several cases illustrate the distinction between permissible conditions that "specify the activities Congress wants to" support and impermissible conditions that seek to regulate "outside the contours of the federal program itself." For example, the prohibition on 501(c)(3) organizations engaging in lobbying is a *valid* condition because Congress has the right to choose which speech to benefit and because it provided lobbying organizations the ability to segregate funds to obtain a tax exemption for the portion of its non-lobbying activities. *See Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540 (1983). Similarly, the requirement that any grant under Title X of the Public Health Service Act not be used to support abortion was a *permissible* condition because it regulated the "scope" of the benefit while leaving "unfettered" other constitutional activities. *Rust v. Sullivan*, 500 U.S. 173, 195–200 (1991).

Conversely, a condition that nongovernmental organizations receiving congressional funding to combat the spread of HIV/AIDS affirmatively adopt a policy opposing prostitution was *impermissible*. *Agency for Int'l Dev.*, 570 U.S. at 218–20. The Court held that by requiring a recipient to maintain a blanket policy against prostitution in order to obtain funds to eradicate HIV/AIDS, the government was

compelling speech and "plac[ing] a condition on *the recipient*," not "the particular program or service." *Id.* at 219 (emphasis added).

**3.** The distinction is clear: Congress may define the scope of activities it chooses to benefit through tax exemptions but may not leverage that benefit to regulate conduct wholly outside that scope. *Id.* at 214–15. The requirement that 501(c)(3) organizations disclose the names and addresses of "significant contributors" falls on the wrong side of this line for two reasons.

*First*, disclosure of donor identities bears no relationship to whether an organization operates for permissible exempt purposes. The IRS does not use Schedule B information to verify that organizations refrain from lobbying or political campaigning—the actual statutory limits on 501(c)(3) status. Indeed, the IRS admits it rarely consults Schedule B data for enforcement purposes.[2]

*Second*, the many exemptions expose the disclosure requirement's disconnect from its stated purpose. Through Section 501(c)(3), Congress

---

[2] *See* Treasury Dep't., *Treasury Department and IRS Announce Significant Reform to Protect Personal Donor Information to Certain Tax-Exempt Organizations* (July 16, 2018), https://tinyurl.com/mt34npf4.

exempted from taxation nonprofit organizations "operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes," among other things, so long as they do not, for example, "influence legislation" or "participate in . . . any political campaign." 26 U.S.C. § 501(c)(3). The statute thus clearly defines the "scope" of activities or programs Congress wished to benefit. The requirement that a 501(c)(3) organization disclose the names and addresses of its "substantial contributors" adds nothing to that definition—in fact, it does not even serve to verify whether the organization is in fact operating for a permissible purpose.

This is confirmed by the fact that the IRS does not require the same information from other 501(c) organizations—or even from all 501(c)(3) organizations. For example, under IRS regulations, the disclosure requirement does not apply to "religious organizations and educational organizations described in section 170(b)(1)(A)(ii)." Guidance Under Section 6033 Regarding the Reporting Requirements of Exempt Organizations, 85 Fed. Reg. 31,31959 (May 28, 2020) (codified at 26 C.F.R. 1). Nor does it apply to 501(c)(4) social welfare organizations and 501(c)(6) trade associations. *See id.* These exemptions prove the

disclosure requirement is not intended to define the scope of the tax benefit but is rather an independent burden on associational rights.

Consequently, the unconstitutional-conditions doctrine applies to the requirement that 501(c)(3) organizations disclose the names and addresses of their "substantial contributors." The Supreme Court has long applied this doctrine to denials of tax exemptions. *See*, *e.g.*, *Speiser*, 357 U.S. at 513. And the compelled disclosure of an organization's contributors implicates both the freedom of speech and of association. *See NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute . . . a restraint on freedom of association . . . ."). The unconstitutional-conditions doctrine is designed to prevent exactly this type of indirect intrusion upon constitutional rights by "impos[ing] conditions which require the relinquishment of constitutional rights." *Frost & Frost Trucking*, 271 U.S. at 594.

## II. The IRS Disclosure Requirement Is Subject To And Fails Strict Scrutiny.

Even if this Court concludes that the unconstitutional-conditions doctrine does not independently doom the disclosure requirement, the requirement still fails First Amendment scrutiny.

**1.** This Court should apply strict scrutiny in reviewing the constitutionality of the disclosure requirement because that requirement implicates the fundamental right of free association.

The right to freely associate exists at the intersection of the First Amendment rights to freedom of speech and to peaceably assemble. For this reason, the Supreme Court has time and again emphasized that "the freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the" Constitution. *NAACP*, 357 U.S. at 460; *see also Shelton v. Tucker*, 364 U.S. 479, 486 (1960) (noting that the "right of free association" is "a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society"). This freedom promotes "[e]ffective advocacy of both public and private points of view," *NAACP*, 357 U.S. at 460, protects a group's ability to control its expressive identity, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000), and "amplif[ies]" individuals' voices, *FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 495 (1985).

The right to freely associate necessarily includes the right to associate anonymously. As the Supreme Court has observed,

"[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP*, 357 U.S. at 462. For that reason, "compelled disclosure of affiliation with groups engaged in advocacy may constitute . . . a restraint on freedom of association." *Id.*

But it is a foundational principle of our constitutional jurisprudence that "the ability of like-minded individuals to associate . . . may not be curtailed." *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 309 (2012). Courts, therefore, routinely apply strict scrutiny to regulations that threaten to inhibit free association. *See, e.g.*, *NAACP*, 357 U.S. at 460–61 ("[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."); *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 133 (2d Cir. 2013) (holding that rules which "inhibit[] protected association and interfere[] with government employees' freedom to associate" are "subject to the same strict scrutiny") (citing *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 (1990)); *La. Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1498 (5th Cir. 1995) ("[A]s is also true for expressive associational

rights, the constitutional right of private association is . . . a fundamental right" that "is subject to strict scrutiny"); *see also Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) ("Government actions that burden the exercise of . . . fundamental rights or liberty interests are subject to strict scrutiny."). It necessarily follows that strict scrutiny should apply to a rule compelling disclosure of an organization's members just as much as it would to a rule prohibiting those members from associating in the first place.

**2.** To be sure, a three-Justice plurality in *Bonta* suggested that exacting scrutiny, rather than strict scrutiny, applies in cases involving compelled disclosures. 594 U.S. at 607. But this stemmed from a misapprehension regarding the historical use of the terms "strict scrutiny" and "exacting scrutiny."

As one leading scholar has explained, "[b]efore 1960, what we would now call strict judicial scrutiny—that is, inquiries into whether infringements on constitutional rights are necessary or narrowly tailored to promote compelling governmental interests—did not exist." Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1284 (2007). Although "the idea had emerged that some constitutional rights deserve

more protection than others, or appropriately trigger heightened judicial scrutiny, . . . no workable formula had emerged to implement this general idea." *Id.* at 1273.

In fact, it was not until 1969 that "the modern version of strict scrutiny made its first unambiguous appearance in a Supreme Court majority opinion." *Id.* at 1282 (citing *Shapiro v. Thompson*, 394 U.S. 618 (1969)). Before that time—and even, at times, in the present—"strict scrutiny" and "exacting scrutiny" were used interchangeably to refer to the same level of heightened review. *See* R. Randall Kelso, *Clarifying the Four Kinds of "Exacting Scrutiny" Used in Current Supreme Court Doctrine*, 127 Penn St. L. Rev. 375, 376 (2023) ("Over the last 50 years, the Supreme Court has used the term 'exacting scrutiny' in four distinct ways," including "to refer exactly to strict scrutiny review[.]").

Tellingly, the plurality in *Bonta* pointed to the Court's 1958 decision in *NAACP* as the source of exacting scrutiny. 594 U.S. at 608 ("*Buckley* [*v. Valeo*, 424 U.S. 1 (1976)] derived the test from *NAACP v. Alabama*."). But that case, which struck down a state's attempt to compel the NAACP to disclose the names and addresses of its members, clearly did not apply anything but the most stringent review: "[S]tate action which may have

the effect of curtailing the freedom to associate is subject to *the closest scrutiny*." 357 U.S. at 460–61 (emphasis added).

**3.** It is certainly true that *Buckley v. Valeo*, 424 U.S. 1 (1976), articulated a form of exacting scrutiny that is distinct from, and more permissive than, the version endorsed by the Court in *NAACP. See id.* at 94 ("[A] restriction can be sustained [under exacting scrutiny] only if it furthers a 'vital' governmental interest that is 'achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity.'") (citation omitted). But a more permissive standard is defended in the context of campaign contributions on the grounds that such contributions present a risk of *quid pro quo* corruption and that regulating campaign contributions would not meaningfully constrain citizens' ability to engage in myriad other forms of political (and even electioneering) speech. And tellingly, this "exacting scrutiny" standard has been limited to the electoral context, where states have been afforded "significant flexibility in implementing their own voting systems." *John Doe #1 v. Reed*, 561 U.S. 186, 195 (2010); *see also id.* at 196 ("We have a series of precedents considering First Amendment

challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed 'exacting scrutiny.'").

By contrast, contributions to 501(c) nonprofit organizations do not pose any discernible threat to the public interest. That's why the IRS extends disclosure exemptions to some 501(c)(3) organizations, including religious organizations and certain educational organizations. *See supra* at 14–15. And, more recently, it "eliminated the requirement that [tax-exempt organizations] organized under Section 501(c)—other than 501(c)(3)—report the names and addresses of large donors," citing its authority "to exempt certain [tax-exempt organizations] from Form 990 reporting requirements when '[it] determines that such returns are not necessary for the efficient administration of the internal revenue laws.'"[3] The IRS reasoned that the disclosure requirement was not necessary for enforcement, raised compliance costs, and increased the risk of

---

[3] Cong. Rsch. Serv., *Nonprofit Donor Information Disclosure*, Congress.gov (Aug. 1, 2019), https://tinyurl.com/3rrwchry; *see also* 26 C.F.R. § 1.6033-2(a)(2)(ii)(F).

inadvertent disclosures.[4]

Requiring 501(c)(3) organizations to disclose the names and addresses of "substantial contributors," however, has a profound chilling effect on the exercise of First Amendment rights. The IRS has repeatedly been subject to data breaches, exposing the identities of substantial contributors to nefarious actors.[5]

And the government itself has used taxpayer information to target perceived political enemies. In 2004, for example, "the NAACP was hit with an audit over accusations of improper political activity for criticizing the Bush administration."[6] Less than a decade later, the IRS admitted to subjecting certain right-leaning political organizations to extra scrutiny

---

[4] *See* Treasury Dep't., *Treasury Department and IRS Announce Significant Reform, supra* note 2; Cong. Rsch. Serv., *IRS Will No Longer Require Disclosure of Certain Nonprofit Donor Information* (Aug. 14, 2018), https://tinyurl.com/35cbandj.

[5] *See*, *e.g.*, U.S. Government Accountability Office, *Taxpayer Information Keeps Ending Up in the Wrong Hands. What Can IRS Do to Better Protect It?* (Sept. 26, 2023), https://tinyurl.com/3t67ssmy; CBS News, *Massive IRS Data Breach Much Bigger Than First Thought* (Feb. 29, 2016), https://tinyurl.com/yuvwy7mp.

[6] Kelsey Snell, *IRS Targeted NAACP in 2004*, Politico (May 13, 2013), https://tinyurl.com/2shspx2h.

based on their names or ideological leanings.[7] And now that the party occupying the White House has changed, there has been talk of "sweeping changes at the Internal Revenue Service that would allow the agency to pursue criminal inquiries of left-leaning groups more easily."[8]

In short, the balance between government interests and the imposition on First Amendment speech that weighs in favor of exacting scrutiny in campaign finance cases weighs in precisely the opposite direction here. The Court should apply strict scrutiny to the disclosure requirement.

## CONCLUSION

The Court should strike down the disclosure requirement as an unconstitutional condition and as a direct burden on the right to associate under strict scrutiny, remanding with orders that the district court enter judgment in favor of the Buckeye Institute.

---

[7] *See* Alan Rappeport, *In Targeting Political Groups, I.R.S. Crossed Party Lines*, N.Y. Times (Mar. 25, 2018), https://tinyurl.com/mpexpdyz.

[8] Brian Schwartz, Richard Rubin & Joel Schectman, *Trump Team Plans IRS Overhaul to Enable Pursuit of Left-Leaning Groups*, Wall St. J. (Oct. 15, 2025), https://tinyurl.com/5n8hjx7x.

Dated: November 26, 2025

Respectfully submitted,

Darpana Sheth
Todd F. Gaziano
THE CENTER FOR INDIVIDUAL
RIGHTS
1100 Connecticut Avenue, N.W.
Suite 625
Washington, D.C. 20036
Telephone: (202) 833-8403
*sheth@cir-usa.org*
*gaziano@cir-usa.org*

*/s/ Samuel Eckman*
Samuel Eckman
*Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7204
*seckman@gibsondunn.com*

Elizabeth A. Kiernan
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: (214) 698-3100
*ekiernan@gibsondunn.com*

*Counsel for Amici The Center for Individual Rights, New Civil
Liberties Alliance, and Hamilton Lincoln Law Institute*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.　　This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains fewer than 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b).

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook typeface.

Dated: November 26, 2025　　　　　*/s/ Samuel Eckman*

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 25, 2025          *s/Samuel Eckman*