# No. 25-3170

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BUCKEYE INSTITUTE,

Plaintiff-Appellee

v.

**INTERNAL REVENUE SERVICE; SCOTT BESSENT, in his official capacity as Acting Commissioner of Internal Revenue; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury,**

Defendants-Appellants

## ON INTERLOCUTORY APPEAL FROM THE ORDER OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

## REPLY BRIEF FOR THE APPELLANT

BRETT A. SHUMATE
  *Assistant Attorney General*
MICHAEL WEISBUCH
  *Senior Counsel*
  *Office of the Associate Attorney General*

JENNIFER M. RUBIN        (202) 307-0524
MARIE E. WICKS        (202) 307-0461
  *Attorneys*
  *Tax Litigation Branch*
  *U.S. Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

# TABLE OF CONTENTS

**Page**

Table of contents..................................................................................i

Table of authorities ............................................................................ii

Introduction .......................................................................................1

Argument:

    A.    Rational-basis review is the proper level of scrutiny for this federal tax subsidy, which is reasonable and does not reach outside the tax-subsidy program ...........................8

        1.    Consistent with *Regan*, the § 6033(b)(5) reporting requirement is a condition subject to rational-basis review ......................................................................8

        2.    Buckeye's attempt to limit *Regan*'s application is unavailing.....................................................................15

    B.    Exacting scrutiny does not apply because the substantial-contributor reporting requirement is not a compelled disclosure ...........................................................20

        1.    Buckeye downplays key distinctions between *AFP* and this case................................................................20

        2.    Despite Buckeye's attempts to frame it as such, the substantial-contributor reporting requirement is not a compelled disclosure ........................................22

    C.    Even if an exacting-scrutiny analysis applied, the substantial-contributor reporting requirement should be upheld as a matter of law ......................................25

    D.    Buckeye's arguments regarding the need for discovery lack merit.........................................................31

Conclusion.........................................................................................34

Certificate of compliance ..................................................................35

Addendum ........................................................................................37

# TABLE OF AUTHORITIES

**Cases:**                                                          **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) .................................. 4-5, 9-11, 13, 17-18

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
591 U.S. 430 (2020) ...................................................18-19

*Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.,*
810 F. App'x 8 (D.C. Cir. 2020).............................................31

*Am. Library Ass'n, Inc. v. United States,*
201 F. Supp. 2d 401 (E.D. Pa. 2002), *rev'd,*
539 U.S. 194 .........................................................32

*Americans for Prosperity Foundation v. Bonta,*
594 U.S. 595 (2021) ....................................................5-6, 8, 14,
19-21, 23-25, 28

*Bull v. United States,*
295 U.S. 247 (1935) ............................................................11

*Citizens United v. FEC,*
558 U.S. 310 (2010) ............................................................19

*Doe v. Reed,*
561 U.S. 186 (2010) ............................................................25

*Dubuque & Pac. R.R. v. Litchfield,*
64 U.S. (23 How.) 66 (1859) ................................................28

*Fam. Tr. of Mass., Inc. v. United States,*
722 F.3d 355 (D.C. Cir. 2013) ..............................................30

*FCC v. Beach Comm'ns, Inc.,*
508 U.S. 307 (1993) ............................................................31

*G.M. Leasing Corp. v. United States,*
429 U.S. 338 (1977) ......................................................11, 33

*McGuire v. Reilly,*
260 F.3d 36 (1st Cir. 2001) .................................................26

*Mobile Republican Assembly v. United States,*
353 F.3d 1357 (11th Cir. 2003).............................................8-9

**Cases (cont'd):**                                                  **Page(s)**

*Ostergren v. Frick,*
856 F. App'x 562 (6th Cir. 2021)..............................................9

*Perry v. Sindermann,*
408 U.S. 593 (1972) ...............................................................24

*Regan v. Taxation with Representation
of Washington,*
461 U.S. 540 (1983) ................................................. 3-11, 14-17,
19-20, 25, 30-32

*Rust v. Sullivan,*
500 U.S. 173 (1991) .................................................................9

*Shelton v. Tucker,*
364 U.S. 479 (1960) ...........................................................23-24

*Tyler v. Hillsdale Cty Sheriff's Dep't,*
837 F.3d 678 (6th Cir. 2016) ..............................................26, 32

*United States v. American Library Association,*
539 U.S. 194 (2003) ...............................................................32

*United States v. Richey,*
924 F.2d 857 (9th Cir. 1991) ..................................................22

*Vill. of Schaumburg v. Citizens for a Better Env't,*
444 U.S. 620 (1980) ...........................................................20, 23

*Wieman v. Updegraff,*
344 U.S. 183 (1952) ...............................................................24

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433 (2015) ...............................................................26

*Ysursa v. Pocatello Educ. Ass'n,*
555 U.S. 353 (2009) ............................................................9, 31

**Statutes:**

Internal Revenue Code (26 U.S.C.):

§ 170(a)(1) ...............................................................................1
§ 501 .....................................................................................30
§ 501(a) ...................................................................................1
§ 501(c).................................................................................30
§ 501(c)(3) .......................... 1-3, 5-17, 21, 23, 25-26, 28-31, 33
§ 501(c)(4) ...................................................3, 10, 15, 17-19

**Statutes (cont'd):**                                         **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 509(a) ...................................................................... 13
§ 509(a)(3)(C) ............................................................ 13
§ 4945(h) ................................................................... 18
§ 4946(a)(1)(A) .......................................................... 13
§ 4958 ........................................................................ 13
§ 4958(c)(1)(A) .......................................................... 13
§ 4958(c)(3)(A) .......................................................... 13
§ 4958(f)(1)(A) ........................................................... 13
§ 6033 ........................................................................ 18
§ 6033(b)(1)-(16) ....................................................... 16
§ 6033(b)(5) ................................................ 2, 6, 8-9, 15-16, 18, 20-21, 23, 25, 27, 32
§ 6103 ..................................................................... 6, 22
§ 6103(a) ................................................................. 6, 21
§ 6104(b) ................................................................. 6, 21
§ 6104(d)(3) ............................................................. 6, 21
§ 7213 .................................................................... 6, 21-22
§ 7431 ..................................................................... 6, 21

Tax Reform Act of 1969, Pub. L. No. 91-172, 83 Stat. 487 ............ 21

**Regulations and Regulatory Materials:**

Treasury Regulations (26 C.F.R.):

§ 1.501(c)(3)-1(b)(4) ................................................... 30
§ 1.501(c)(3)-1(c)(2) .................................................... 30
§ 1.501(c)(3)-1(d)(1)(ii) ................................................ 30
§ 53.4958-3(e)(2)(ii) .................................................... 13

85 Fed. Reg. 31959 (May 28, 2020) ................................... 29

**Miscellaneous:** **Page(s)**

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW (2012) .........28

Kathleen M. Sullivan, *Unconstitutional Conditions*,
102 Harv. L. Rev. 1413 (1989) .................................................9

## INTRODUCTION

Buckeye's response only confirms the District Court's error and underscores the practical problems that would result from approving the District Court's reasoning—which threatens to undermine not only the § 501(c)(3) exemption and deduction framework, but also the Internal Revenue Code's broader use of reporting to promote voluntary compliance with requirements in the conferral of tax benefits. Charitable organizations that obtain tax-exempt status under § 501(c)(3) of the Internal Revenue Code[1] enjoy a highly valuable double subsidy:  they are exempt from federal income tax pursuant to § 501(a), and their contributors may deduct their contributions pursuant to § 170(a)(1), reducing contributors' income tax liability.  This double subsidy amounts to a public investment program to the tune of tens of billions of dollars annually.  That investment promotes both charity and association:  For every dollar donated to amplify a nonprofit's charitable works, a donor may receive a matched subsidy at the applicable income tax rate, which encourages further donations.  That virtuous cycle could break down if the government did not have the information to cross-

---

[1] Statutory references are to the Internal Revenue Code, Title 26.

check substantial contributions and claimed deductions to promote voluntary compliance. Indeed, widespread abuse of § 501(c)(3) status prompted Congress over 50 years ago to enact legislative reforms to increase oversight and facilitate meaningful enforcement of new rules regulating § 501(c)(3) organizations. Yet Buckeye seeks to undermine the integrity of the charitable-exemption-and-deduction framework. This Court should reject Buckeye's attempt to turn back the clock.

To ensure that § 501(c)(3) solely subsidizes the charitable purposes authorized by statute—and does not impermissibly benefit private interests, including an organization's substantial contributors—Congress attached certain express conditions. The organization must report "the total of the contributions and gifts received by it during the year, and the names and addresses of all substantial contributors." § 6033(b)(5). For reporting purposes, an organization's substantial contributors are those who contribute more than $5,000, if such amount is more than 2% of the total annual contributions received. In Buckeye's case (based on its total contributions reported for 2019), that means disclosing only contributors who donated approximately $50,000 or more. (Gov't MTD, RE 21, PageID # 61 n.4.)

This reporting requirement is a condition of a voluntary, opt-in subsidy that ensures § 501(c)(3) organizations operate exclusively for exempt purposes in accordance with congressional intent.  As such, under *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), the only Supreme Court case to consider the constitutionality of a condition on a federal tax subsidy via tax exemption, heightened scrutiny does not apply.  *See* US-Br. 27-32.  Rather such a condition should be upheld so long as it is reasonable and does not reach outside the federal tax-subsidy program.  The substantial-contributor reporting requirement satisfies both criteria (*see* US-Br. 32-39):  It provides a limited, diagnostic snapshot of major donors—*i.e.*, those who could exert significant influence over the organization, engage in impermissible transactions, and separately claim large charitable contribution deductions.  And it reasonably fits the needs associated with the IRS's administration of the § 501(c)(3) tax-subsidy requirements.  *See* US-Br. 33-38.  Indeed, the reporting requirement not only stays within the contours of the § 501(c)(3) regime; it is essential to what makes the regime itself function.  *See* US-Br. 38-39.  The option to create a tax-exempt § 501(c)(4) affiliate with

anonymous donors, moreover, "allow[s] an organization bound by a funding condition to exercise its First Amendment rights outside the scope of the federal program." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219 (2013) (*AOSI I*). In short, the reporting requirement is part of a statutory subsidy framework blessed by *Regan* and confirmed by the Supreme Court in numerous decisions.

Buckeye's response fails to rehabilitate the District Court's erroneous application of exacting scrutiny. Buckeye mischaracterizes Supreme Court precedent, misunderstands how the requirements of the Internal Revenue Code work together, and severely misstates the implications of the Government's position defending this decades-old requirement—while papering over the problematic implications of Buckeye's own position.

To start, Buckeye wrongly asserts that the substantial-contributor reporting requirement "must overcome heightened scrutiny because it does not regulate how federal funds are used." Resp-Br. 37. That misunderstands the law and facts twice over. First off, with respect to the unconstitutional conditions doctrine, neither *Regan* nor any other Supreme Court decision requires heightened scrutiny merely because a

condition does not regulate the use of funds. Instead, *Regan* applied rational-basis review. 461 U.S. at 545-47. Indeed, the rule that Buckeye purports to derive from *Regan* cannot even explain the outcome in *Regan*: the condition against lobbying in *Regan* was placed on the § 501(c)(3) organization's overall operations, and not limited to specific funds and contributions exempted from taxation (and thus subsidized by the Government). Instead, a reasonable condition is lawful if it does not "regulate speech outside the contours of the program itself." *AOSI I*, 570 U.S. at 215. Moreover, even if this were the standard, the requirement *does* regulate how funds are used, because it gives effect to prohibitions on operations. The reporting requirement is the glue of a framework designed to ensure that tax subsidies are not misused for purposes other than the public good—and that the government's public investment program does not risk breaking down.

Buckeye also repeats the District Court's mistake of sidelining *Regan*'s analysis in favor of the exacting-scrutiny standard for compelled disclosures set forth in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) (*AFP*). *See* US-Br. 40-53. Buckeye largely

ignores that California's compelled disclosure regulation at issue in *AFP* (which required disclosure for nonprofits to exercise their constitutionally protected right to solicit charitable contributions) is critically different from the voluntary, opt-in § 501(c)(3) tax subsidy. And Buckeye cannot wave away the fact that *AFP* not only took pains to distinguish § 6033(b)(5)'s reporting requirement as a "condition of federal tax-exempt status," but also noted that "revenue collection efforts and conferral of tax-exempt status may raise issues not presented by California's disclosure requirement, which can prevent charities from operating in the State altogether." 594 U.S. at 618 (citing *Regan*, 461 U.S. at 545). Moreover, unlike the state regulation requiring disclosure in *AFP*, the substantial-contributor reporting requirement is guarded by § 6103's strict prohibition on wrongful disclosure, carrying with it potential civil liability and criminal prosecution and imprisonment. I.R.C. §§ 6103(a), 6104(b) & (d)(3), 7213, 7431. Buckeye barely acknowledges the overall statutory framework, instead drawing exaggerated hypotheticals that bear no relation to this situation. *See, e.g.*, Resp-Br. 20, 50-53.

Even if Buckeye were correct that exacting scrutiny applies, the substantial-contributor reporting requirement is constitutional as a matter of law because it is substantially related to the important government interests of revenue collection and enforcement of the critical § 501(c)(3) statutory restrictions against misuse of charitable contributions. *See* US-Br. 53-65. The statutory framework, Congressional findings, legislative history, and declarations of IRS officials confirm the tight relationship between substantial-contributor information and compliance with the broader § 501(c)(3) regime, which is of undisputed importance.

Finally, Buckeye's arguments regarding the need for discovery even under *Regan* are meritless, because the Government need only show a rational basis to justify Congress's decision to place a condition on the tax subsidy. *Regan* itself confirms that evidentiary inquiries are unnecessary to uphold facially rational tax-subsidy conditions.

## ARGUMENT

**A.** **Rational-basis review is the proper level of scrutiny for this federal tax subsidy, which is reasonable and does not reach outside the tax-subsidy program**

    **1.** **Consistent with *Regan*, the § 6033(b)(5) reporting requirement is a condition subject to rational-basis review**

*Regan*'s rational-basis review applies as the only Supreme Court case to consider a condition on a federal tax exemption/subsidy. Because the reporting requirement is a condition on congressionally granted subsidies, this case falls squarely under *Regan*, which unlike *AFP* (*see*, below, §B) dealt directly with the § 501(c)(3) tax subsidy. *See Regan*, 461 U.S. at 543-45; *AFP*, 594 U.S. at 618 (citing *Regan*, 461 U.S. at 545); *see also Mobile Republican Assembly v. United States*, 353 F.3d 1357, 1361 (11th Cir. 2003) (*Regan* governed First Amendment challenge because Congress did not bar "the exercise of the appellees' constitutional rights" but "established certain requirements that must be followed in order to claim the benefit of a public tax subsidy").[2] *See* US–Br. 27-32.

---

[2] Buckeye contends (Resp-Br. 48) that *Mobile Republican* is inapposite because it was an Anti-Injunction Act case. But the court relied on *Regan* to conclude that the reporting requirement at issue

(continued…)

Moreover, like the lobbying requirement in *Regan*—the substantial-contributor reporting requirement is a reasonable condition on a tax subsidy that does not reach beyond the limits of the § 501(c)(3) framework. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359-360 (2009) (citing *Regan* and reasoning that "the State need only demonstrate a rational basis to justify" the prohibition at issue); *Rust v. Sullivan*, 500 U.S. 173, 197 (1991); *AOSI I*, 570 U.S. at 217; *Ostergren v. Frick*, 856 F. App'x 562, 571 (6th Cir. 2021); US-Br. 32-39. Rather, the reporting requirement permissibly "define[s] the federal program" of § 501(c)(3) and has a strong nexus to that tax subsidy. *See AOSI I*, 570 U.S. at 214-17 (citing *Regan* among examples of such conditions).

Section 6033(b)(5) is directly relevant to the Government's interest in determining whether § 501(c)(3) organizations are improperly benefiting individuals wielding major influence over the organization, and the propriety of deductions for individual contributions. *See* US-Br. 34-37, 57-58; *see generally* Kathleen M. Sullivan, *Unconstitutional*

---

there was a "condition[] upon the receipt of a voluntary tax subsidy." *Mobile Republican*, 353 F.3d at 1359. Because it *was* such a condition and was therefore part of the tax scheme, the Anti-Injunction Act prohibited the lawsuit. Similarly, here, *Regan* applies to the § 6033(b)(5) condition. *See Mobile Republican*, 353 F.3d at 1359.

*Conditions*, 102 Harv. L. Rev. 1413, 1457 (1989) ("[t]he more germane a condition to a benefit, the more deferential the review").

The reporting requirement does not reach outside the scope of § 501(c)(3)'s tax-subsidy program because the requirement applies only to organizations described in § 501(c)(3) (and even then, applies only to the biggest donors, with the most power over an organization and the largest charitable deductions). Further, as in *Regan*, organizations that wish to avoid the reporting requirement can refrain from obtaining § 501(c)(3) status or operate with a § 501(c)(4) affiliate, which would not be required to report substantial contributors. *See* US-Br. 38-39. They can therefore associate anonymously and "exercise [their] First Amendment rights outside the scope of the federal program." *AOSI I*, 570 U.S. at 219.

Buckeye's contrary broad-brush arguments are incorrect. To start, Buckeye argues (Resp-Br. 29) that "[f]unding conditions receive lower scrutiny only when they limit how federal funds are used." Tellingly, Buckeye cannot point to any binding precedent saying that. Instead, "the relevant distinction ... is between conditions that define the limits of the government spending program—those that specify the

activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *AOSI I*, 570 U.S. at 214-215.

Although, in some cases, "[t]he line is hardly clear," *id.* at 215, the reporting requirement at issue here does not regulate speech outside of the § 501(c)(3) program. It simply promotes compliance with Congress's decision not to subsidize activities beyond the scope of § 501(c)(3). As *Regan* indicates, to evaluate a challenge to a tax subsidy condition, "it is necessary to understand the effect of the tax exemption system enacted by Congress." 461 U.S. at 544. The reporting requirement is just an example of how the Internal Revenue Code works: such requirements are part-and-parcel of tax benefits themselves because our system largely functions on a system of "voluntary compliance in the collection of taxes" given that their "prompt and certain availability [is] an imperious need." *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350 (1977) (quoting *Bull v. United States*, 295 U.S. 247, 259 (1935)).

To understand why the reporting requirement is part of the § 501(c)(3) operating system (rather than stretching beyond it), consider the broader framework. Every qualifying gift to a § 501(c)(3) is

effectively a shared transaction between the donor, the organization, and all taxpayers (*i.e.*, the government). The organization receives money from the donor and a matching tax exemption from the government; the donor gives money to the organization and receives a matched deduction (at the applicable income tax rate) from the government. For any such system to function smoothly, the entity making the matched subsidies (here, the government) must have the information available to be able to verify both ends of the matching. Because the IRS can audit only a limited number of returns, the reporting requirement promotes trust (voluntary compliance) in what is necessarily a "trust, but verify" system. Without the requirement, that system turns into "trust, don't verify."

Put another way, even if Buckeye were correct that lesser scrutiny applies only when a condition "limits how federal funds are used" (*see* Resp-Br. 29), the substantial-contributor reporting requirement *does* in effect limit how funds are used by organizations like Buckeye that receive § 501(c)(3) tax subsidies. Buckeye concedes (Resp-Br. 38) that § 501(c)(3) requires organizations to ensure that funding does not inure "to the benefit of private shareholders or individuals," and that this

condition, among others, "ensures that federal funds will not be used for ... prohibited purposes." *AOSI I*, 570 U.S. at 218.  And numerous Code provisions related to § 501(c)(3) compliance rely on substantial-contributor information, including: informing whether the organization is classified as a public charity, and not a private foundation (§§ 509(a); 170(b)(1)(A)(vi); 4946(a)(1)(A)); determining whether § 4958 excise taxes for "excess benefit transactions" are owed (§§ 4958(c)(1)(A), (c)(3)(A) & (B), (f)(1)(A); Treas. Reg. § 53.4958-3(e)(2)(ii)); and determining whether an organization might be classified as a "supporting organization," which is barred if the charity is controlled directly or indirectly by a "disqualified person," including a "substantial contributor" (§§ 509(a)(3)(C), 4946(a)(1)(A)).  *See* US-Br. 34-37, 57.

These interconnected laws demonstrate that the substantial-contributor reporting requirement is a condition of § 501(c)(3) tax-exempt status and a critical requirement for ensuring that these tax subsidies are used for permissible purposes.  *See* § 501(c)(3) (entities must be "organized and operated exclusively" for exempt purposes).  It applies only to organizations described in § 501(c)(3) and required to file a Form 990 series return, part of which, for covered organizations, is

the requirement to report substantial contributors on Schedule B. It is thus a condition on tax subsidies that does not regulate any speech beyond the contours of the § 501(c)(3) program—exactly what *Regan* upheld.

Buckeye misses the important nexus between substantial-contributor information and the Government's administration of the § 501(c)(3) regime, implicating issues of "revenue collection efforts and conferral of tax-exempt status." *AFP*, 594 U.S. at 618. Such a nexus is absent in Buckeye's inapt comparison between the substantial-contributor reporting requirement and a hypothetical law granting "federal funds for lobbying" but "restrict[ing] funds to only those applicants who agree not to attend church." (Resp-Br. 20.) Along the same lines, Buckeye's statement that "[t]here is no general rule that conditions directly related to voluntary tax benefits receive lower scrutiny" (Resp-Br. 46) misses the mark. The fact that the reporting requirement is a condition related to a voluntary tax benefit takes it out of *AFP*'s ambit (concerning conditions constraining the exercise of constitutional rights).

## 2. Buckeye's attempt to limit *Regan*'s application is unavailing

1.      Buckeye contends (Resp-Br. 31-37) that *Regan*'s holding is limited to subsidies dictating how federal funds are used.  This is not what *Regan* held, but in any event, § 6033(b)(5) would meet Buckeye's fabricated test.  In addition to the points discussed above, Buckeye ignores that *Regan* upheld a condition on a tax subsidy that, though activity-based, was nevertheless imposed upon the organization as a whole.  Put another way, whether the organization as a whole could obtain § 501(c)(3) status—which implicates multiple limitations on the organization, operations, and other compliance requirements to further exempt purposes—was conditioned on its refraining from substantial lobbying with *any* substantial funds (not just to the extent of the tax-exemption subsidy).  And Section 501(c)(3) did not bar the organization from engaging in lobbying—it could do so either by becoming a Section 501(c)(4) organization as a whole, or else "returning to the dual structure it used in the past."  *Regan*, 461 U.S. at 544.

It would be odd if Congress could, with a tax-exemption condition, decline to subsidize an organization's lobbying but could not require an organization's limited disclosure of substantial contributors to show

compliance. *Regan*'s analysis is not limited to activities only, as opposed to other reasonable conditions on § 501(c)(3) status that define the exemption system, such as a reporting requirement. *See generally* § 6033(b)(1)-(16), (j). Each of the conditions on § 501(c)(3) status ensure that such organizations are "operated exclusively" for exempt purposes. *See* § 501(c)(3); *Regan*, 461 U.S. at 543. Regardless of whether the condition is a bar on the ability to engage in substantial lobbying as a § 501(c)(3) organization, as in *Regan*, or a reporting requirement that attaches to § 501(c)(3) status, it is still a condition on the § 501(c)(3) tax subsidy. An organization may avoid having to comply with the condition by declining the subsidy.

2. As in *Regan*, Congress imposed the substantial-contributor reporting condition as a condition for the § 501(c)(3) tax subsidy. Applying the reasoning of *Regan* to the § 6033(b)(5) requirement: the system Congress has enacted provides subsidies to nonprofit civic welfare organizations generally, and an additional subsidy to those charitable organizations that satisfy the § 501(c)(3) requirements, including reporting their substantial contributors, and to the substantial contributors themselves in the form of a tax deduction. This

represents a congressional choice, based on the pre-reporting experience that the § 501(c)(3) exemption was being abused. Therefore, "Congress chose not to subsidize" organizations that do not satisfy § 501(c)(3) requirements—including the substantial-contributor reporting requirement—"as extensively as it chose to subsidize" organizations that satisfy those requirements. *Regan*, 461 U.S. at 544. In other words, an organization is not denied any "independent benefit" should it choose to forgo the subsidy of § 501(c)(3) status. *Id.* at 545.

Much like in *Regan*, a § 501(c)(4) affiliate could be created that is not subject to the condition. Buckeye dismisses (Resp-Br. 42-46) this option as allowing only the separate § 501(c)(4) entity to associate anonymously. But *AOSI I*'s discussion of *Regan* could hardly be clearer: By adopting "a 'dual structure,'" *i.e.*, "separately incorporating as a § 501(c)(3) organization and § 501(c)(4) organization—the nonprofit could continue to claim § 501(c)(3) status for its [exempt] activities, while attempting to influence legislation in its § 501(c)(4) capacity with separate funds." 570 U.S. at 215 (quoting *Regan*, 461 U.S. at 544). When that option exists, a condition on a tax subsidy does "not deny the organization a government benefit on account of" any constitutionally

protected interest. *Id.* (internal quotation marks omitted). At issue here is not whether Buckeye's substantial contributors can associate anonymously *while receiving tax deductions* for their donations, for there is no such right. Rather, the question is whether their *right to associate* is infringed. A § 501(c)(4) affiliate would permit Buckeye's supporters to donate (*i.e.*, to associate with other like-minded persons) without being subject to the substantial-contributor reporting requirement, alleviating any potential burden on associational rights. The Government would no longer doubly subsidize their association with charitable contribution deductions, but they could associate nonetheless.[3]

Buckeye also argues that *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.* (*AOSI II*), 591 U.S. 430 (2020), "forecloses the government's affiliate argument." (Resp-Br. 45.) But *AOSI II* did not

---

[3] One amicus asserts that, without deductions, there would be "reduced giving overall and no giving from private foundations and donor advised funds, which are generally limited to making grants only to other 501(c)(3) organizations." (Found. Indiv. Rts. Am. 28.) This statement is not entirely accurate, and any such concern is not due to § 6033(b)(5), but rather expenditure-responsibility requirements under § 4945(h) and grant-reporting requirements under other § 6033 provisions.

purport to reject *Regan*'s on-point discussion of § 501(c)(4) dual structure (as reaffirmed in *AOSI I*). Rather, the Court merely pointed to *Regan* in response to the plaintiffs' argument regarding speech "misattribution," reasoning that "*as relevant here*, that case simply explained that a speech restriction on a corporate entity [does] not prevent a separate affiliate from speaking." *AOSI II*, 591 U.S. at 437 (citing *Regan*, 461 U.S. at 544-45 & n.6) (emphasis added). And *AFP* indicates that such analyses are distinct from ones concerning "revenue collection efforts and conferral of tax-exempt status." 594 U.S. at 618 (citing *Regan*, 461 U.S. at 545). Thus, *AOSI II* does nothing to undermine *Regan's* and *AOSI I*'s statements that the option to create a § 501(c)(4) affiliate alleviates any potential constitutional burden.

Buckeye's reliance on *Citizens United v. FEC,* 558 U.S. 310 (2010), also fails. For one thing, *Citizens United* involved an outright "ban on corporate speech." *Id.* at 337. For another, the exception (forming a PAC) was "burdensome" because "they are expensive to administer and subject to extensive regulations." *Id.* at 337-38. Formation of a § 501(c)(4) affiliate, on the other hand, is not "unduly burdensome." *Regan,* 461 U.S. at 544 n.6.

**B.   Exacting scrutiny does not apply because the substantial-contributor reporting requirement is not a compelled disclosure**

Buckeye and the District Court err in sidelining *Regan* in favor of *AFP*.  To be sure, *AFP* involved the same donor information as § 6033(b)(5).  But the similarities end there.  California's requirement was a compelled disclosure, where the cost of noncompliance was a bar on all operations and soliciting of contributions in California. *AFP*, 594 U.S. at 618.  This was critical because the Court emphasized that charities have a First Amendment right to solicit contributions. *Id.* (citing *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 633 (1980)).  This is categorically different from the § 6033(b)(5) requirement, which is a condition of a voluntary, opt-in tax subsidy, not a compelled disclosure.

**1.   Buckeye downplays key distinctions between *AFP* and this case**

In *AFP*, the Court expressly distinguished the tax context.  594 U.S. at 618 (citing *Regan*, 461 U.S. at 545).  And the Court emphasized that the California requirement "can prevent charities from operating in the State altogether." *Id.*  Buckeye downplays this statement (Resp-Br. 29 n.3) based on its placement in the opinion's analysis section.  But

the fact that the Court observed that "revenue collection efforts and conferral of tax-exempt status," *AFP*, 594 U.S. at 618, present different issues than the California law renders *AFP* distinguishable generally.

Moreover, the purpose of California's regulation was to police charitable fraud, not to confer a tax benefit. The regulation at issue in *AFP* required organizations, when renewing their registrations with the Attorney General, to file copies of their Forms 990 and required schedules. The requirement was not part of California's tax law and was not linked to any California tax benefit. *See AFP*, 594 U.S. at 612.

By contrast, Congress imposed § 6033(b)(5) expressly as part of the § 501(c)(3) tax exemption framework (and to overhaul that framework after observing widespread abuse). Tax Reform Act of 1969, Pub. L. No. 91-172, §§ 101, 201, 83 Stat. 487, 520, 549. And, importantly, the reporting requirement operates within the rigid confines of civil damages or even potential criminal penalties and imprisonment in the event of wrongful disclosure. *See* §§ 6103(a), 6104(b) & (d)(3), 7213, 7431. No such statutory prohibition and protections existed in *AFP*.

Buckeye (in its factual background, *see* Resp-Br. 11-13) and its amici try to undercut the impact of § 6103 protections by identifying certain instances of unauthorized disclosure that (although highly unfortunate) can best be described as outliers. As noted (US-Br. 60 n.11) with respect to the 14 known disclosures of contributor information since 2010, an average of one public disclosure per year out of the more than 200,000 Forms 990 filed annually actually demonstrates the efficacy of the IRS's confidentiality provisions. Buckeye references other leaks, but there is no indication that those other leaks involved substantial-contributor information specifically. And, again, wrongful disclosure of return information can result in severe consequences, including criminal prosecution. *See, e.g.*, *United States v. Richey*, 924 F.2d 857, 861, 863 (9th Cir. 1991) (upholding conviction under § 7213).

**2. Despite Buckeye's attempts to frame it as such, the substantial-contributor reporting requirement is not a compelled disclosure**

Buckeye's argument for exacting scrutiny hinges on the incorrect premise that the substantial-contributor reporting requirement is a compelled disclosure. California's regulation (unlike the requirement

here) was a compelled disclosure because it gave charitable organizations the Hobson's choice of disclosing information or being prohibited from operating in California at all—including soliciting funds. *See AFP*, 594 U.S. at 601-02; *see also id.* at 618 (citing *Schaumburg*, 444 U.S. at 633). By contrast, the § 501(c)(3) tax exemption is wholly voluntary. Charities that do not opt into the § 501(c)(3) regime are free to operate and solicit funds regardless of whether they satisfy the reporting requirements of § 501(c)(3). Thus, § 6033(b)(5) is critically different from the compelled disclosure in *AFP*.

Similarly, Buckeye incorrectly claims that the substantial-contributor reporting requirement is comparable to the compelled disclosures at issue in *Shelton v. Tucker*, 364 U.S. 479 (1960) (Resp-Br. 28). In *Shelton*, an Arkansas statute required public school teachers to disclose all organizations to which they belonged or supported. *Id.* at 480. There were no restrictions on the public disclosure of the teachers' information. The Court held that the state "statute's comprehensive interference with associational freedom goes far beyond what might be justified in the exercise of the State's legitimate inquiry into the fitness and competency of its teachers." *Id.* at 490.

*Shelton* differs from this case not only in the "completely unlimited" scope of the compelled disclosures at issue there (which went far beyond administering a government program), but also because the teachers were being denied a benefit because of their associations. *See AFP*, 594 U.S. at 610-11. Moreover, the consequences of "opting out" of employment are materially different from those of opting out of a tax subsidy. *See, e.g.*, *Wieman v. Updegraff*, 344 U.S. 183, 190-91 (1952).

*Perry* likewise involved the denial of the benefit of public employment (there, as a professor) based on the plaintiff's exercise of his First Amendment freedom. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The Court observed that a government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Id.* The Court reaffirmed prior holdings, including *Shelton*, in which "this Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights." *Id.* at 597-98.

This case does not fit within the scope of *Shelton* and *Perry*. The reporting requirement is obviously far more limited in scope. It is

critical to a public subsidy/investment framework. And the Court in *Regan*, 461 U.S. at 545, reasoned that the case did not fall within *Perry*'s scope because the organization was not being denied an independent benefit on account of its intention to lobby. Similarly, § 6033(b)(5)'s reporting requirement does not deny organizations an independent benefit, because they could decline the tax subsidy and instead operate as taxable organizations not subject to the § 501(c)(3) reporting requirements.

**C.** **Even if an exacting-scrutiny analysis applied, the substantial-contributor reporting requirement should be upheld as a matter of law**

Exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *AFP*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). The substantial-contributor reporting requirement substantially relates to the important government interests of collecting revenue and enforcing the Code's charitable-exemption laws (which no one disputes are critically important). US-Br. 56-64.

To satisfy heightened scrutiny, "the government can rely on a wide range of sources, including legislative history, empirical evidence,

case law, and even common sense." *Tyler v. Hillsdale Cty Sheriff's Dep't*, 837 F.3d 678, 693-94 (6th Cir. 2016) (discussing how the government can satisfy intermediate scrutiny); *accord Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452-57 (2015) (Florida judicial canon satisfies narrow tailoring (under strict scrutiny) based on canon itself, its purpose, relevant case law, and state law); *McGuire v. Reilly*, 260 F.3d 36, 48-49 (1st Cir. 2001) (applying intermediate scrutiny and finding narrow tailoring of a state law based on the act's stated purpose and legislative history).

Here, the statutory framework, congressional findings when the law was enacted, and declarations of IRS officials submitted below are more than enough to show a substantial relationship between the challenged reporting requirement and the government's important interest in preventing abuse of the § 501(c)(3) exemption. *See* US-Br 58 n.10.

As noted above, the reporting requirement is more than substantially related to the overarching public subsidy/investment framework; it is effectively the glue of that framework. Potential substitutes for the requirement proved inadequate. Individual

taxpayers' Forms 1040 do not provide substantial-contributor information.[4] And other Form 990 attachments, such as Schedule L, would not capture the identities of substantial contributors or amounts contributed. Any alternative that precludes the IRS from obtaining substantial-contributor information until it opens an examination of an organization is insufficient because that information helps the IRS to identify which organizations warrant examination in the first place (and, more importantly given the IRS's limited resources, promotes voluntary compliance). US-Br. 55.[5] Buckeye does not challenge that showing—it merely uses it as a jumping-off point for hypotheticals that are strikingly different from the actual law at issue. (Resp-Br. 50-51.)

Buckeye claims (Resp-Br. 55-57) that the Government's reliance on the evident purposes behind Congress's enactment of § 6033(b)(5) is insufficient to prove adequate tailoring under an exacting scrutiny

---

[4] Currently, taxpayers are required to report total amounts of cash and non-cash "gifts to charity" on Schedule A to Form 1040, but are generally not required to report the names of recipient organizations.

[5] Amicus Tax Law Center at NYU provided helpful data regarding resource constraints, noting that "[e]ven a one-percentage point decline in voluntary compliance would cost the government over $45 billion a year." (NYU-Am-Br. 8.)

analysis.  But by relying on *AFP*, Buckeye fails to undercut the

Government's argument based on the unique nature and background of

the § 501(c)(3) substantial-contributor reporting requirement (US-Br.

53-64), much less render it "frivolous" (Resp-Br. 57).  Although the

Court in *AFP* considered evidence concerning California's actual use of

Schedule B information, the Court's opinion does not expressly require

extrinsic evidence (particularly with respect to a voluntary compliance

regime).  And unlike the state regulation in *AFP*, here the federal

statute is supported by congressional commentary regarding the

rampant abuse of the charitable exemption giving rise to the 1969

implementation of the substantial-contributor reporting requirement,

as well as the connection between this information and the framework

of requirements for § 501(c)(3) organizations.  *See* US-Br. 34-37, 57.[6]

In any event, the record already contains evidence concerning how

the federal government uses Schedule B information.  The declarations

submitted below illustrate that Schedule B information is useful in the

---

[6] Legislative history can properly "reflect ... the facts in existence when the law was enacted."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 372 (2012) (citing, *e.g.*, *Dubuque & Pac. R.R. v. Litchfield*, 64 U.S. (23 How.) 66, 87-88 (1859)).

course of selecting returns for audit and identifying audit issues. (*See* Brinkley Decl., RE 43-1, PageID # 499-506; Gonzalez Decl., RE 43-9, PageID # 653-657.) IRS specialists are trained to and regularly use Schedule B information in assessing whether public charities should be reclassified as private foundations, and specialists are often asked to confirm whether contributions from particular donors appear on Schedule B. (*See* Vera Decl., RE 43-8, PageID # 650-652.) This ability to cross-check encourages voluntary compliance and discourages taxpayers from claiming large charitable deductions that they did not make.

Moreover, Buckeye relies mistakenly on the Treasury Department's 2020 elimination of regulations requiring tax-exempt organizations "other than organizations described in section 501(c)(3)" to report substantial contributors. 85 Fed. Reg. 31959, 31963 (May 28, 2020). Buckeye and amici argue that this reversal indicates that the reporting requirement is not needed for § 501(c)(3) organizations. *See* Resp-Br. 58. But Treasury distinguished § 501(c)(3) organizations. *See* 85 Fed. Reg. at 31964; *see generally* 85 Fed. Reg. at 31959-31969. And

nothing in Treasury's analysis undermines Congress's decision that § 501(c)(3) organizations should be treated differently.

That distinction makes sense. As an initial matter, § 501(c)(3) organizations have stricter, more clearly defined rules than other § 501(c) organizations. *See* Treas. Reg. § 1.501(c)(3)-1(b)(4), (c)(2), (d)(1)(ii); *see also, e.g.*, *Fam. Tr. of Mass., Inc. v. United States*, 722 F.3d 355, 359 (D.C. Cir. 2013). Plus, those other organizations do not partake in a double-subsidy, matched investment framework in the tens of billions of dollars annually. Because exempt organizations outside § 501(c)(3) often do not receive tax-deductible donations and/or have different purposes than promoting the public good, and/or participate in bespoke smaller-scale programs, the concerns motivating the reporting requirement are minimized or wholly absent with respect to such organizations.[7] The Treasury Department's action with respect to those materially distinguishable organizations does not undermine Congress's judgment as to § 501(c)(3) organizations.

---

[7] Tellingly, the only specific example Buckeye provides of a § 501 organization (outside of § 501(c)(3)) that enjoys a double subsidy is a specialized program for veterans' organizations. *See Regan*, 461 U.S. at 550-51 (discussing such organizations).

**D.    Buckeye's arguments regarding the need for discovery lack merit**

Under rational-basis review, the Supreme Court has stated that "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307, 315 (1993) (rational-basis review in context of due process and equal protection challenges). Oddly, Buckeye suggests that when *Regan* applies, it does not require rational-basis review. According to Buckeye (Resp-Br. 62 & n.7), this is because "*Regan* mentions rational-basis review once when discussing the Equal Protection Clause." But that is only because *Regan* rejected the First Amendment challenge to the tax subsidy at issue without conducting *any* means-end balancing. *See* 461 U.S. at 544-46. Because the Court later stated that Congress's condition was "not irrational," *id.* at 550, the United States has assumed that *Regan* evaluated the "reasonableness" (Resp.-Br. 22, 62) of the § 501(c)(3) restriction on lobbying in the context of a rational-basis analysis, *see also Ysursa*, 555 U.S. at 359 (citing *Regan*, 461 U.S. at 546-551); *Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.*, 810 F. App'x 8, 10 (D.C. Cir.

2020) (citing *Regan*, 461 U.S. at 547-548). So *Regan*'s mode of analysis clearly does not support Buckeye's view that discovery is needed.

Because the rational basis for the substantial-contributor requirement is evident from the statutory framework and fully supported by the legislative history, the Government is entitled to judgment as a matter of law.

Buckeye's reliance (at 62) on *United States v. American Library Association*, 539 U.S. 194 (2003) is also unavailing. A full trial was held in *American Library Association* because it was unclear to what extent computer "filtering software" blocked constitutionally protected speech. *Am. Library Ass'n, Inc. v. United States*, 201 F. Supp. 2d 401, 408 (E.D. Pa. 2002), *rev'd*, 539 U.S. 194.

Here, by contrast, Buckeye wants a trial to explore how the Government uses the information required by § 6033(b)(5). But proof of usage is not necessary given the statutory framework, specific congressional findings at the time of enactment that narrower alternatives were "inadequate," and the tie between this requirement and various other provisions in the Code. *See Tyler*, 837 F.3d at 693-694; US-Br. 61-64; *supra*, §A.1. Discovery is also not needed to confirm

the overarching tax policy of "voluntary compliance," which this requirement indisputably encourages. *See G.M. Leasing Corp.*, 429 U.S. at 350.

***

Buckeye's hyperbolic statements about the consequences of upholding this decades-old reporting requirement should not obscure the implications of Buckeye's position. Accepting that position will not only undermine the § 501(c)(3) framework; it will call into question the government's overarching ability to promote voluntary compliance with subsidy conditions using basic reporting requirements. Congress should not be disincentivized from providing a multi-billion-dollar subsidy/investment framework that *promotes* association based on the unavailability of a reporting requirement that, while modest in scope, is critical to the integrity of the system.

## CONCLUSION

The order of the District Court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
MICHAEL WEISBUCH
  *Senior Counsel*
  *Office of the Associate Attorney General*

/s/ *Marie E. Wicks*

JENNIFER M. RUBIN          (202) 307-0524
MARIE E. WICKS            (202) 307-0461
  *Attorneys*
  *Tax Litigation Branch*
  *Civil Division*
  *U.S. Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

FEBRUARY 27, 2026

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

    1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X]   this document contains <u>6,082</u> words, **or**

    [ ]   this brief uses a monospaced typeface and contains <u>     </u> lines of text.

    2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

    [ ]   this brief has been prepared in a monospaced typeface using <u>              </u> with <u>          </u>.

(s)  <u>/s/ *Marie E. Wicks*</u>

Attorney for  <u>the United States</u>

Dated:  <u>February 27, 2026</u>

# CERTIFICATE OF SERVICE

It is hereby certified that on February 27, 2026, the foregoing reply brief was electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Marie E. Wicks
MARIE E. WICKS
*Attorney*

## ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

### Pursuant to Sixth Circuit Rule 30(g)

| Record Entry No. | Description | Page ID Range |
|---|---|---|
| 21 | Government's Motion to Dismiss | 56-85 |
| 43-1 | Lynn A. Brinkley Declaration | 499-506 |
| 43-8 | Rogelio Vera Declaration | 650-652 |
| 43-9 | Adrian F. Gonzalez Declaration | 653-657 |